Daniel Alberstone (SBN 105275)
dalberstone@baronbudd.com
Roland Tellis (SBN 186269)
rtellis@baronbudd.com
Mark Pifko (SBN 228412)
mpifko@baronbudd.com
BARON & BUDD, P.C.
1999 Avenue of the Stars, Suite 3450
Los Angeles, California 90067
Telephone:  (310) 860-0476
Facsimile:   (310) 860-0480

Attorneys for Plaintiffs
LATARA BIAS, ERIC BREAUX,
NAN WHITE-PRICE, and DIANA ELLIS,
individually, and on behalf of other members of
the public similarly situated

# UNITED STATES DISTRICT COURT

## NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| LATARA BIAS, ERIC BREAUX, NAN WHITE-PRICE, and DIANA ELLIS, individually, and on behalf of other members of the general public similarly situated, <br><br> Plaintiffs, <br><br> vs. <br><br> WELLS FARGO & COMPANY, a Delaware corporation, WELLS FARGO BANK, N.A., a national association, J.P. MORGAN CHASE & CO., a Delaware corporation, J.P. MORGAN CHASE BANK, N.A., a national association, and CHASE HOME FINANCE LLC, a Delaware limited liability company, <br><br> Defendants. | Case Number: **CV12 0664** <br><br> **CLASS ACTION** <br> **Jury Trial Demanded** <br><br> **COMPLAINT FOR:** <br><br> (1)  Violations of California's Unfair Competition Law (Cal. Bus. & Prof. Code §§ 17200 *et seq.*); <br><br> (2)  Violations of the Racketeer Influenced and Corrupt Organizations Act (18 U.S.C. § 1962(c)); <br><br> (3)  Violations of the Racketeer Influenced and Corrupt Organizations Act (18 U.S.C. § 1962(d)); and <br><br> (4)  Unjust Enrichment |

CLASS ACTION COMPLAINT

For their complaint against Wells Fargo & Company, Wells Fargo Bank, N.A., J.P. Morgan Chase & Co., J.P. Morgan Chase Bank, N.A., and Chase Home Finance LLC (collectively "Defendants"), Plaintiffs Latara Bias, Eric Breaux, Nan White-Price, and Diana Ellis ("Plaintiffs"), individually, and on behalf of all other members of the public similarly situated, based on information and belief, allege as follows:

## INTRODUCTION AND NATURE OF THE ACTION

1.      This case concerns fraudulent and misleading practices committed by Defendants in connection with their home mortgage loan servicing businesses. Together, Defendants service almost 20 million loans, approximately 25% of the total number of loans in the United States. Using an automated mortgage loan management system and an enterprise of subsidiaries and inter-company departments and divisions, Defendants have engaged in a scheme to fraudulently conceal their unlawful assessment of improperly marked-up or unnecessary fees for default-related services, cheating borrowers who can least afford it.

2.      When home mortgage borrowers get behind on their payments and go into "default," lenders conduct various default-related services, purportedly designed to protect the lender's interest in the property. However, lenders are not permitted to mark-up the fees for such services to earn a profit. Nor are lenders permitted to assess borrowers' accounts for default-related service fees that are unreasonable and unnecessary. Nevertheless, as discussed in detail below, using false pretenses to conceal the truth from borrowers, that is precisely what Defendants do.

3.      In effect, to generate hearty profits, Defendants have substituted inflated interest rates with inflated fees. Defendants formed enterprises -- associations of subsidiaries and affiliated companies -- and designed schemes to disguise hidden mark-ups, and unnecessary fees so that they could earn additional, undisclosed profits. Through these unlawful enterprises, Defendants mark-up the fees charged by vendors, often by 100% or more, and then, without disclosing the mark-up, assess borrowers' accounts for the hidden profits. In connection with their schemes, Defendants also have a practice of

routinely assessing fees for default-related services, even when they are unnecessary and inappropriate.  Employing this strategy, Defendants are able to quietly profit from default-related service fees at the expense of struggling consumers.  Indeed, in the fourth quarter of 2011 alone, defendant Wells Fargo & Company saw a 20% increase in profits.[1]

4.     Many borrowers reasonably believe the lender from whom they obtained their mortgage will hold and service their loan until it is paid off.  Instead, through relatively recent mortgage industry practices, such as securitization and the sale of mortgage backed securities, that is often not the case.  In today's market, loans and the rights to service them are bought and sold at will, multiple times over.  Because banks like Defendants who service loans do not profit directly from interest payments made by borrowers, rather than ensuring that borrowers stay current on their loans, Defendants are more concerned with generating revenue from fees assessed against the mortgage accounts they service.  According to one member of the Board of Governors of the Federal Reserve System, "a foreclosure almost always costs the investor [who owns the loan] money, but [it] may actually earn money for the servicer in the form of fees."[2]

5.     Banks like Defendants see opportunity where investors see failure because borrowers are captives to companies who service their loans.  Accordingly, when borrowers go into default and Defendants unilaterally decide to perform default-related services, borrowers have no option but to accept Defendants' choice of providers.

6.     Taking advantage of these circumstances, the Wells Fargo defendants and Chase defendants each formed enterprises with their respective subsidiaries and affiliates, and then, developed a uniform practice of unlawfully marking up default-related service

---

[1] *See* Ben Protess, New York Times, *Wells Fargo Profit Rose 20% in Fourth Quarter*, Jan. 17, 2012, available at http://dealbook.nytimes.com/2012/01/17/wells-fargo-fourth-quarter-profit-up-20/ (last visited Jan. 17, 2012).

[2] *See* Sarah Bloom Raskin, Member Board of Governors of the Federal Reserve System, *Remarks at the National Consumer Law Center's Consumer Rights Litigation Conference*, Boston Massachusetts, Nov. 12, 2010, available at www.federalreserve.gov/newsevents/speech/raskin20101112a.htm (last visited Jan. 23, 2012).

CLASS ACTION COMPLAINT

1   charges assessed against borrowers' accounts so that Defendants can earn undisclosed

2   profits in connection with these services.  Defendants' marked-up fees violate borrowers'

3   mortgage agreements because the fees exceed the actual cost of the services, and

4   therefore, they are not, as the mortgage agreements require, "reasonable" or "appropriate"

5   to protect the note holder's interest in the property.

6       7.    Defendants are aware that it is improper to mark-up the fees assessed on

7   borrowers' accounts for default-related services.  Therefore, Defendants fraudulently

8   conceal these fees on borrowers' accounts, omitting any information about Defendants'

9   additional profits, by identifying them on mortgage statements only as "Other Charges,"

10  "Other Fees," "Miscellaneous Fees," or "Corporate Advances."

11      8.    The rampant abuses by mortgage servicers like Defendants, has led federal

12  regulators to enter into numerous Consent Orders, but according to Mark Pearce, Director,

13  Division of Depositor and Consumer Protection, Federal Deposit Insurance Corporation,

14  "these consent orders do not fully identify and remedy past errors in mortgage-servicing

15  operations of large institutions; in fact, the scope of the interagency review did not

16  include a review of . . . the fees charged in the servicing process.  Much work remains to

17  identify and correct past errors and to ensure that the servicing process functions

18  effectively, efficiently, and fairly going forward."[3]

19      9.    Plaintiffs bring this action, seeking injunctive relief and damages on behalf of

20  themselves and the thousands of borrowers who have been victimized by the Defendants'

21  uniform schemes.

---

25  [3] *See* Mark Pearce, Director, Division of Depositor and Consumer Protection, Federal Deposit Insurance
26  Corporation, *Mortgage Servicing:  An Examination of the Role of Federal Regulators in Settlement
    Negotiations and the Future of Mortgage Servicing Standards,* before the Subcommittees on Financial
27  Institutions and Consumer Credit, and Oversight and Investigations Committee on Financial Services,
    U.S. House of Representatives, July 7, 2011, available at
28  http://financialservices.house.gov/UploadedFiles/070711pearce.pdf (last visited, Feb. 1, 2012).

3

CLASS ACTION COMPLAINT

**JURISDICTION AND VENUE**

10.     Jurisdiction is proper in this Court under 28 U.S.C. § 1332(d)(2).  The matter in controversy, exclusive of interest and costs, exceeds the sum or value of $5,000,000 and is a class action in which members of the class of plaintiffs are citizens of states different from Defendants.  Further, greater than two-thirds of the members of the Class reside in states other than the states in which Defendants are a citizens.  This Court also has jurisdiction over this matter under 28 U.S.C. §§ 1331, 1961, 1962 and 1964.  This Court has personal jurisdiction over Defendants under 18 U.S.C. §1965.  In addition, under 28 U.S.C. § 1367, this Court may exercise supplemental jurisdiction over the state law claims because all of the claims are derived from a common nucleus of operative facts and are such that Plaintiffs ordinarily would expect to try them in one judicial proceeding.

11.     Venue lies within this judicial district under 28 U.S.C. § 1391(a) and (c) because defendants Wells Fargo & Company and Wells Fargo Bank, N.A.'s principal place of business is in this District, the acts giving rise to the claims at issue in this Complaint occurred, among other places in this District, and Defendants' contacts are sufficient to subject them to personal jurisdiction in this District, and therefore, Defendants reside in this District for purposes of venue.

**Intradistrict Assignment**

12.     Consistent with Northern District of California Civil Local Rule 3-5(b), assignment to the San Francisco or Oakland Division is appropriate under Civil Local Rules 3-2(c) and 3-2(d), because acts giving rise to the claims at issue in this Complaint occurred, among other places, in this District, in the City of San Francisco.

**PARTIES**

13.     Plaintiff Latara Bias is an individual and a citizen of Louisiana.

14.     Plaintiff Eric Breaux is an individual and a citizen of Louisiana.

15.     Plaintiff Nan White-Price is an individual and a citizen of Louisiana.

16.     Plaintiff Diana Ellis is an individual and a citizen of California.

4

17.     Defendant Wells Fargo & Company is a publicly traded corporation organized under the laws of Delaware and headquartered in San Francisco, California.

18.     Defendant Wells Fargo Bank, N.A. is a subsidiary of Wells Fargo & Company, and is a national bank organized and existing as a national association under the National Bank Act, 12 U.S.C. §§ 21 *et seq.*, with its principal place of business in San Francisco, California.

19.     Defendant J.P. Morgan Chase & Co. is a publicly traded corporation organized under the laws of Delaware, with its principal place of business in New York, New York.

20.     Defendant J.P. Morgan Chase Bank, N.A. is a subsidiary of J.P. Morgan Chase & Co., and is a national bank organized and existing as a national association under the National Bank Act, 12 U.S.C. §§ 21 *et seq.*, with its principal place of business in Columbus, Ohio.

21.     Defendant Chase Home Finance LLC, is a subsidiary of J.P. Morgan Chase & Co. and J.P. Morgan Chase Bank, N.A., and is a Delaware limited liability company, with its principal place of business in Iselin, New Jersey.

22.     Whenever, in this Complaint, reference is made to any act, deed, or conduct of Defendants committed in connection with the enterprise, the allegation means that Defendants engaged in the act, deed, or conduct by or through one or more of their officers, directors, agents, employees or representatives, each of whom was actively engaged in the management, direction, control or transaction of the ordinary business and affairs of Defendants and the enterprise.

23.     Plaintiffs are informed and believe, and based thereon, allege that, at all material times herein, each Wells Fargo defendant, Wells Fargo & Company and Wells Fargo Bank, N.A. (collectively "Wells Fargo"), was the agent, servant, or employee of, and acted within the purpose, scope, and course of said agency, service, or employment, and with the express or implied knowledge, permission, and consent of the other Wells Fargo defendant, and ratified and approved the acts of the other Wells Fargo defendant.

5

24.     Plaintiffs are informed and believe, and based thereon, allege that, at all material times herein, each Chase defendant, J.P. Morgan Chase & Co., J.P. Morgan Chase Bank, N.A., and Chase Home Finance LLC (collectively, "Chase"), was the agent, servant, or employee of the other Chase defendants, and acted within the purpose, scope, and course of said agency, service, or employment, and with the express or implied knowledge, permission, and consent of the other Chase defendants, and ratified and approved the acts of the other Chase defendants.

## FACTUAL BACKGROUND

25.     America's lending industry is in turmoil.  Many of the current problems in the industry derive from the fact that the lending community has divorced itself from the borrowers it once served.  Traditionally, when people wanted to borrow money, they went to a bank or a "savings and loan."  Banks loaned money and borrowers promised to repay the bank, with interest, over a specific period of time.  The originating bank kept the loan on its balance sheet, and serviced the loan -- processing payments, and sending out applicable notices and other information -- until the loan was repaid.  The originating bank had a financial interest in ensuring that the borrower was able to repay the loan.

26.     Today, however, the process has changed.  Mortgages are now packaged, bundled, and sold to investors on Wall Street through what is referred to in the financial industry as mortgage backed securities or MBS.  This process is called securitization. Securitization of mortgage loans provides banks like Defendants with the benefit of immediately being able to recover the amounts loaned.  Securitization essentially eliminates the bank's risk from potential default.  But, by eliminating the risk of default, mortgage backed securities have disassociated the lending community from borrowers. Numerous unexpected consequences have resulted from the divide between lenders and borrowers.

27.     Among other things, securitization has created an industry of companies in the lending industry like Defendants, who no longer make money primarily from interest on the loans they originate.  Thus, lenders no longer have the financial interest in the

6

1    repayment of loans that they once did.  Instead, banks like Wells Fargo and Chase service

2    or administer mortgages for hedge funds and investment houses who own the loans.

3    Rather than earn income from the interest on these loans, banks like Wells Fargo and

4    Chase are paid a fee for their loan administration services.

5         28.    Additionally, under agreements with investors (pooling and service

6    agreements), loan servicers like Defendants are entitled to assess fees on borrowers'

7    accounts for default-related services in connection with their administration of borrowers'

8    loans.  These fees include Broker's Price Opinion fees, and appraisal fees.  Defendants'

9    collection of these fees, however, exemplifies how America's lending industry has run off

10   the rails.

11        29.    As one Member of the Board of Governors of the Federal Reserve System

12   has explained, "[w]hile an investor's financial interests are tied more or less directly to the

13   performance of a loan, the interests of a third-party servicer are tied to it only indirectly, at

14   best.  The servicer makes money, to oversimplify it a bit, by maximizing fees earned and

15   minimizing expenses while performing the actions spelled out in its contract with the

16   investor. . . . The broad grant of delegated authority that servicers enjoy under pooling

17   and servicing agreements (PSAs), combined with an effective lack of choice on the part of

18   consumers, creates an environment ripe for abuse."[4]

19        30.    For banks like Wells Fargo and Chase, who are unhappy with the flat fee

20   they earn for servicing loans, the right to charge exorbitant fees has opened the door to a

21   world of exploitation.  As a result of the disassociation between loan servicers and the

22   monies generated from the interest borrowers pay on their loans, Wells Fargo and Chase

23   have been incentivized to find other ways to grow their profits.

24        31.    Wells Fargo and Chase, with their subsidiaries, and affiliated companies each

25

26   [4] *See* Sarah Bloom Raskin, Member Board of Governors of the Federal Reserve System, *Remarks at the*
27   *National Consumer Law Center's Consumer Rights Litigation Conference*, Boston Massachusetts, Nov.
     12, 2010, available at www.federalreserve.gov/newsevents/speech/raskin20101112a.htm (last visited Jan.
28   23, 2012).

CLASS ACTION COMPLAINT

1  formed an unlawful enterprise and decided to game the system, under the guise of
2  collecting default-related service fees, and then, they sought to increase mortgage
3  servicing revenues by fraudulently concealing marked-up fees assessed on borrowers'
4  accounts.

5      32.    In short, as explained by Adam J. Levitin, Associate Professor of Law at the
6  Georgetown University Law Center, in testimony to the United States House Financial
7  Services Committee, Subcommittee on Housing and Community Opportunity, "Servicers'
8  business model also encourages them to cut costs wherever possible, even if this involves
9  cutting corners on legal requirements, and to lard (sic) on junk fees and in-sourced
10 expenses at inflated prices."[5]

**Defendants' Automated Loan Servicing Practices**

12     33.    Together, Defendants service approximately 20 million loans.  To maximize
13 profits, Defendants assign the complex task of administering these millions of loans to
14 computer software programs.  Chase and Wells Fargo automate their loan servicing
15 businesses through a computer software program provided by Fidelity National
16 Information Services, Inc., which is called Mortgage Servicing Package ("Fidelity MSP").
17 Fidelity MSP is a sophisticated home loan management program, and is one of the most
18 widely used such programs in the United States.

19     34.    When a loan is originated, guidelines for managing the loan are imported into
20 Fidelity MSP.  Loans serviced by Defendants are then automatically managed by the
21 Fidelity MSP software according to those guidelines.  For example, among other things, if
22 a loan in Defendants' systems is past due, the guidelines instruct the computer when to
23 impose late fees.  Defendants also assess other charges and fees against borrowers'
24 accounts by using "wrap around" software packages that work with the Fidelity MSP

---

26 [5] *See* Adam J. Levitin, *Robo-Singing, Chain of Title, Loss Mitigation, and Other Issues in Mortgage*
27 *Servicing*, before the House Financial Services Committee, Subcommittee on Housing and Community
   Opportunity, Nov. 18, 2010, available at
28 http://financialservices.house.gov/Media/file/hearings/111/Levitin111810.pdf (last visited Feb. 1, 2012).

system.  Based on parameters inputted into these programs, Defendants' computer systems automatically implement decisions about how to manage borrowers' accounts based on internal software logic.  The systems are designed to manage borrowers' accounts and assess fees, according to a protocol designed by the executives at Chase and Wells Fargo.

35.    The Fidelity MSP software Defendants use also has a platform called Bankruptcy Work Station ("BWS") that is purportedly infused with computer logic designed to manage a loans during a pending bankruptcy.  To manage loans in default, Chase also uses a software program called "FORTRACS."  "FORTRACS automates default management processing, decisioning and documentation of a loan. With fully integrated modules and synchronization of activities, it supports the lender's credit and collateral risk management through loss mitigation, foreclosure processing, bankruptcy monitoring, claims processing and REO management."[6]

36.    Plaintiffs are informed and believe, and based thereon, allege that as part of the Chase and Wells Fargo enterprises' efforts to conceal the extent of their activities, Defendants also program their computer systems to automatically remove from account statements submitted in court proceedings, some of the fees and charges typically assessed against borrowers accounts because they have been prohibited by a particular jurisdiction or judge within a jurisdiction.

**Marked-Up and Unnecessary Fees for Default-Related Services**

37.    In their loan servicing operations, Defendants follow a strategy to generate fraudulently concealed default-related fee income.  Rather than simply obtain default-related services directly from independent third-party vendors, and charge borrowers for the actual cost of these services, Defendants assess borrowers' accounts for services that are unnecessary and they unlawfully add additional, undisclosed profits on to the charges before they are assessed on borrowers' accounts.

---

[6] *See* http://www.isgn.com/Products/Fortracs.htm (last visited Feb. 8, 2012).

38.     Defendants' scheme works as follows.  Defendants order default-related services from their subsidiaries and affiliated companies, who, in turn, obtain the services from third-party vendors.  The third-party vendors charge Defendants for their services.  Defendants, in turn, charge borrowers a fee that is significantly marked-up from the third-party vendors' actual fees for the services.  As a result, even though the mortgage market has collapsed, and more and more borrowers are falling into delinquency, Defendants continue to earn substantial profits by assessing undisclosed, marked-up fees for default-related services on borrowers' accounts.

39.     The mortgage contract between a lender and a borrower consists of two documents:  the promissory note ("Note") and the mortgage or deed of trust ("Security Instrument").  The mortgage contacts serviced by Defendants are substantially similar because they conform to the standard Fannie Mae/Freddie Mac form contract.  These contracts contain form language regarding what occurs if borrowers default on their loans.  The Security Instrument authorizes the loan servicer, in the event of default, to:

> pay for whatever is reasonable or appropriate to protect the note holder's interest in the property and rights under the security instrument, including protecting and/or assessing the value of the property, and securing and/or repairing the property.

40.     The Security Instrument further provides that any such amounts disbursed by the servicer shall become additional debt of the borrower secured by the Security Instrument and shall bear interest at the Note rate from the date of disbursement.  The Note provides that the note holder:

> will have the right to be paid back by [the borrower] for all of its costs and expenses in enforcing this Note to the extent not prohibited by applicable law.  Those expenses include, for example, reasonable attorneys' fees.

Thus, the mortgage contract allows the servicer to pay for default-related services when

1    necessary or appropriate, and to be reimbursed by the borrower, but it does not authorize

2    the servicer to mark-up the actual cost of those services to make a profit.

3        41.    Broker's Price Opinions ("BPOs") are a significant category of default-

4    related service fees that, in furtherance of Defendants' unlawful enterprises, are assessed

5    on borrowers' accounts with substantial, undisclosed mark-ups, fraudulently generating

6    revenue in the loan servicing business.

7        42.    As discussed above, by charging marked-up fees for BPOs, Defendants

8    violate the agreements with borrowers because, among other things, charges that exceed

9    the actual cost of the services provided are neither reasonable, nor appropriate to protect

10   the note holder's interest in the property and the rights under the security instrument.

11       43.    Furthermore, the wrongful nature of the marked-up fees is demonstrated  by

12   the fact that Defendants do not disclose to borrowers that the fees assessed on their

13   accounts are marked-up from the amount actually charged by the vendor.

14       44.    Although Defendants assess fees for BPOs on borrowers' accounts in

15   amounts ranging from $95 to $135, as of December 2010, under Fannie Mae guidelines,

16   the maximum reimbursable rate for an exterior BPO is $80,[7] and in practice, the actual

17   cost is much less.  According to the National Association of BPO Professionals, the actual

18   cost of a BPO may be as little as $30.[8]

19                     **Practices Specific to the Wells Fargo Enterprise**

20       45.    Defendants Wells Fargo & Company and Wells Fargo Bank, N.A. administer

21   approximately 10.3 million home mortgage loans, which is about one out of every seven

22   mortgages in the United States.  Defendant Wells Fargo & Company, and its subsidiary,

23   defendant Wells Fargo Bank, N.A. formed an enterprise and devised a scheme to defraud

24   borrowers and obtain money from them by means of false pretenses.

25

26   [7] *See* Fannie Mae, *Broker Price Opinion Providers and Pricing Structure*, available at
     https://efanniemae.com/sf/guides/ssg/annltrs/pdf/2010/ntce121710a.pdf (last visited Feb. 1, 2012).

27   [8] *See* National Association of BPO Professionals (NABPOP), *Broker Price Opinion – BPO Brief*,
28   available at http://www.nabpop.org/Advocacy-BPOBrief-2.php (last visited Feb. 2, 2012).

                                          11

46.     Using its computerized automated mortgage loan management system and an enterprise of Wells Fargo subsidiaries and inter-company departments and divisions, Wells Fargo engaged in a scheme to fraudulently conceal and assess unlawfully marked-up BPO fees on borrowers' accounts, cheating hundreds of thousands of borrowers out of hundreds of millions dollars.  Furthermore, to conceal its actions and mislead borrowers about the true nature of its actions, Wells Fargo has employed a corporate practice that omits the true nature of the fees that are being assessed on borrowers' accounts.  Wells Fargo conceals these marked-up BPO fees, by identifying the charges on borrowers' statements only as "Other Charges," or "Other Fees."  These practices are common to all of Wells Fargo's files.

47.     Additionally, in order to further conceal its activities and mislead both borrowers and the courts, Wells Fargo established an inter-company division or d/b/a, who participates as a member of the enterprise, called Premiere Asset Services ("PAS").  PAS exists to generate revenues for Wells Fargo and it does not operate at arms-length with Wells Fargo & Company or Wells Fargo Bank, N.A.  According to PAS' website, PAS is located, among other places, in San Bernardino, California.



**PREMIERE**
Asset Services                                    *Specialists* in REO Properties

Home    Company Profile    Buying an REO    Property Search    Home Buying Resources    Business Partners

**Company Profile**

Congratulations for discovering an alternative to the typical home buying process. In many areas of the United States the market is still slanted in favor of sellers, causing buyers to compete for homes, raising prices to their maximum, and effectively shutting many out of realizing the dream of home ownership.

We believe that REO (Real Estate Owned) properties still provide an excellent opportunity to acquire affordable properties in all areas of the country. Our clients' portfolios include properties in all states and cover the full range of property types and property conditions...everything from homes in "move-in" condition to homes that will require substantial renovations. So no matter if you are looking for your first home or are a veteran renovation enthusiast, we have the home for you.

Premiere Asset Services is an REO property management and marketing firm located in Frederick, MD, and San Bernardino, CA. Our mission is to provide property valuation, management, and marketing services to banks, mortgage companies, and other investors that own real estate as a result of foreclosure actions. We maintain a close relationship with real estate agents nationwide and utilize those agents to list properties. All offers or questions concerning any specific property should be addressed to the listing agent.

Privacy Policy | Copyright Notice
© Copyright 2003 Premiere Asset Services, All Rights Reserved

CLASS ACTION COMPLAINT

48.    In furtherance of the enterprise's unlawful activities, Wells Fargo also has used the Internet to make it appear as though PAS is an independent company that provides, among other things, BPOs, fraudulently concealing the fact that PAS is really just a vehicle that provides Wells Fargo with a false pretense for obtaining money from borrowers so that it can earn undisclosed profits.



49.    Acting as Wells Fargo's agent under the scheme, PAS performs the BPOs ordered by Wells Fargo.  When Wells Fargo orders BPOs, PAS sub-contracts the BPOs to different local real estate brokers.  PAS does not actually perform the BPOs itself. Nevertheless, consistent with the design of Wells Fargo's illegal enterprise, when borrowers demand that Wells Fargo substantiate charges for BPOs, PAS, at Wells Fargo's direction, invoices to Wells Fargo as if PAS was an independent, third-party vendor.

50.    Wells Fargo never actually pays the invoices because they are not legitimate invoices.  Instead, as Wells Fargo has admitted in other federal court proceedings, PAS is merely a division of Wells Fargo, and the "invoices" produced by PAS as purported evidence of third-party vendor costs for BPOs are actually internal memos between Wells

13

Fargo departments allocating costs of administration.

51.   The amount paid by Wells Fargo for the BPOs is approximately one-half to one-third as much as the amounts assessed on borrowers' accounts based on the invoices generated by PAS.  Wells Fargo assesses fees for BPOs on borrowers' accounts, charging from $95 to $125, when in fact, the actual cost of each BPO is approximately $50 or less.

52.   Wells Fargo never pays PAS for the BPOs, but rather when the BPOs are completed by real estate brokers, Wells Fargo issues checks directly to the real estate brokers.  Despite this reality, driven to increase profits with illegally marked-up charges, Wells Fargo assesses borrowers' accounts with fees for these "pass through" expenses, even though the assessed amounts include a profit of two to three times more than the actual expenses incurred by Wells Fargo.

53.   In furtherance of its scheme to conceal its illegal charges, PAS was created as part of Wells Fargo's enterprise to act as a phony third party vendor, making it appear to borrowers, and the courts as though the amounts assessed on borrowers' accounts are actual third party costs.  Wells Fargo never discloses that it is generating profits from the BPO charges that are illegally and improperly assessed on borrowers' accounts.

54.   Similarly, Plaintiffs are informed and believe, and on that basis, allege that when Wells Fargo assesses borrowers' accounts for property inspections, Wells Fargo includes an unlawful and undisclosed mark-up.  The actual cost of property inspections performed by Wells Fargo's vendors, such as First American Field Services, is $15. Nevertheless, when Wells Fargo assess borrowers' accounts for the fees, it adds an undisclosed profit for itself, and assesses borrowers' accounts $20 for the inspection. Wells Fargo conceals its unlawful profits by merely identifying the fee as "Other Charges," or "Inspection," without informing borrowers that the fee is marked-up.  If borrowers inquire about the nature of these fees, Wells Fargo further conceals and misleads borrowers, attempting to dissuade them from challenging the charge, by telling them that such fees are "[i]n accordance with the terms of your mortgage."

14

CLASS ACTION COMPLAINT

55.   As a result of Wells Fargo's unlawful enterprise, hundreds of thousands of unsuspecting borrowers like Plaintiffs are cheated out of hundreds of millions of dollars.

### Practices Specific to the Chase Enterprise

56.   Defendant J.P. Morgan Chase & Co., and its subsidiaries, defendant J.P. Morgan Chase Bank, N.A., and defendant Chase Home Finance LLC, formed an enterprise and devised a scheme to defraud borrowers and obtain money from them by means of false pretenses.  Chase services approximately 9 million mortgage loans, which is about 12% of the loans in the United States.[9]

57.   Like Wells Fargo, according to defendant J.P. Morgan Chase & Co.'s 2010 Annual Report, "[w]hen it becomes likely that a borrower is either unable or unwilling to pay, the Firm obtains a broker's price opinion of the home based on an exterior-only valuation."[10]

58.   Plaintiffs are informed and believe, and on that basis, allege that using its computerized automated mortgage loan management system and an enterprise of Chase subsidiaries and inter-company departments and divisions, Chase unlawfully charges marked-up fees for default-related services.  Furthermore, to fraudulently conceal its actions and mislead borrowers about the true nature of its actions, Chase employs a corporate practice that omits true nature of the fees that are being assessed on borrowers' accounts.

59.   Plaintiffs are informed and believe, and on that basis, allege that Chase conceals these marked-up fees for default-related services on borrowers accounts, by identifying the charges only as "Miscellaneous Fees," "Corporate Advances," "Other Fees," or "Advances" on borrowers' statements.  Under the these categories, Chase

---

[9] *See* J.P. Morgan Chase & Co. 2010 Annual Report at p. 39, available at http://files.shareholder.com/downloads/ONE/1653115906x0x458380/ab2612d5-3629-46c6-ad94-5fd3ac68d23b/2010_JPMC_AnnualReport_.pdf (last visited Jan. 24, 2012).

[10] *See* J.P. Morgan Chase & Co. 2010 Annual Report, available at http://files.shareholder.com/downloads/ONE/1653115906x0x458380/ab2612d5-3629-46c6-ad94-5fd3ac68d23b/2010_JPMC_AnnualReport_.pdf (last visited Jan. 24, 2012).

assesses fees for BPOs on borrowers' accounts, charging from $95 to $135, when in fact, on information and belief, the actual cost of each BPO is approximately $50 or less. Plaintiffs are informed and believe, and on that basis, allege that a significant number of these BPOs are ordered by Chase's Bankruptcy Processing team and Collection Department in San Diego, California.

60.    Plaintiffs are informed and believe, and on that basis, allege that under the "Miscellaneous Fees," "Corporate Advances," "Other Fees," or "Advances" categories on borrowers' statements, Chase also assesses unnecessary and unreasonable fees for property inspections.  In order to generate profits from these fees, Chase's automated loan servicing system is set up to order property inspections and assess fees against borrowers when they are a certain number of days late on their mortgage, regardless of whether the assessment of such fees is appropriate, reasonable, or necessary under the circumstances. Although such inspections purportedly are conducted to guard against property loss, Chase's practices are designed to ensure that these fees are charged to as many accounts as possible, even if the inspections are inappropriate, unnecessary, or unreasonable.

61.    Plaintiffs are informed and believe, and on that basis, allege that guidelines inputted into Chase's loan management software system automatically trigger property inspections if a loan is past due by a certain number of days.  After a borrower's account is past due by a set number of days, as inputted into the software, Chase's computer automatically generates a work order for a property inspection automatically, *and without human intervention*.  Moreover, so long as a borrower's account is past due by the requisite number of days inputted into the loan management software, Chase's system automatically continues to order inspections, regardless of whether it is reasonable or appropriate under the circumstances.

62.    Plaintiffs are informed and believe, and on that basis, allege that even if the property inspections were properly performed and actually reviewed by someone at the bank, Chase's continuous assessment of fees for these inspections on borrowers accounts is still improper and unreasonable because of the frequency with which they are

16

CLASS ACTION COMPLAINT

1  performed.  If the first inspection report shows that the property is occupied and in good
2  condition, it is unnecessary and inappropriate for Chase's system to automatically
3  continue to order monthly inspections. Nothing in the reports justifies continued
4  monitoring.

5      63.    In order to further lull borrowers into a sense of trust, conceal Chase's
6  unlawful fees, and dissuade borrowers from challenging Chase's unlawful fee
7  assessments, Chase falsely represents on statements provided to borrowers that "Other
8  Fees" and "Advances," which are charges for BPOs and property inspections, include
9  "amounts allowed by [borrowers'] Note and Security Instrument."

10     64.    As a result of Chase's unlawful enterprise, hundreds of thousands of
11  unsuspecting borrowers are cheated out of hundreds of millions of dollars.

12                **Injuries Borrowers Suffer as a Result of Defendants' Practices**

13     65.    In addition to the direct monetary damages caused to borrowers, in the form
14  of the difference between the actual cost of the services provided and the marked-up fees
15  assessed on borrowers' accounts, borrowers suffer other, less obvious injuries as a result
16  of the practices described herein.

17     66.    The assessment of these marked-up fees can make it impossible for
18  borrowers to become current on their loan.  Charges for default-related services can add
19  hundreds or thousands of dollars to borrowers' loans over time, driving them further into
20  default.

21     67.    When borrowers get behind on their mortgage, and fees for these default-
22  related services are stacked on to the past-due principal and interest payments,
23  Defendants' practices make it increasingly difficult for borrowers to ever bring their loan
24  current.  Even if borrowers pay the delinquent principal and interest payments, the
25  marked-up fees for default-related services ensure that borrowers stay in default.  After
26  paying delinquent principal and interest, although the next payment comes in on time,
27  often through automatic payment deductions from borrowers' bank accounts, part of the
28  payment is applied to the fees first, so there is not enough to cover the entire monthly

1   payment.  This makes that payment late, creating a cascade of more fees, and more

2   arrears, that keeps borrowers in delinquency.  By the time borrowers are aware,

3   Defendants are threatening to foreclose unless a huge payment is made, and the weight of

4   these unnecessary fees drops borrowers into a financial abyss.

5        68.    As a result of Defendants' practices, which force borrowers to move deeper

6   into default, borrowers suffer damage to their credit score.  Defendants provide

7   information about borrowers' payment history to credit reporting companies, including

8   whether they have been late with a payment or missed any payments.  By keeping

9   borrowers in default with these practices, Defendants affect whether borrowers can get a

10   loan in the future – and what borrowers' interest rate will be on such loans.

11        69.    Additionally, as a result of Defendants' practices, which force borrowers to

12   move deeper into default, borrowers are driven into foreclosure.

13                  **PLAINTIFFS' CLAIMS AGAINST WELLS FARGO**

14        70.    Plaintiff Latara Bias is a resident of Napoleonville, which is in Assumption

15   Parish, Louisiana.

16        71.    Plaintiff Eric Breaux is a resident of Napoleonville, which is in Assumption

17   Parish, Louisiana.

18        72.    Plaintiffs Bias and Breaux have a mortgage serviced by Wells Fargo.

19        73.    Wells Fargo continually assessed $95 fees for BPOs on the mortgage account

20   of Plaintiffs Bias and Breaux, beginning on December 28, 2006.  Wells Fargo also

21   assessed $95 fees for BPOs on the mortgage account of Plaintiffs Bias and Breaux on

22   September 27, 2007 and March 28, 2008.

23        74.    Plaintiff White-Price is a resident of Abita Springs, which is in St. Tammany

24   Parish, Louisiana.

25        75.    Plaintiff White-Price has a mortgage serviced by Wells Fargo.

26        76.    A "Monthly Mortgage Statement," dated September 19, 2011, mailed to

27   Plaintiff White-Price by defendant Wells Fargo included an assessment of $100.00 for

28   "Other Charges."  Plaintiff is informed and believes, and on that basis, alleges that these

1 charges included unlawful marked-up fees for default-related services.

2 ## PLAINTIFFS' CLAIMS AGAINST CHASE

3 77.    Plaintiff Ellis is a resident of Los Angeles County, California.

4 78.    Plaintiff Ellis has a mortgage serviced by Chase.

5 79.    A "Mortgage Loan Statement," dated July 1, 2011, issued to Plaintiff Ellis by

6 defendant Chase included an assessment of $154.24 for "Miscellaneous Fees." Plaintiff is

7 informed and believes, and on that basis, alleges that these fees included unlawful

8 marked-up and unnecessary fees for default-related services, and that over the history of

9 her loan, her account was assessed numerous other unlawful and unnecessary fees for

10 default-related services.

11 ## STATUTE OF LIMITATIONS

12 80.    Any applicable statutes of limitations have been tolled by Defendants'

13 knowing and active concealment, denial, and misleading actions, as alleged herein.

14 Plaintiffs and members of the Class, as defined below, were kept ignorant of critical

15 information required for the prosecution of their claims, without any fault or lack of

16 diligence on their part. Plaintiffs and members of the Class could not reasonably have

17 discovered the true nature of the Defendants' marked-up fee scheme.

18 81.    Defendants are under a continuous duty to disclose to Plaintiffs and members

19 of the classes the true character, quality, and nature of the fees they assess on borrowers'

20 accounts. Defendants knowingly, affirmatively, and actively concealed the true character,

21 quality, and nature of their assessment of marked-up fees against borrowers' accounts.

22 Plaintiffs and members of the Class reasonably relied upon Defendants' knowing,

23 affirmative, and active concealment. Based on the foregoing, Defendants are estopped

24 from relying on any statutes of limitation as a defense in this action.

25 82.    The causes of action alleged herein did or will only accrue upon discovery of

26 the true nature of the charges assessed against borrowers' accounts, as a result of

27 Defendants' fraudulent concealment of material facts. Plaintiffs and members of the

28 Class did not discover, and could not have discovered, through the exercise of reasonable

1    diligence, the true nature of the unlawful fees assessed against their accounts.

2        83.    Legal scholars have explained that, as a result of these deceptive practices, it

3    is impossible for borrowers to determine that they are victims of these violations, because

4    "without a true itemization that identifies the nature of each fee, parties cannot verify that

5    a mortgage claim is correctly calculated . . . the servicer could be overreaching and

6    charging fees that are not permitted by law or by the terms of the contract. . . . By

7    obscuring the information needed to determine the alleged basis for the charges, servicers

8    thwart effective review of mortgage claims. The system can only function as intended if

9    complete and appropriate disclosures are made."[11]

10       84.    Additionally, judges examining Wells Fargo's conduct have found that, "[a]t

11   the heart of the problem is Wells Fargo's failure to disclose to its borrowers/debtors, the

12   trustee, or the Court, the nature or amount of fees and charges assessed . . . [l]ack of

13   disclosure facilitates the injury.  Naive borrowers/debtors, trustees and creditors rightly

14   assume that Wells Fargo is complying with the plain meaning of its notes, mortgages,

15   court orders and confirmed plans.  Why would anyone assume otherwise? . . . How are

16   they to challenge a practice or demand correction of an error they do not know exists."[12]

---

[11] See Katherine Porter, *Misbehavior and Mistake in Bankruptcy Mortgage Claims*, 87 Tex. L. Rev. 121, 155 (2008).

[12] See *In re: Jones*, 418 B.R. 687, 699 (E.D. La. 2009).

CLASS ACTION COMPLAINT

## CLASS ACTION ALLEGATIONS

85.   Plaintiffs bring this action, on behalf of themselves and all others similarly situated, as a class action under Rule 23 of the Federal Rules of Civil Procedure.

86.   The classes Plaintiffs seek to represent (collectively, the "Class") are defined as follows:

> All residents of the United States of America who had a loan serviced by Wells Fargo and whose accounts were assessed fees for default-related services, including Broker's Price Opinions, and inspection fees, at any time, continuing through the date of final disposition of this action (the "Wells Fargo Subclass").

> All residents of the United States of America who had a loan serviced by Chase and whose accounts were assessed fees for default-related services, including Broker's Price Opinions, and inspection fees, at any time, continuing through the date of final disposition of this action (the "Chase Subclass").

87.   Plaintiffs reserve the right to amend the Class definitions if discovery and further investigation reveals that the Class should be expanded or otherwise modified.

88.   Plaintiffs reserve the right to establish sub-classes as appropriate.

89.   This action is brought and properly may be maintained as a class action under the provisions of Federal Rules of Civil Procedure 23(a)(1)-(4) and 23(b)(1), (b)(2) or (b)(3), and satisfies the requirements thereof.  As used herein, the term "Class Members" shall mean and refer to the members of the Class.

90.   Community of Interest:  There is a well-defined community of interest among members of the Class, and the disposition of the claims of these members of the Class in a single action will provide substantial benefits to all parties and to the Court.

91.   Numerosity:  While the exact number of members of the Class is unknown to Plaintiffs at this time and can only be determined by appropriate discovery, membership in the Class is ascertainable based upon the records maintained by Defendants.  At this time, Plaintiffs are informed and believe that the Class includes hundreds of thousands of

21

members.  Therefore, the Class is sufficiently numerous that joinder of all members of the Class in a single action is impracticable under Federal Rule of Civil Procedure Rule 23(a)(1), and the resolution of their claims through the procedure of a class action will be of benefit to the parties and the Court.

92.    Ascertainablity:  Names and addresses of members of the Class are available from Defendants' records.  Notice can be provided to the members of the Class through direct mailing, publication, or otherwise using techniques and a form of notice similar to those customarily used in consumer class actions arising under California state law and federal law.

93.    Typicality:  Plaintiffs' claims are typical of the claims of the other members of the Class which they seek to represent under Federal Rule of Civil Procedure 23(a)(3) because each Plaintiff and each member of the Class has been subjected to the same deceptive and improper practices and has been damaged in the same manner thereby.

94.    Adequacy:  Plaintiffs will fairly and adequately represent and protect the interests of the Class as required by Federal Rule of Civil Procedure Rule 23(a)(4). Plaintiffs are adequate representatives of the Class, because they have no interests which are adverse to the interests of the members of the Class.  Plaintiffs are committed to the vigorous prosecution of this action and, to that end, Plaintiffs have retained counsel who are competent and experienced in handling class action litigation on behalf of consumers.

95.    Superiority: A class action is superior to all other available methods of the fair and efficient adjudication of the claims asserted in this action under Federal Rule of Civil Procedure 23(b)(3) because:

(a)    The expense and burden of individual litigation make it economically unfeasible for members of the Class to seek to redress their claims other than through the procedure of a class action.

(b)    If separate actions were brought by individual members of the Class, the resulting duplicity of lawsuits would cause members to seek to redress their claims other than through the procedure of a class action;

and

    (c)    Absent a class action, Defendants likely would retain the benefits of their wrongdoing, and there would be a failure of justice.

96.    Common questions of law and fact exist as to the members of the Class, as required by Federal Rule of Civil Procedure 23(a)(2), and predominate over any questions which affect individual members of the Class within the meaning of Federal Rule of Civil Procedure 23(b)(3).

97.    The common questions of fact include, but are not limited to, the following:

    (a)    Whether Defendants engaged in unlawful, unfair, misleading, or deceptive business acts or practices in violation of California Business & Professions Code sections 17200 *et seq.*;

    (b)    Whether Defendants' practice of charging marked-up fees to borrowers, as alleged herein, is illegal;

    (c)    Whether Defendants were members of, or participants in the conspiracy alleged herein;

    (d)    Whether Defendants engaged in a pattern or practice of racketeering, as alleged herein;

    (e)    Whether documents and statements provided to Plaintiffs and members of the Class omitted material facts;

    (f)    Whether Plaintiffs and members of the class sustained damages, and if so, the appropriate measure of damages; and

    (g)    Whether Plaintiffs and members of the Class are entitled to an award of reasonable attorneys' fees, pre-judgment interest, and costs of this suit.

98.    In the alternative, this action is certifiable under the provisions of Federal Rule of Civil Procedure 23(b)(1) and/or 23(b)(2) because:

    (a)    The prosecution of separate actions by individual members of the Class would create a risk of inconsistent or varying adjudications with

1   respect to individual members of the Class which would establish

2   incompatible standards of conduct for Defendants;

3   (b)   The prosecution of separate actions by individual members of the

4   Class would create a risk of adjudications as to them which would, as a

5   practical matter, be dispositive of the interests of the other members of

6   the Class not parties to the adjudications, or substantially impair or

7   impede their ability to protect their interests; and

8   (c)   Defendants have acted or refused to act on grounds generally

9   applicable to the Class, thereby making appropriate final injunctive

10   relief or corresponding declaratory relief with respect to the Class as a

11   whole and necessitating that any such relief be extended to members of

12   the Class on a mandatory, class-wide basis.

13   99.   Plaintiffs are not aware of any difficulty which will be encountered in the

14   management of this litigation which should preclude its maintenance as a class action

15   **FIRST CAUSE OF ACTION**

16   **Violation of Unfair Business Practices Act**

17   **(California Business & Professions Code §§ 17200 *et seq.*)**

18   100.   Plaintiffs incorporate by reference in this cause of action each and every

19   allegation of the preceding paragraphs, with the same force and effect as though fully set

20   forth herein.

21   101.   California Business and Professions Code section 17200 prohibits "any

22   unlawful, unfair or fraudulent business act or practice." For the reasons described above,

23   Defendants have engaged in unfair, or fraudulent business acts or practices in violation of

24   California Business and Professions Code sections 17200 *et seq.*

25   102.   In the course and conduct of their loan servicing and collection, Chase and

26   Wells Fargo omit a true itemization that identifies the nature of each fee, and they fail to

27   disclose the nature of the charges and fees assessed. Defendants conceal the fact the

28   category identified as "Miscellaneous Fees" or "Other Charges" reflects marked-up and/or

24

1   unnecessary fees that were never incurred by Defendants. Relying on Defendants,

2   Plaintiffs and members of the Class believe they are obligated to pay the amounts

3   specified in Chase and Wells Fargo's communications for default-related services.

4   103.   In truth and in fact, borrowers are not obligated to pay the amounts that have

5   been specified in Chase and Wells Fargo's communications for default-related services,

6   such as BPOs. Chase and Wells Fargo omit the fact that the amounts they represent as

7   being owed have been marked-up beyond the actual cost of the services, or they are

8   unnecessary, in violation of the mortgage contract. Contrary to Chase and Wells Fargo's

9   communications, Defendants are not legally authorized to assess and collect these fees.

10   104.   Defendants' omissions of material facts, as set forth herein, constitute an

11   unlawful practice because they violate Title 18 United States Code sections 1341, 1343,

12   and 1962, as well as California Civil Code sections 1572, 1573, 1709, 1710, and 1711,

13   among others, and the common law.

14   105.   Defendants' omissions of material facts, as set forth herein, also constitute

15   "unfair" business acts and practices within the meaning of California Business and

16   Professions Code sections 17200 et seq., in that Defendants' conduct was injurious to

17   consumers, offended public policy, and was unethical and unscrupulous. Plaintiffs also

18   assert a violation of public policy by withholding material facts from consumers.

19   Defendants' violation of California's consumer protection and unfair competition laws in

20   California resulted in harm to consumers.

21   106.   There were reasonable alternatives available to Defendants to further

22   Defendants' legitimate business interests, other than the conduct described herein.

23   107.   California Business and Professions Code section 17200 also prohibits any

24   "fraudulent business act or practice." Defendants' concealment of material facts, as set

25   forth above, was false, misleading, or likely to deceive the public within the meaning of

26   California Business and Professions Code section 17200. Defendants' concealment was

27   made with knowledge of its effect, and was done to induce Plaintiffs and members of the

28   Class to pay the marked-up and/or unnecessary fees for default-related services.

CLASS ACTION COMPLAINT

108.   Plaintiffs relied their reasonable expectation that Defendants comply with the plain meaning of the mortgage agreement, Notes, Security Instruments, court orders and confirmed plans, and as a result, Plaintiffs relied on Defendants' disclosures about the fees on their statements, reasonably believing the "Other Charges," "Other Fees," or "Miscellaneous Fees" to be valid charges that were not unlawfully marked-up and/or unnecessary.  Indeed, to lull borrowers into a sense of trust and dissuade them from challenging Defendants' unlawful fee assessments, Defendants further conceal their scheme by telling borrowers, in statements and other documents, that such fees are "allowed by [borrowers'] Note and Security Instrument," or that they are "[i]n accordance with the terms of your mortgage."  Had the true nature of the fees been disclosed to Plaintiffs and members of the Class, they would have been aware of the mark-ups, or unnecessary nature of the fees, and Plaintiffs would have disputed the charges and not paid them.

109.   Plaintiffs and members of the Class have been injured in fact and suffered a loss of money or property as a result of Defendants' fraudulent, unlawful, and unfair business practices.  Plaintiffs and members of the Class would not have paid Defendant's unlawful fees or they would have challenged the assessment of such fees on their accounts had it not been for Defendants' concealment of material facts.

110.   Defendants have thus engaged in unlawful, unfair, and fraudulent business acts entitling Plaintiffs and members of the Class to judgment and equitable relief against Defendants, as set forth in the Prayer for Relief.

111.   Additionally, under Business and Professions Code section 17203, Plaintiffs and members of the Class seek an order requiring Defendants to immediately cease such acts of unlawful, unfair, and fraudulent business practices, and requiring Defendants to correct its actions.

CLASS ACTION COMPLAINT

## SECOND CAUSE OF ACTION

### Violations of the Racketeer Influenced and Corrupt Organizations Act

### (18 U.S.C. § 1962(c))

112.    Plaintiffs incorporate by reference in this cause of action each and every allegation of the preceding paragraphs, with the same force and effect as though fully set forth herein.

### The Wells Fargo Enterprise

113.    Defendants Wells Fargo & Company and Wells Fargo Bank, N.A. are each persons within the meaning of Title 18 United States Code section 1961(3).  At all relevant times, in violation of Title 18 United States Code section 1962(c), Wells Fargo & Company and Wells Fargo Bank, N.A. conducted the affairs of an association-in-fact enterprise, as that term is defined in Title 18 United States Code section 1961(4).  The affairs of this enterprise affected interstate commerce through a pattern of racketeering activity.

114.    Wells Fargo's enterprise is an ongoing, continuing group or unit of persons and entities associated together for the common purpose of limiting costs and maximizing profits by fraudulently concealing assessments for unlawfully marked-up and/or unnecessary fees for default-related services on borrowers' accounts.

115.    While defendants Wells Fargo & Company and Wells Fargo Bank, N.A. participate in and are part of the enterprise, they also have an existence separate and distinct from the enterprise.

CLASS ACTION COMPLAINT

**The Chase Enterprise**

116.   Defendants J.P. Morgan Chase & Co., J.P. Morgan Chase Bank, N.A., and Chase Home Finance LLC are each persons within the meaning of Title 18 United States Code section 1961(3).  At all relevant times, in violation of Title 18 United States Code section 1962(c), J.P. Morgan Chase & Co., J.P. Morgan Chase Bank, N.A., and Chase Home Finance LLC conducted the affairs of an association-in-fact enterprise, as that term is defined in Title 18 United States Code section 1961(4).  The affairs of this enterprise affected interstate commerce through a pattern of racketeering activity.

117.   Chase's enterprise is an ongoing, continuing group or unit of persons and entities associated together for the common purpose of limiting costs and maximizing profits by fraudulently concealing assessments for unlawfully marked-up and/or unnecessary fees for default-related services on borrowers' accounts.

118.   While defendants J.P. Morgan Chase & Co., J.P. Morgan Chase Bank, N.A., and Chase Home Finance LLC participate in and are part of the enterprise, they also have an existence separate and distinct from the enterprise.

**The Predicate Acts**

119.   Defendants' systematic scheme to fraudulently conceal assessments of unlawfully marked-up fees on the accounts of borrowers who have mortgage loans administered by Wells Fargo and Chase, as described above, which was facilitated by the use of the United States Mail and wire, constitutes "racketeering activity" within the meaning of Title 18 United States Code section 1961(1) as acts of mail fraud and wire fraud under Title 18 United States Code sections 1341 and 1343.

120.   In violation of Title 18 United States Code sections 1341 and 1343, Wells Fargo and Chase utilized the mail and wire in furtherance of their scheme to defraud borrowers whose loans are serviced by Wells Fargo and Chase by obtaining money from borrowers using false or fraudulent pretenses.

121.   Through the mail and wire, Wells Fargo and Chase enterprises provided mortgage invoices, loan statements, or proofs of claims to borrowers, demanding that

28

borrowers pay fraudulently concealed marked-up and/or unnecessary fees for default-related services, such as BPOs.

122.   Defendants fraudulently and unlawfully marked-up fees in violation of borrowers' mortgage agreements because the fees exceed the actual cost of the services, and therefore, they are not, as the mortgage agreements require, "reasonable" or "appropriate" to protect the note holder's interest in the property.  Defendants' assessment of fees that were unnecessary are also unlawful because unnecessary fees are not, as the mortgage agreements require, "reasonable" or "appropriate" to protect the note holder's interest in the property.

123.   The mortgage invoices, loan statements, or proofs of claims provided to borrowers fraudulently concealed the true nature of assessments made on borrowers' accounts.  Using false pretenses, identifying the fees on mortgage invoices, loan statements, or proofs of claims only as "Other Charges," "Other Fees," "Miscellaneous Fees," or "Corporate Advances" to obtain full payments from borrowers, Defendants disguised the true nature of these fees and omitted the fact that the fees include undisclosed mark-ups and/or were unnecessary.

124.   Furthermore, to lull borrowers into a sense of trust, conceal Defendants' unlawful fees, and dissuade borrowers from challenging Defendants' unlawful fee assessments, Defendants further conceal their scheme from borrowers by telling them, in statements and other documents, that such fees are "allowed by [borrowers'] Note and Security Instrument," or that they are "[i]n accordance with the terms of your mortgage."

125.   Each of these acts constituted an act of mail fraud for purposes of Title 18 United States Code section 1341.

126.   Additionally, using the Internet, telephone, and facsimile transmissions to fraudulently communicate false information about these fees to borrowers, to pursue and achieve their fraudulent scheme, Defendants engaged in repeated acts of wire fraud in violation of Title 18 United States Code section 1343.

127.   In an effort to pursue their fraudulent scheme, Defendants knowingly

29

fraudulently concealed or omitted material information from Plaintiffs and members of the Class. Defendants' knowledge that their activities were fraudulent and unlawful is evidenced by the fact that they did not disclose the mark-ups and/or unnecessary nature of the fees in their communications to borrowers.

128.  The predicate acts specified above constitute a "pattern of racketeering activity" within the meaning of Title 18 United States Code section 1961(5) in which Defendants have engaged under Title 18 United States Code section 1962(c).

129.  All of the predicate acts of racketeering activity described herein are part of the nexus of the affairs and functions of the Wells Fargo and Chase racketeering enterprises.

130.  The pattern of racketeering activity is currently ongoing and open-ended, and threatens to continue indefinitely unless this Court enjoins the racketeering activity.

131.  Numerous schemes have been completed involving repeated unlawful conduct that by its nature, projects into the future with a threat of repetition.

132.  As a direct and proximate result of these violations of Title 18 United States Code sections 1962(c) and (d), Plaintiffs and members of the class have suffered substantial damages. Defendants are liable to Plaintiffs and members of the Class for treble damages, together with all costs of this action, plus reasonable attorney's fees, as provided under Title 18 United States Code section 1964(c).

# THIRD CAUSE OF ACTION

**Violation of the Racketeer Influenced and Corrupt Organizations Act, Conspiracy to Violate Title 18 United States Code section 1962(c)**

**(18 U.S.C. § 1962(d))**

133.  Plaintiffs incorporate by reference in this cause of action each and every allegation of the preceding paragraphs, with the same force and effect as though fully set forth herein.

134.  As set forth above, in violation of Title 18 United States Code section 1962(d), Defendants Wells Fargo & Company and Wells Fargo Bank, N.A. conspired to

30

1  violate the provisions of Title 18 United States Code section 1962(c).

2      135.   As set forth above, in violation of Title 18 United States Code section

3  1962(d), Defendants J.P. Morgan Chase & Co., J.P. Morgan Chase Bank, N.A., and Chase

4  Home Finance LLC conspired to violate the provisions of Title 18 United States Code

5  section 1962(c).

6      136.   As a direct and proximate result, Plaintiffs and the members of the Class

7  have been injured in their business or property by the predicate acts which make up

8  Defendants' patterns of racketeering activity in that unlawfully marked-up and/or

9  unnecessary fees for default-related services were assessed on their mortgage accounts.

10                    **FOURTH CAUSE OF ACTION**

11                         **Unjust Enrichment**

12     137.   Plaintiffs incorporate by reference in this cause of action each and every

13  allegation of the preceding paragraphs, with the same force and effect as though fully set

14  forth herein.

15     138.   By their wrongful acts and omissions of material facts, Defendants were

16  unjustly enriched at the expense of Plaintiffs and members of the Class.

17     139.   The mortgage contract between Defendants and borrowers like Plaintiffs and

18  the members of the Class allows Chase and Wells Fargo to pay for default-related services

19  when necessary or appropriate, and to be reimbursed by the borrower, but it does not

20  authorize Defendants to mark-up the actual cost of those services to make a profit, nor

21  does it allow Defendants to incur unnecessary fees.

22     140.   Nevertheless, Defendants mark-up the prices charged by vendors, often by

23  100% or more, and then, without disclosing the mark-up, assess borrowers' accounts for

24  the higher, marked-up fee so that Defendants can earn a profit.

25     141.   Thus, Plaintiffs and members of the Class were unjustly deprived.

26     142.   Defendants are aware that it is improper to mark-up and/or assess

27  unnecessary fees on borrowers' accounts for default-related services.  Therefore,

28  Defendants fraudulently conceal these fees on borrowers' accounts, omitting any

1  information about Defendants' additional profits, by identifying them on mortgage

2  statements only as "Other Charges," "Other Fees," "Miscellaneous Fees," or "Corporate

3  Advances."

4      143.   Furthermore, to lull borrowers into a sense of trust, conceal Defendants'

5  unlawful fees, and dissuade borrowers from challenging Defendants' unlawful fee

6  assessments, Defendants further conceal their scheme from borrowers by telling them, in

7  statements and other documents, that such fees are "allowed by [borrowers'] Note and

8  Security Instrument," or that they are "[i]n accordance with the terms of your mortgage."

9      144.   It would be inequitable and unconscionable for Defendants to retain the

10  profit, benefit and other compensation they obtained from their fraudulent, deceptive, and

11  misleading conduct alleged herein.

12      145.   Plaintiffs and members of the Class seek restitution from Defendants, and

13  seek an order of this Court disgorging all profits, benefits, and other compensation

14  obtained by Defendants from their wrongful conduct.

15                 **PRAYER FOR RELIEF**

16      Plaintiffs, and on behalf of themselves and all others similarly situated, request the

17  Court to enter judgment against Defendants, as follows:

18      1.    Certifying the Class, as requested herein, certifying Plaintiffs as the

19  representatives of the Class, and appointing Plaintiffs' counsel as counsel for the Class;

20      2.    Ordering that Defendants are financially responsible for notifying all

21  members of the Class of the alleged misrepresentations discussed herein;

22      3.    Awarding Plaintiffs and the members of the Class compensatory damages in

23  an amount according to proof at trial;

24      4.    Awarding restitution and disgorgement of Defendants' revenues to Plaintiffs

25  and members of the Class;

26      5.    Awarding Plaintiffs and the members of the Class treble damages in an

27  amount according to proof at trial;

28      6.    Awarding declaratory and injunctive relief as permitted by law or equity,

1    including:  enjoining Defendants from continuing the unlawful practices as set forth

2    herein, and directing Defendants to identify, with Court supervision, victims of its conduct

3    and pay them restitution and disgorgement of all monies acquired by Defendants by

4    means of any act or practice declared by this Court to be wrongful;

5        7.    Ordering Defendants to engage in corrective advertising;

6        8.    Awarding interest on the monies wrongfully obtained from the date of

7    collection through the date of entry of judgment in this action;

8        9.    Awarding attorneys' fees, expenses, and recoverable costs reasonably

9    incurred in connection with the commencement and prosecution of this action; and

10       10.   For such other and further relief as the Court deems just and proper.

11

12   Dated: February 10, 2012                 BARON & BUDD, P.C.

13

14                                            By:_____

15                                                Mark Pifko

16                                            Daniel Alberstone (SBN 105275)
                                              Roland Tellis (SBN 186269)
17                                            Mark Pifko (SBN 228412)
                                              BARON & BUDD, P.C.
18                                            1999 Avenue of the Stars, Suite 3450
                                              Los Angeles, California  90067
19                                            Telephone:  (310) 860-0476
                                              Facsimile:   (310) 860-0480

20                                            Attorneys for Plaintiffs
                                              LATARA BIAS, ERIC BREAUX,
21                                            NAN WHITE-PRICE, and DIANA ELLIS,
                                              individually, and on behalf of other
22                                            members of the public similarly situated

23

24

25

26

27

28

CLASS ACTION COMPLAINT

## DEMAND FOR JURY TRIAL

Plaintiffs hereby demand a trial of their claims by jury to the extent authorized by law.

Dated: February 10, 2012

BARON & BUDD, P.C.

By: _____
Mark Pifko

Daniel Alberstone (SBN 105275)
Roland Tellis (SBN 186269)
Mark Pifko (SBN 228412)
BARON & BUDD, P.C.
1999 Avenue of the Stars, Suite 3450
Los Angeles, California 90067
Telephone: (310) 860-0476
Facsimile: (310) 860-0480

Attorneys for Plaintiffs
LATARA BIAS, ERIC BREAUX,
NAN WHITE-PRICE, and DIANA ELLIS,
individually, and on behalf of other
members of the public similarly situated

CLASS ACTION COMPLAINT