Daniel Alberstone (SBN 105275)
dalberstone@baronbudd.com
Roland Tellis (SBN 186269)
rtellis@baronbudd.com
Mark Pifko (SBN 228412)
mpifko@baronbudd.com
BARON & BUDD, P.C.
1999 Avenue of the Stars, Suite 3450
Los Angeles, California 90067
Telephone:   (310) 860-0476
Facsimile:   (310) 860-0480

Attorneys for Plaintiffs
LATARA BIAS, ERIC BREAUX,
NAN WHITE-PRICE, DIANA ELLIS,
JAMES SCHILLINGER, RONALD
LAZAR, GLORIA STITT, RONALD
STITT, JUDI SHATZER, MARK
ZIRLOTT, and TERRI LOUISE ZIRLOTT
individually, and on behalf of other members
of the public similarly situated

## UNITED STATES DISTRICT COURT

## NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| LATARA BIAS, ERIC BREAUX, NAN WHITE-PRICE, DIANA ELLIS, JAMES SCHILLINGER, RONALD LAZAR, GLORIA STITT, RONALD STITT, JUDI SHATZER, MARK ZIRLOTT, and TERRI LOUISE ZIRLOTT, individually, and on behalf of other members of the general public similarly situated, | Case Number:  4:12-cv-00664-YGR **FIRST AMENDED CLASS ACTION COMPLAINT FOR:** |
| Plaintiffs, | (1)  Violations of California's Unfair Competition Law (Cal. Bus. & Prof. Code §§ 17200 *et seq.*); |
| vs. | (2)  Violations of the Racketeer Influenced and Corrupt Organizations Act (18 U.S.C. § 1962(c)); |
| WELLS FARGO & COMPANY, a Delaware corporation, WELLS FARGO BANK, N.A., a national association, J.P. MORGAN CHASE & CO., a Delaware corporation, J.P. MORGAN CHASE BANK, N.A., a national association, and CHASE HOME FINANCE LLC, a Delaware limited liability company, CITIBANK, N.A., a national association, and CITIMORTGAGE, INC., a New York corporation, | (3)  Violations of the Racketeer Influenced and Corrupt Organizations Act (18 U.S.C. § 1962(d)); and (4)  Unjust Enrichment |
| Defendants. | **Jury Trial Demanded** |

1    For their complaint against Wells Fargo & Company, Wells Fargo Bank, N.A.,

2  J.P. Morgan Chase & Co., J.P. Morgan Chase Bank, N.A., Chase Home Finance LLC,

3  Citibank, N.A., and CitiMortgage, Inc. (collectively "Defendants"), Plaintiffs Latara

4  Bias, Eric Breaux, Nan White-Price, Diana Ellis, James Schillinger, Ronald Lazar,

5  Gloria Stitt, Ronald Stitt, Judi Shatzer, Mark Zirlott, and Terri Louise Zirlott

6  ("Plaintiffs"), individually, and on behalf of all other members of the public similarly

7  situated, based on information and belief, allege as follows:

8                          **NATURE OF THE ACTION**

9    1.    This case concerns fraudulent practices committed by Defendants in

10  connection with their home mortgage loan servicing businesses.  Together, Defendants

11  service almost 25 million loans, which is approximately one-third of the total number of

12  loans in the United States.  Taking advantage of economic downturn and the increasing

13  number of loans in default, Defendants service these loans according to uniform practices

14  designed to maximize fees assessed on borrowers' accounts when they are late on their

15  payments.  Consistent with these practices, Defendants use automated mortgage loan

16  management systems, made up of an enterprise of subsidiaries, inter-company

17  departments, divisions, and third-party "property preservation" vendors, to engage in a

18  scheme to conceal the unlawful assessment of improperly marked-up or unnecessary fees

19  for default-related services, cheating borrowers who can least afford it.

20   2.    More specifically, when home mortgage borrowers get behind on their

21  payments and go into "default," Defendants assess fees on borrowers' accounts for

22  various default-related services, purportedly designed to protect the lender's interest in the

23  property.  However, Defendants are not permitted to mark-up the fees for such services to

24  earn a profit.  Nor are Defendants permitted to assess borrowers' accounts for default-

25  related service fees that are unreasonable or unnecessary.  Nevertheless, as discussed in

26  detail below, using false pretenses to conceal the truth from borrowers, that is precisely

27  what Defendants do.

28   3.    In effect, to generate hefty profits, the lending industry has substituted

inflated interest rates with inflated fees.  Defendants formed enterprises, associations of subsidiaries, affiliated companies, and "property preservation" vendors, and designed schemes to disguise hidden mark-ups or unnecessary fees so that they could earn additional, undisclosed profits.  Through these unlawful enterprises, Defendants mark-up the fees charged by vendors, often by 100% or more, and then, without disclosing the mark-up, assess borrowers' accounts for the hidden profits.  Furthermore, in connection with their schemes, Defendants also have a practice of routinely assessing fees for default-related services, even when they are unnecessary and inappropriate.  Employing this strategy, Defendants are able to quietly profit from default-related service fees at the expense of struggling consumers.  Indeed, in the fourth quarter of 2011 alone, defendant Wells Fargo & Company saw a 20% increase in profits.[1]

4.      Many borrowers reasonably believe the lender from whom they obtained their mortgage will hold and service their loan until it is paid off.  Instead, however, through relatively recent mortgage industry practices, such as securitization and the sale of mortgage backed securities, that is often not the case.  In today's market, loans and the rights to service them are bought and sold at will, multiple times over.

5.      A borrower's relationship is typically with the mortgage servicer rather than the lender who originated the loan.  Defendants are some of the largest mortgage servicers in the United States.  As mortgage servicers, Defendants are responsible for the day-to-day management of loan accounts, including handling customer inquiries, collecting and crediting loan payments, sending default notices to delinquent borrowers, negotiating loan modifications, and directing foreclosure activities, including engaging the services of foreclosure counsel, even if the foreclosure is brought in the name of the owner of the loan, rather than the servicer.

6.      Borrowers depend on their mortgage servicers to handle servicing-related

---

[1] *See* Ben Protess, New York Times, *Wells Fargo Profit Rose 20% in Fourth Quarter*, Jan. 17, 2012, available at http://dealbook.nytimes.com/2012/01/17/wells-fargo-fourth-quarter-profit-up-20/ (last visited Jan. 17, 2012).

1  tasks accurately and with skill.  Because banks like Defendants who service loans do not

2  profit directly from interest payments made by borrowers, rather than ensuring that

3  borrowers stay current on their loans, Defendants are more concerned with generating

4  revenue from fees assessed against the mortgage accounts they service.  According to one

5  member of the Board of Governors of the Federal Reserve System, "a foreclosure almost

6  always costs the investor [who owns the loan] money, but [it] may actually earn money

7  for the servicer in the form of fees."[2]

8      7.      Banks like Defendants see opportunity where investors see failure because

9  borrowers are captives to companies who service their loans.  Accordingly, when

10  borrowers go into default and Defendants unilaterally decide to perform default-related

11  services, borrowers have no option but to accept Defendants' choice of providers.

12      8.      Taking advantage of these circumstances, the Wells Fargo defendants, Chase

13  defendants, and Citi defendants each formed enterprises with their respective subsidiaries,

14  affiliates, and "property preservation" vendors, and then, developed a uniform practice of

15  unlawfully marking up default-related service charges assessed against borrowers'

16  accounts so that Defendants can earn undisclosed profits in connection with these

17  services.  Defendants' marked-up fees violate borrowers' mortgage agreements because

18  the fees exceed the actual cost of the services, and therefore, they are not, as the mortgage

19  agreements require, "reasonable" or "appropriate" to protect the note holder's interest in

20  the property.

21      9.      Defendants are aware that it is improper to mark-up the fees assessed on

22  borrowers' accounts for default-related services.  Therefore, Defendants fraudulently

23  conceal these fees on borrowers' accounts, omitting any information about Defendants'

24  additional profits, by identifying them on mortgage statements with cryptic descriptions,

25

26  [2] *See* Sarah Bloom Raskin, Member Board of Governors of the Federal Reserve System, *Remarks at the National Consumer Law Center's Consumer Rights Litigation Conference*, Boston Massachusetts, Nov.

27  12, 2010, available at www.federalreserve.gov/newsevents/speech/raskin20101112a.htm (last visited Jan.

28  23, 2012).

such as "Other Charges," "Other Fees," "Miscellaneous Fees," "Corporate Advances," or "Delinquency Expenses."

10.    Indeed, Defendants' practices are designed to avoid detection even when examined in bankruptcy proceedings.  As one court has explained, "[l]enders have apparently been operating under the assumption that the fees and costs in their proofs of claim are invulnerable to challenge because debtors lack the sophistication, the debtors' bar lacks the financial motivation, and bankruptcy courts lack the time."[3]  "[T]he Court believes that certain members of the mortgage industry are *intentionally* attempting to game the system by requesting undocumented and potentially excessive fees."[4]

11.    The rampant abuses by mortgage servicers like Defendants, have led federal regulators to enter into numerous Consent Orders, but according to Mark Pearce, Director, Division of Depositor and Consumer Protection, Federal Deposit Insurance Corporation, "these consent orders do not fully identify and remedy past errors in mortgage-servicing operations of large institutions; in fact, the scope of the interagency review did not include a review of . . . the fees charged in the servicing process.  Much work remains to identify and correct past errors and to ensure that the servicing process functions effectively, efficiently, and fairly going forward."[5]

12.    Plaintiffs bring this action, seeking injunctive relief and damages on behalf of themselves and the thousands of borrowers who have been victimized by the Defendants' uniform schemes.

---

[3] *In re: Prevo*, 394 B.R. 847, 848 (Bankr. S.D. Tex. 2008).

[4] *Id.* at 851 (emphasis added).

[5] *See* Mark Pearce, Director, Division of Depositor and Consumer Protection, Federal Deposit Insurance Corporation, *Mortgage Servicing:  An Examination of the Role of Federal Regulators in Settlement Negotiations and the Future of Mortgage Servicing Standards*, before the Subcommittees on Financial Institutions and Consumer Credit, and Oversight and Investigations Committee on Financial Services, U.S. House of Representatives, July 7, 2011, available at http://financialservices.house.gov/UploadedFiles/070711pearce.pdf (last visited, Feb. 1, 2012).

**JURISDICTION AND VENUE**

13.     Jurisdiction is proper in this Court under 28 U.S.C. § 1332(d)(2).  The matter in controversy, exclusive of interest and costs, exceeds the sum or value of $5,000,000 and is a class action in which members of the class of plaintiffs are citizens of states different from Defendants.  Further, greater than two-thirds of the members of the Class reside in states other than the states in which Defendants are a citizens.

14.     This Court also has jurisdiction over this matter under 28 U.S.C. §§ 1331, 1961, 1962 and 1964.  This Court has personal jurisdiction over Defendants under 18 U.S.C. §1965.  In addition, under 28 U.S.C. § 1367, this Court may exercise supplemental jurisdiction over the state law claims because all of the claims are derived from a common nucleus of operative facts and are such that Plaintiffs ordinarily would expect to try them in one judicial proceeding.

15.     Venue lies within this judicial district under 28 U.S.C. § 1391(a) and (c) because defendants Wells Fargo & Company and Wells Fargo Bank, N.A.'s principal place of business is in this District, the acts giving rise to the claims at issue in this Complaint occurred, among other places, in this District, and Defendants' contacts are sufficient to subject them to personal jurisdiction in this District, and therefore, Defendants reside in this District for purposes of venue.

**Intradistrict Assignment**

16.     Consistent with Northern District of California Civil Local Rule 3-5(b), assignment to the San Francisco or Oakland Division is appropriate under Civil Local Rules 3-2(c) and 3-2(d), because acts giving rise to the claims at issue in this Complaint occurred, among other places, in this District, in the City of San Francisco.

**PARTIES**

17.     Plaintiff Latara Bias is an individual and a citizen of Louisiana.

18.     Plaintiff Eric Breaux is an individual and a citizen of Louisiana.

19.     Plaintiff Nan White-Price is an individual and a citizen of Louisiana.

20.     Plaintiff Diana Ellis is an individual and a citizen of California.

21.   Plaintiff James Schillinger is an individual and a citizen of Tennessee.

22.   Plaintiff Ronald Lazar is an individual and a citizen of Oregon.

23.   Plaintiff Gloria Stitt is an individual and a citizen of New York.

24.   Plaintiff Ronald Stitt is an individual and a citizen of New York.

25.   Plaintiff Judi Shatzer is an individual and a citizen of Maryland.

26.   Plaintiff Mark Zirlott is an individual and a citizen of Alabama.

27.   Plaintiff Terri Louise Zirlott is an individual and a citizen of Alabama.

28.   Defendant Wells Fargo & Company is a corporation organized under the laws of Delaware and headquartered in San Francisco, California.

29.   Defendant Wells Fargo Bank, N.A. is a subsidiary of Wells Fargo & Company, and is a national bank organized and existing as a national association under the National Bank Act, 12 U.S.C. §§ 21 *et seq.*, with its principal place of business in San Francisco, California.

30.   Defendant J.P. Morgan Chase & Co. is a corporation organized under the laws of Delaware, with its principal place of business in New York, New York.

31.   Defendant J.P. Morgan Chase Bank, N.A. is a subsidiary of J.P. Morgan Chase & Co., and is a national bank organized and existing as a national association under the National Bank Act, 12 U.S.C. §§ 21 *et seq.*, with its principal place of business in Columbus, Ohio.

32.   Defendant Chase Home Finance LLC, is a subsidiary of J.P. Morgan Chase & Co. and J.P. Morgan Chase Bank, N.A., and is a Delaware limited liability company, with its principal place of business in Iselin, New Jersey.

33.   Defendant Citibank, N.A. is a national bank organized and existing as a national association under the National Bank Act, 12 U.S.C. §§ 21 *et seq.*, with its principal place of business in New York, New York, and is a subsidiary of Citicorp, and is the parent corporation of CitiMortgage, Inc.

34.   Defendant CitiMortgage, Inc. is a subsidiary of Citibank, N.A., and is a New York corporation, with its principal place of business in O'Fallon, Missouri.

35.     Whenever, in this Complaint, reference is made to any act, deed, or conduct of Defendants committed in connection with the enterprise, the allegation means that Defendants engaged in the act, deed, or conduct by or through one or more of their officers, directors, agents, employees or representatives, each of whom was actively engaged in the management, direction, control or transaction of the ordinary business and affairs of Defendants and the enterprise.

36.     Plaintiffs are informed and believe, and based thereon, allege that, at all material times herein, each Wells Fargo defendant, Wells Fargo & Company and Wells Fargo Bank, N.A. (collectively "Wells Fargo"), was the agent, servant, or employee of, and acted within the purpose, scope, and course of said agency, service, or employment, and with the express or implied knowledge, permission, and consent of the other Wells Fargo defendant, and ratified and approved the acts of the other Wells Fargo defendant.

37.     Plaintiffs are informed and believe, and based thereon, allege that, at all material times herein, each Chase defendant, J.P. Morgan Chase & Co., J.P. Morgan Chase Bank, N.A., and Chase Home Finance LLC (collectively, "Chase"), was the agent, servant, or employee of the other Chase defendants, and acted within the purpose, scope, and course of said agency, service, or employment, and with the express or implied knowledge, permission, and consent of the other Chase defendants, and ratified and approved the acts of the other Chase defendants.

38.     Plaintiffs are informed and believe, and based thereon, allege that, at all material times herein, each Citi defendant, Citibank, N.A. and CitiMortgage, Inc. (collectively, "Citi"), was the agent, servant, or employee of, and acted within the purpose, scope, and course of said agency, service, or employment, and with the express or implied knowledge, permission, and consent of the other Citi defendant, and ratified and approved the acts of the other Citi defendant.

## FACTUAL BACKGROUND

39.    America's lending industry is in turmoil, and the lending community has divorced itself from the borrowers it once served.  Traditionally, when people wanted to borrow money, they went to a bank or a "savings and loan."  Banks loaned money and borrowers promised to repay the bank, with interest, over a specific period of time.  The originating bank kept the loan on its balance sheet, and serviced the loan -- processing payments, and sending out applicable notices and other information -- until the loan was repaid.  The originating bank had a financial interest in ensuring that the borrower was able to repay the loan.

40.    Today, however, the process has changed.  Mortgages are now packaged, bundled, and sold to investors on Wall Street through what is referred to in the financial industry as mortgage backed securities or MBS.  This process is called securitization.  Securitization of mortgage loans provides banks like Defendants with the benefit of immediately being able to recover the amounts loaned.  Securitization essentially eliminates the bank's risk from potential default.  But, by eliminating the risk of default, mortgage backed securities have disassociated the lending community from borrowers.  Numerous unexpected consequences have resulted from the divide between lenders and borrowers.

41.    Among other things, securitization has created an industry of companies in the lending industry like Defendants, who no longer make money primarily from interest on the loans they originate.  Thus, lenders no longer have the financial interest in the repayment of loans that they once did.  Instead, banks like Wells Fargo, Chase, and Citi service or administer mortgages for hedge funds and investment houses who own the loans.  Rather than earn income from the interest on these loans, banks like Wells Fargo, Chase, and Citi are paid a fee for their loan administration services.

42.    Additionally, under agreements with investors (pooling and service agreements), loan servicers like Defendants assess fees on borrowers' accounts for default-related services in connection with their administration of borrowers' loans.

These fees include Broker's Price Opinion fees and appraisal fees. Defendants' collection of these fees, however, exemplifies how America's lending industry has run off the rails.

43.    As one Member of the Board of Governors of the Federal Reserve System has explained, "[w]hile an investor's financial interests are tied more or less directly to the performance of a loan, the interests of a third-party servicer are tied to it only indirectly, at best. The servicer makes money, to oversimplify it a bit, by maximizing fees earned and minimizing expenses while performing the actions spelled out in its contract with the investor. . . . The broad grant of delegated authority that servicers enjoy under pooling and servicing agreements (PSAs), combined with an effective lack of choice on the part of consumers, creates an environment ripe for abuse."[6]

44.    For banks like Wells Fargo, Chase, and Citi, who are determined to maximize the money they earn for servicing loans, the right to charge exorbitant fees has opened the door to a world of exploitation. As a result of the disassociation between loan servicers and the monies generated from the interest borrowers pay on their loans, Wells Fargo, Chase, and Citi have been incentivized to find other ways to grow their profits.

45.    Wells Fargo, Chase, and Citi, with their subsidiaries, affiliated companies, intercompany divisions, and third-party "property preservation" vendors, each formed an unlawful enterprise and decided to game the system, under the guise of collecting default-related service fees, and then, they sought to increase mortgage servicing revenues by fraudulently concealing marked-up or unnecessary fees assessed on borrowers' accounts.

46.    In short, as explained by Adam J. Levitin, Associate Professor of Law at the Georgetown University Law Center, in testimony to the United States House Financial Services Committee, Subcommittee on Housing and Community Opportunity, "Servicers' business model also encourages them to cut costs wherever possible, even if this involves

---

[6] *See* Sarah Bloom Raskin, Member Board of Governors of the Federal Reserve System, *Remarks at the National Consumer Law Center's Consumer Rights Litigation Conference*, Boston Massachusetts, Nov. 12, 2010, available at www.federalreserve.gov/newsevents/speech/raskin20101112a.htm (last visited Jan. 23, 2012).

cutting corners on legal requirements, and to lard (sic) on junk fees and in-sourced expenses at inflated prices."[7]

## DEFENDANTS' AUTOMATED LOAN SERVICING PRACTICES

47.   Together, Defendants service approximately 25 million loans.  To maximize profits, Defendants assign the complex task of administering these millions of loans to computer software programs.  The software programs are designed to manage borrowers' accounts and assess fees, according to protocols designed by the executives at Chase, Wells Fargo, and Citi.

48.   Plaintiffs are informed and believe, and based thereon, allege that as part of the Chase, Wells Fargo, and Citi enterprises' efforts to conceal the extent of their activities, Defendants also program their computer systems to automatically remove from account statements submitted in court proceedings, some of the fees and charges typically assessed against borrowers accounts because they have been prohibited by a particular jurisdiction or judge within a jurisdiction, only to later assess the fees on the account after the court proceedings have concluded.

### Chase and Wells Fargo's Automated Loan Management Practices

49.   Chase and Wells Fargo automate their loan servicing businesses through a computer software program provided by Fidelity National Information Services, Inc., which is called Mortgage Servicing Package ("Fidelity MSP").  Fidelity MSP is a sophisticated home loan management program, and is one of the most widely used such programs in the United States.

50.   When a loan is originated, guidelines for managing the loan are imported into Fidelity MSP.  Loans serviced by Chase and Wells Fargo are then automatically managed by the software according to those guidelines.  For example, among other things, if a loan

---

[7] *See* Adam J. Levitin, *Robo-Singing, Chain of Title, Loss Mitigation, and Other Issues in Mortgage Servicing*, before the House Financial Services Committee, Subcommittee on Housing and Community Opportunity, Nov. 18, 2010, available at
http://financialservices.house.gov/Media/file/hearings/111/Levitin111810.pdf (last visited Feb. 1, 2012).

in Chase or Wells Fargo's systems is past due, the guidelines instruct the computer when to impose late fees. Chase and Wells Fargo also assess other charges and fees against borrowers' accounts by using "wrap around" software packages that work with the Fidelity MSP system. Based on parameters inputted into these programs, Chase and Wells Fargo's computer systems automatically implement decisions about how to manage borrowers' accounts based on internal software logic. Chase and Wells Fargo assess fees for default-related services on borrowers' accounts through these systems.

51.     The Fidelity MSP software used by Chase and Wells Fargo also has a platform called Bankruptcy Work Station ("BWS") that is purportedly infused with computer logic designed to manage a loans during a pending bankruptcy. Additionally, to manage loans in default, Chase also uses a software program called "FORTRACS." "FORTRACS automates default management processing, decisioning and documentation of a loan. With fully integrated modules and synchronization of activities, it supports the lender's credit and collateral risk management through loss mitigation, foreclosure processing, bankruptcy monitoring, claims processing and REO management."[8]

### Citi's Automated Loan Management Practices

52.     Citi automates its loan servicing business primarily through two computer software programs, which are called CitiLink and Maestro. CitiLink and Maestro are proprietary to Citi. Citi also uses a program called DRI, which is a case management, communications, and recordkeeping software system for default-related matters.

53.     Like Fidelity MSP, CitiLink and Maestro contain information relating to the origination, payment, interest, and fees concerning mortgages serviced by Citi. Management of payment information for loans serviced by Citi is automated by CitiLink and Maestro. When borrowers send payment checks to Citi, the payments are automatically loaded into CitiLink or Maestro. Payments made over the phone or on the Internet are automatically fed into CitiLink or Maestro as well.

---

[8] *See* http://www.isgn.com/Products/Fortracs.htm (last visited Feb. 8, 2012).

54.     Based on parameters inputted into these programs, Citi's computer systems automatically implement decisions about how to manage borrowers' accounts based on internal software logic.  Among other things, if a loan in Citi's systems is past due, the internal software logic in CitiLink and Citi's other loan management programs is designed to automatically assess late fees, default-related service fees, and other charges against borrowers' accounts.

**MARKED-UP AND UNNECESSARY FEES**

**FOR DEFAULT-RELATED SERVICES**

55.     In their loan servicing operations, Defendants follow a strategy to generate fraudulently concealed default-related fee income.  Rather than simply obtain default-related services directly from independent third-party vendors, and charge borrowers for the actual cost of these services, Defendants assess borrowers' accounts for services that are unnecessary and they unlawfully add additional, undisclosed profits on to the charges before they are assessed on borrowers' accounts.

56.     Defendants' scheme works as follows.  Defendants order default-related services from their subsidiaries and affiliated companies, who, in turn, obtain the services from third-party vendors.  The third-party vendors charge Defendants for their services. Defendants, in turn, charge borrowers a fee that is significantly marked-up from the third-party vendors' actual fees for the services.  As a result, even though the mortgage market has collapsed, and more and more borrowers are falling into delinquency, Defendants continue to earn substantial profits by assessing undisclosed, marked-up fees for default-related services on borrowers' accounts.

57.     The mortgage contract between a lender and a borrower generally consists of two documents:  the promissory note ("Note") and the mortgage or deed of trust ("Security Instrument").  The mortgage contacts serviced by Defendants are substantially similar because they conform to the standard Fannie Mae/Freddie Mac form contract. These contracts contain form language regarding what occurs if borrowers default on their loans.  The Security Instrument authorizes the loan servicer, in the event of default, to:

> pay for whatever is reasonable or appropriate to protect the note holder's interest in the property and rights under the security instrument, including protecting and/or assessing the value of the property, and securing and/or repairing the property.

58.     The Security Instrument further provides that any such amounts disbursed by the servicer shall become additional debt of the borrower secured by the Security Instrument and shall bear interest at the Note rate from the date of disbursement.  The Note provides that the note holder:

> will have the right to be paid back by [the borrower] for all of its costs and expenses in enforcing this Note to the extent not prohibited by applicable law.  Those expenses include, for example, reasonable attorneys' fees.

Thus, the mortgage contract allows the servicer to pay for default-related services when necessary or appropriate, and to be reimbursed by the borrower, but it does not authorize the servicer to mark-up the actual cost of those services to make a profit, nor does it permit such fees to be assessed on borrowers' accounts when they are unnecessary or inappropriate.

59.     Broker's Price Opinions ("BPOs") are a significant category of default-related service fees that, in furtherance of Defendants' unlawful enterprises, are assessed on borrowers' accounts with substantial, undisclosed mark-ups, fraudulently generating revenue in the loan servicing business.

60.    As discussed above, by charging marked-up fees for BPOs, Defendants violate the agreements with borrowers because, among other things, charges that exceed the actual cost of the services provided are neither reasonable, nor appropriate to protect the note holder's interest in the property and the rights under the security instrument.

61.    Furthermore, the wrongful nature of the marked-up fees is demonstrated by the fact that Defendants do not disclose to borrowers that the fees assessed on their accounts are marked-up from the amount actually charged by the vendor.

62.    Although Defendants assess fees for BPOs on borrowers' accounts in amounts ranging from $95 to $125, as of December 2010, under Fannie Mae guidelines, the maximum reimbursable rate for an exterior BPO is $80,[9] and in practice, the actual cost is much less.  According to the National Association of BPO Professionals, the actual cost of a BPO may be as little as $30.[10]

### Practices Specific to the Wells Fargo Enterprise

63.    Defendants Wells Fargo & Company, and Wells Fargo Bank, N.A. administer approximately 10.3 million home mortgage loans, which is about one out of every seven mortgages in the United States.  Defendant Wells Fargo & Company, its subsidiary, defendant Wells Fargo Bank, N.A., their third-party "property preservation" vendors, and the real estate brokers who provide BPOs for Wells Fargo, formed an enterprise and devised a scheme to defraud borrowers and obtain money from them by means of false pretenses.

64.    The vast majority of consumer real estate loans serviced by defendant a Wells Fargo & Company affiliate are serviced by defendant Wells Fargo Bank, N.A., either through its division, Wells Fargo Home Mortgage, or its trade name, America's Servicing Company.  Approximately 70% of the loans serviced by Wells Fargo are

---

[9] *See* Fannie Mae, *Broker Price Opinion Providers and Pricing Structure*, available at https://efanniemae.com/sf/guides/ssg/annltrs/pdf/2010/ntce121710a.pdf (last visited Feb. 1, 2012).

[10] *See* National Association of BPO Professionals (NABPOP), *Broker Price Opinion – BPO Brief*, available at http://www.nabpop.org/Advocacy-BPOBrief-2.php (last visited Feb. 2, 2012).

serviced for investors, including Fannie Mae, Freddie Mac, and private investors.

65.    Using the enterprise and its automated mortgage loan management system, Wells Fargo engaged in a scheme to fraudulently conceal and assess unlawfully marked-up BPO fees on borrowers' accounts, cheating hundreds of thousands of borrowers out of hundreds of millions dollars.  Furthermore, to conceal its actions and mislead borrowers about the true nature of its actions, Wells Fargo has employed a corporate practice that omits the true nature of the fees that are being assessed on borrowers' accounts.  Wells Fargo conceals these marked-up BPO fees, by identifying the charges on borrowers' statements only as "Other Charges," or "Other Fees."  These practices are common to all of Wells Fargo's files.

66.    Additionally, in order to further conceal its activities and mislead both borrowers and the courts, Wells Fargo established an inter-company division or d/b/a, who participates as a member of the enterprise, called Premiere Asset Services ("PAS"). PAS exists to generate revenues for Wells Fargo and it does not operate at arms-length with Wells Fargo & Company or Wells Fargo Bank, N.A.  According to PAS' website, PAS is located, among other places, in San Bernardino, California.



**Company Profile**

Congratulations for discovering an alternative to the typical home buying process. In many areas of the United States the market is still slanted in favor of sellers, causing buyers to compete for homes, raising prices to their maximum, and effectively shutting many out of realizing the dream of home ownership.

We believe that REO (Real Estate Owned) properties still provide an excellent opportunity to acquire affordable properties in all areas of the country. Our clients' portfolios include properties in all states and cover the full range of property types and property conditions...everything from homes in "move-in" condition to homes that will require substantial renovations. So no matter if you are looking for your first home or are a veteran renovation enthusiast, we have the home for you.

Premiere Asset Services is an REO property management and marketing firm located in Frederick, MD, and San Bernardino, CA. Our mission is to provide property valuation, management, and marketing services to banks, mortgage companies, and other investors that own real estate as a result of foreclosure actions. We maintain a close relationship with real estate agents nationwide and utilize those agents to list properties. All offers or questions concerning any specific property should be addressed to the listing agent.

Privacy Policy | Copyright Notice
© Copyright 2003 Premiere Asset Services, All Rights Reserved

15                              Case No. 4:12-cv-00664-YGR
FIRST AMENDED CLASS ACTION COMPLAINT

67.     In furtherance of the enterprise's unlawful activities, Wells Fargo also has used the Internet to make it appear as though PAS is an independent company that provides, among other things, BPOs, fraudulently concealing the fact that PAS is really just a vehicle that provides Wells Fargo with a false pretense for obtaining money from borrowers so that it can earn undisclosed profits.



68.     Acting as Wells Fargo's agent under the scheme, PAS performs the BPOs ordered by Wells Fargo.  When Wells Fargo orders BPOs, PAS sub-contracts the BPOs to different local real estate brokers.  PAS does not actually perform the BPOs itself. Nevertheless, consistent with the design of Wells Fargo's illegal enterprise, when borrowers demand that Wells Fargo substantiate charges for BPOs, PAS, at Wells Fargo's direction, invoices to Wells Fargo as if PAS was an independent, third-party vendor.

69.     Wells Fargo never actually pays the invoices because they are not legitimate invoices.  Instead, as Wells Fargo has admitted in other federal court proceedings, PAS is merely a division of Wells Fargo, and the "invoices" produced by PAS as purported evidence of third-party vendor costs for BPOs are actually internal memos between Wells

Fargo departments allocating costs of administration.

70.    The amount paid by Wells Fargo for the BPOs is approximately one-half to one-third as much as the amounts assessed on borrowers' accounts based on the invoices generated by PAS.  Wells Fargo assesses fees for BPOs on borrowers' accounts, charging from $95 to $125, when in fact, the actual cost of each BPO is approximately $50 or less.

71.    Wells Fargo never pays PAS for the BPOs, but rather when the BPOs are completed by real estate brokers, Wells Fargo issues checks directly to the real estate brokers.  Despite this reality, driven to increase profits with illegally marked-up charges, Wells Fargo assesses borrowers' accounts with fees for these "pass through" expenses, even though the assessed amounts include a profit of two to three times more than the actual expenses incurred by Wells Fargo.

72.    In furtherance of its scheme to conceal its illegal charges, PAS was created as part of Wells Fargo's enterprise to act as a phony third party vendor, making it appear to borrowers, and the courts as though the amounts assessed on borrowers' accounts are actual third party costs.  Wells Fargo never discloses that it is generating profits from the BPO charges that are illegally and improperly assessed on borrowers' accounts.

73.    Similarly, Plaintiffs are informed and believe, and on that basis, allege that when Wells Fargo assesses borrowers' accounts for property inspections, Wells Fargo includes an unlawful and undisclosed mark-up.  The actual cost of property inspections performed by Wells Fargo's vendors, such as First American Field Services, is $15.  Nevertheless, when Wells Fargo assess borrowers' accounts for the fees, it adds an undisclosed profit for itself, and assesses borrowers' accounts $20 for the inspection.  Wells Fargo conceals its unlawful profits by merely identifying the fee as "Other Charges," or "Inspection," without informing borrowers that the fee is marked-up.  If borrowers inquire about the nature of these fees, Wells Fargo further conceals and misleads borrowers, attempting to dissuade them from challenging the charge, by telling them that such fees are "[i]n accordance with the terms of your mortgage."

74.     As a result of Wells Fargo's unlawful enterprise, hundreds of thousands of unsuspecting borrowers like Plaintiffs are cheated out of millions of dollars.

### Practices Specific to the Chase Enterprise

75.     Defendant J.P. Morgan Chase & Co., its subsidiaries, defendant J.P. Morgan Chase Bank, N.A., and defendant Chase Home Finance LLC, their "property preservation" vendors, and the real estate brokers who provide BPOs for Chase, formed an enterprise and devised a scheme to defraud borrowers and obtain money from them by means of false pretenses.  Chase services approximately 9 million mortgage loans, which is about 12% of the loans in the United States.[11]

76.     Like Wells Fargo, according to defendant J.P. Morgan Chase & Co.'s 2010 Annual Report, "[w]hen it becomes likely that a borrower is either unable or unwilling to pay, the Firm obtains a broker's price opinion of the home based on an exterior-only valuation."[12]

77.     Plaintiffs are informed and believe, and on that basis, allege that using the enterprise and Chase's computerized automated mortgage loan management system, Chase unlawfully charges marked-up or unnecessary fees for default-related services. Furthermore, to fraudulently conceal its actions and mislead borrowers about the true nature of its actions, Chase employs a corporate practice that omits true nature of the fees that are being assessed on borrowers' accounts.

78.     Plaintiffs are informed and believe, and on that basis, allege that Chase conceals these marked-up fees for default-related services on borrowers accounts, by identifying the charges only as "Miscellaneous Fees," "Corporate Advances," "Other Fees," or "Advances" on borrowers' statements.  Under the these categories, Chase

---

[11] *See* J.P. Morgan Chase & Co. 2010 Annual Report at p. 39, available at http://files.shareholder.com/downloads/ONE/1653115906x0x458380/ab2612d5-3629-46c6-ad94-5fd3ac68d23b/2010_JPMC_AnnualReport_.pdf (last visited Jan. 24, 2012).

[12] *See* J.P. Morgan Chase & Co. 2010 Annual Report, available at http://files.shareholder.com/downloads/ONE/1653115906x0x458380/ab2612d5-3629-46c6-ad94-5fd3ac68d23b/2010_JPMC_AnnualReport_.pdf (last visited Jan. 24, 2012).

assesses fees for BPOs on borrowers' accounts, charging from $95 to $125, when in fact, on information and belief, the actual cost of each BPO is approximately $50 or less. Plaintiffs are informed and believe, and on that basis, allege that a significant number of these BPOs are ordered by Chase's Bankruptcy Processing team and Collection Department in San Diego, California.

79.    Plaintiffs are informed and believe, and on that basis, allege that under the "Miscellaneous Fees," "Corporate Advances," "Other Fees," or "Advances" categories on borrowers' statements, Chase also assesses unnecessary and unreasonable fees for property inspections.  In order to generate profits from these fees, Chase's automated loan management system is set up to order property inspections and assess fees against borrowers when they are a certain number of days late on their mortgage, regardless of whether the assessment of such fees is appropriate, reasonable, or necessary under the circumstances.  Although such inspections purportedly are conducted to guard against property loss, Chase's practices are designed to ensure that these fees are charged to as many accounts as possible, even if the inspections are inappropriate, unnecessary, or unreasonable.

80.    When a loan is delinquent, Chase repeatedly contacts borrowers by telephone and by letter.  In these communications, Chase determines whether the property is occupied.  Nevertheless, Plaintiffs are informed and believe, and on that basis, allege that guidelines inputted into Chase's loan management software system automatically trigger property inspections if a loan is past due by a certain number of days.  After a borrower's account is past due by a set number of days, as inputted into the software, Chase's computer automatically generates a work order for a property inspection without human intervention.  Moreover, so long as a borrower's account is past due by the requisite number of days inputted into the loan management software, Chase's system automatically continues to order inspections, regardless of whether it is reasonable or appropriate under the circumstances.

81.    Plaintiffs are informed and believe, and on that basis, allege that even if the

property inspections were properly performed and actually reviewed by someone at the bank, Chase's continuous assessment of fees for these inspections on borrowers accounts is still improper and unreasonable because of the frequency with which they are performed. If the first inspection report shows that the property is occupied and in good condition, it is unnecessary and inappropriate for Chase's system to automatically continue to order monthly inspections. Nothing in the reports justifies continued monitoring.

82.     In order to further lull borrowers into a sense of trust, conceal Chase's unlawful fees, and dissuade borrowers from challenging Chase's unlawful fee assessments, Chase falsely represents on statements provided to borrowers that "Other Fees" and "Advances," which are charges for BPOs and property inspections, include "amounts allowed by [borrowers'] Note and Security Instrument."

83.     As a result of Chase's unlawful enterprise, hundreds of thousands of unsuspecting borrowers are cheated out of millions of dollars.

### Practices Specific to the Citi Enterprise

84.     Defendant Citibank, N.A., its subsidiary, defendant CitiMortgage, Inc., and their "property preservation" vendors, and the real estate brokers who provide BPOs for Citi, formed an enterprise and devised a scheme to defraud borrowers and obtain money from them by means of false pretenses.

85.     CitiMortgage, Inc. is the fourth-largest servicer in the United States. CitiMortgage, Inc. services approximately 4 million loans, and approximately 20% of those loans concern properties in California.

86.     Plaintiffs are informed and believe, and on that basis, allege that using the enterprise and Citi's automated mortgage loan management system, Citi conceals marked-up or unnecessary fees for default-related services on borrowers accounts, by identifying the charges only as "Delinquency Expenses" on borrowers' statements. Under the this category of charges, Citi assesses fees for BPOs on borrowers' accounts, in amounts ranging from $84 to $105, when in fact, on information and belief, the actual cost of each

BPO is approximately $50 or less.

87.     Plaintiffs are informed and believe, and on that basis, allege that under the "Delinquency Expenses" category on borrowers' statements, Citi also assesses unnecessary and unreasonable fees for property inspections.  In order to generate profits from these fees, Citi's automated loan management system is set up to order property inspections and assess fees against borrowers when they are a certain number of days late on their mortgage, regardless of whether the assessment of such fees is appropriate, reasonable, or necessary under the circumstances.  Although such inspections purportedly are conducted to guard against property loss, Citi's practices are designed to ensure that these fees are charged to as many accounts as possible, even if the inspections are inappropriate, unnecessary, or unreasonable.

88.     Plaintiffs are informed and believe, and on that basis, allege that guidelines inputted into Citi's loan management software system automatically trigger property inspections if a loan is past due by a certain number of days.  Plaintiffs are informed and believe, and on that basis, allege that after a borrower's account is past due by a set number of days, as inputted into the software, Citi's computer automatically generates a work order for a property inspection without human intervention.  Moreover, so long as a borrower's account is past due by the requisite number of days inputted into the loan management software, Citi's system automatically continues to order inspections, regardless of whether it is reasonable or appropriate under the circumstances.

89.     Plaintiffs are informed and believe, and on that basis, allege that even if the property inspections were properly performed and actually reviewed by someone at the bank, Citi's continuous assessment of fees for these inspections on borrowers accounts is still improper and unreasonable because of the frequency with which they are performed. If the first inspection report shows that the property is occupied and in good condition, it is unnecessary and inappropriate for Citi's system to automatically continue to order monthly inspections.  Nothing in the reports justifies continued monitoring

90.     As a result of Citi's unlawful enterprise, hundreds of thousands of

unsuspecting borrowers are cheated out of millions of dollars.

## BORROWERS SUFFER HARM
## AS A RESULT OF DEFENDANTS' PRACTICES

91.    In addition to the direct monetary damages caused to borrowers, in the form of the difference between the actual cost of the services provided and the marked-up fees assessed on borrowers' accounts, borrowers suffer other, less obvious injuries as a result of the practices described herein.

92.    The assessment of these marked-up fees can make it impossible for borrowers to become current on their loan.  Charges for default-related services can add hundreds or thousands of dollars to borrowers' loans over time, driving them further into default.

93.    When borrowers get behind on their mortgage, and fees for these default-related services are stacked on to the past-due principal and interest payments, Defendants' practices make it increasingly difficult for borrowers to ever bring their loan current.  Even if borrowers pay the delinquent principal and interest payments, the marked-up fees for default-related services ensure that borrowers stay in default.  After paying delinquent principal and interest, although the next payment comes in on time, often through automatic payment deductions from borrowers' bank accounts, part of the payment is applied to the fees first, so there is not enough to cover the entire monthly payment.  This makes that payment late, creating a cascade of more fees, and more arrears, that keeps borrowers in delinquency.  By the time borrowers are aware, Defendants are threatening to foreclose unless a huge payment is made, and the weight of these unnecessary fees drops borrowers into a financial abyss.

94.    As a result of Defendants' practices, which force borrowers to move deeper into default, borrowers suffer damage to their credit score.  Defendants provide information about borrowers' payment history to credit reporting companies, including whether they have been late with a payment or missed any payments.  By keeping borrowers in default with these practices, Defendants affect whether borrowers can get a

loan in the future – and what borrowers' interest rate will be on such loans.

95.   Additionally, as a result of Defendants' practices, which force borrowers to move deeper into default, borrowers are driven into foreclosure.

## PLAINTIFFS' CLAIMS AGAINST WELLS FARGO

96.   Plaintiff Latara Bias is a resident of Napoleonville, which is in Assumption Parish, Louisiana.

97.   Plaintiff Eric Breaux is a resident of Napoleonville, which is in Assumption Parish, Louisiana.

98.   Plaintiffs Bias and Breaux have a mortgage serviced by Wells Fargo.

99.   Wells Fargo continually assessed $95 fees for BPOs on the mortgage account of Plaintiffs Bias and Breaux, beginning on December 28, 2006.  Wells Fargo also assessed $95 fees for BPOs on the mortgage account of Plaintiffs Bias and Breaux on September 27, 2007 and March 28, 2008.

100.   Plaintiff White-Price is a resident of Abita Springs, which is in St. Tammany Parish, Louisiana.

101.   Plaintiff White-Price has a mortgage serviced by Wells Fargo.

102.   A "Monthly Mortgage Statement," dated September 19, 2011, mailed to Plaintiff White-Price by defendant Wells Fargo included an assessment of $100.00 for "Other Charges."  Plaintiff is informed and believes, and on that basis, alleges that these charges included unlawful marked-up fees for default-related services.

## PLAINTIFFS' CLAIMS AGAINST CHASE

103.   Plaintiff Ellis is a resident of Los Angeles County, California.

104.   Plaintiff Ellis has a mortgage serviced by Chase.

105.   A "Mortgage Loan Statement," dated July 1, 2011, issued to Plaintiff Ellis by defendant Chase included an assessment of $154.24 for "Miscellaneous Fees."  Plaintiff is informed and believes, and on that basis, alleges that these fees included unlawful marked-up and unnecessary fees for default-related services, and that over the history of her loan, her account was assessed numerous other unlawful and unnecessary fees for

default-related services.

106.   Plaintiff Schillinger is a resident of Shelby County, Tennessee.

107.   Plaintiff Schillinger has a mortgage serviced by Chase.

108.   Chase continually assessed fees for default-related services, including property inspections, on the mortgage account of Plaintiff Schillinger, including on October 18, 2011, October 28, 2011, and February 18, 2012.

109.   Plaintiff Lazar is a resident of Coos County, Oregon.

110.   Plaintiff Lazar has a mortgage serviced by Chase.

111.   Chase continually assessed fees for default-related services, including property inspections, on the mortgage account of Plaintiff Lazar.  On mortgage statements provided to Plaintiff Lazar in 2010 and 2011, these assessments were identified as "Miscellaneous Fees."  Chase sent Plaintiff Lazar an "Acceleration Warning" letter dated June 2, 2011, demanding that Plaintiff Lazar pay Chase $86.80 for "Other Fees," and $28.00 for "Advances."  The June 2, 2011 letter further stated, "Other Fees and Advances include those amounts allowed by your Note and Security Instrument."

## PLAINTIFFS' CLAIMS AGAINST CITI

112.   Plaintiff Gloria Stitt is a resident of New York County, New York.

113.   Plaintiff Ronald Stitt is a resident of New York County, New York.

114.   Plaintiffs Gloria and Ronald Stitt have a mortgage serviced by CitiMortgage.

115.   Citi continually assessed fees for default-related services, including property inspections, on the mortgage account of Plaintiffs Gloria and Ronald Stitt, as early as April 19, 2010.  On mortgage statements provided to Plaintiffs Gloria and Ronald Stitt, such fees were identified as "Delinquency Expenses."  Although some mortgage statements stated, "Delinquency expenses are third-party expenses such as property inspection fees, property preservation costs, appraisal costs, and attorneys fees incurred by CMI as a result of default," Citi did not adequately disclose the true nature of the fees assessed against the account of Plaintiffs Gloria and Ronald Stitt.  Mortgage statements provided by Citi did not state exactly which of those categories of fees were assessed

against the account of Plaintiffs Gloria and Ronald Stitt, nor did they state if the fees identified as "Delinquency Expenses" included more than one category of fee. Additionally, by merely stating, "such as," and giving a list of potential types of fees, Citi leaves borrowers unable to know if there are other categories of fees that are assessed under the "Delinquency Expenses" description.

116.   Plaintiff Shatzer is a resident of Carroll County, Maryland.

117.   Plaintiff Shatzer has a mortgage serviced by CitiMortgage.

118.   Citi continually assessed fees for default-related services, including property inspections, on the mortgage account of Plaintiff Shazter.  From January 2009 to February 2012, Citi assessed fees for more than 30 property inspections.  On mortgage statements provided to Plaintiff Shatzer, such fees were identified as "Delinquency Expenses." Although some mortgage statements stated, "Delinquency expenses are third-party expenses such as property inspection fees, property preservation costs, appraisal costs, and attorneys fees incurred by CMI as a result of default," Citi did not adequately disclose the true nature of the fees assessed against Plaintiff Shatzer's account.  Mortgage statements provided by Citi did not state exactly which of those categories of fees were assessed against Plaintiff Shatzer's account, nor did they state if the fees identified as "Delinquency Expenses" included more than one category of fee.  Additionally, by merely stating, "such as," and giving a list of potential types of fees, Citi leaves borrowers unable to know if there are other categories of fees that are assessed under the "Delinquency Expenses" description.

119.   Plaintiff Mark Zirlott is a resident of Mobile County, Alabama

120.   Plaintiff Terri Louise Zirlott is a resident of Mobile County, Alabama.

121.   Plaintiffs Mark and Terri Zirlott have has a mortgage serviced by CitiMortgage.

122.   Citi continually assessed fees for default-related services, including property inspections, on the mortgage account of Plaintiffs Mark and Terri Louise Zirlott, as early as April 19, 2009.  From April 2009 to March 2010, Citi assessed fees for twelve property

inspections.  On mortgage statements provided to Plaintiffs Mark and Terri Louise Zirlott, such fees were identified as "Delinquency Expenses."  Although some mortgage statements stated, "Delinquency expenses are third-party expenses such as property inspection fees, property preservation costs, appraisal costs, and attorneys fees incurred by CMI as a result of default," Citi did not adequately disclose the true nature of the fees assessed against the account of Plaintiffs Mark and Terri Louise Zirlott.  Mortgage statements provided by Citi did not state exactly which of those categories of fees were assessed against the account of Plaintiffs Mark and Terri Louise Zirlott, nor did they state if the fees identified as "Delinquency Expenses" included more than one category of fee.  Additionally, by merely stating, "such as," and giving a list of potential types of fees, Citi leaves borrowers unable to know if there are other categories of fees that are assessed under the "Delinquency Expenses" description.

## STATUTE OF LIMITATIONS

123.    Any applicable statutes of limitations have been tolled by Defendants' knowing and active concealment, denial, and misleading actions, as alleged herein. Plaintiffs and members of the Class, as defined below, were kept ignorant of critical information required for the prosecution of their claims, without any fault or lack of diligence on their part.  Plaintiffs and members of the Class could not reasonably have discovered the true nature of the Defendants' marked-up fee scheme.

124.    Defendants are under a continuous duty to disclose to Plaintiffs and members of the classes the true character, quality, and nature of the fees they assess on borrowers' accounts.  Defendants knowingly, affirmatively, and actively concealed the true character, quality, and nature of their assessment of marked-up fees against borrowers' accounts. Plaintiffs and members of the Class reasonably relied upon Defendants' knowing, affirmative, and active concealment.  Based on the foregoing, Defendants are estopped from relying on any statutes of limitation as a defense in this action.

125.    The causes of action alleged herein did or will only accrue upon discovery of the true nature of the charges assessed against borrowers' accounts, as a result of

Defendants' fraudulent concealment of material facts.  Plaintiffs and members of the Class did not discover, and could not have discovered, through the exercise of reasonable diligence, the true nature of the unlawful fees assessed against their accounts.

126.   Legal scholars have explained that, as a result of these deceptive practices, it is impossible for borrowers to determine that they are victims of these violations, because "without a true itemization that identifies the nature of each fee, parties cannot verify that a mortgage claim is correctly calculated . . . the servicer could be overreaching and charging fees that are not permitted by law or by the terms of the contract. . . . By obscuring the information needed to determine the alleged basis for the charges, servicers thwart effective review of mortgage claims. The system can only function as intended if complete and appropriate disclosures are made."[13]

127.   Additionally, judges examining Wells Fargo's conduct have found that, "[a]t the heart of the problem is Wells Fargo's failure to disclose to its borrowers/debtors, the trustee, or the Court, the nature or amount of fees and charges assessed . . . [l]ack of disclosure facilitates the injury.  Naive borrowers/debtors, trustees and creditors rightly assume that Wells Fargo is complying with the plain meaning of its notes, mortgages, court orders and confirmed plans.  Why would anyone assume otherwise? . . . How are they to challenge a practice or demand correction of an error they do not know exists."[14]

---

[13] *See* Katherine Porter, *Misbehavior and Mistake in Bankruptcy Mortgage Claims*, 87 Tex. L. Rev. 121, 155 (2008).

[14] *See In re: Jones*, 418 B.R. 687, 699 (E.D. La. 2009).

1

## CLASS ACTION ALLEGATIONS

2     128.   Plaintiffs bring this action, on behalf of themselves and all others similarly

3 situated, as a class action under Rule 23 of the Federal Rules of Civil Procedure.

4     129.   The classes Plaintiffs seek to represent (collectively, the "Class") are defined

5 as follows:

6

7          All residents of the United States of America who had a loan
serviced by Wells Fargo and whose accounts were assessed fees

8          for default-related services, including Broker's Price Opinions,
and inspection fees, at any time, continuing through the date of

9          final disposition of this action (the "Wells Fargo Subclass").

10

11         All residents of the United States of America who had a loan
serviced by Chase and whose accounts were assessed fees for

12         default-related services, including Broker's Price Opinions, and
inspection fees, at any time, continuing through the date of final

13         disposition of this action (the "Chase Subclass").

14

15         All residents of the State of California who had a loan serviced
by Chase and whose accounts were assessed fees for default-

16         related services, including Broker's Price Opinions, and
inspection fees, at any time, continuing through the date of final

17         disposition of this action (the "Chase California Subclass").

18         All residents of the United States of America who had a loan
serviced by CitiMortgage and whose accounts were assessed

19         fees for default-related services, including Broker's Price
Opinions, and inspection fees, at any time, continuing through

20         the date of final disposition of this action (the "Citi Subclass").

21

22     130.   Plaintiffs reserve the right to amend the Class definitions if discovery and

23 further investigation reveals that the Class should be expanded or otherwise modified.

24     131.   Plaintiffs reserve the right to establish sub-classes as appropriate.

25     132.   This action is brought and properly may be maintained as a class action

26 under the provisions of Federal Rules of Civil Procedure 23(a)(1)-(4) and 23(b)(1), (b)(2)

27 or (b)(3), and satisfies the requirements thereof.  As used herein, the term "Class

28

Members" shall mean and refer to the members of the Class.

133.   <u>Community of Interest</u>:  There is a well-defined community of interest among members of the Class, and the disposition of the claims of these members of the Class in a single action will provide substantial benefits to all parties and to the Court.

134.   <u>Numerosity</u>:  While the exact number of members of the Class is unknown to Plaintiffs at this time and can only be determined by appropriate discovery, membership in the Class is ascertainable based upon the records maintained by Defendants.  At this time, Plaintiffs are informed and believe that the Class includes hundreds of thousands of members.  Therefore, the Class is sufficiently numerous that joinder of all members of the Class in a single action is impracticable under Federal Rule of Civil Procedure Rule 23(a)(1), and the resolution of their claims through the procedure of a class action will be of benefit to the parties and the Court.

135.   <u>Ascertainablity</u>:  Names and addresses of members of the Class are available from Defendants' records.  Notice can be provided to the members of the Class through direct mailing, publication, or otherwise using techniques and a form of notice similar to those customarily used in consumer class actions arising under California state law and federal law.

136.   <u>Typicality</u>:  Plaintiffs' claims are typical of the claims of the other members of the Class which they seek to represent under Federal Rule of Civil Procedure 23(a)(3) because each Plaintiff and each member of the Class has been subjected to the same deceptive and improper practices and has been damaged in the same manner thereby.

137.   <u>Adequacy</u>:  Plaintiffs will fairly and adequately represent and protect the interests of the Class as required by Federal Rule of Civil Procedure Rule 23(a)(4).  Plaintiffs are adequate representatives of the Class, because they have no interests which are adverse to the interests of the members of the Class.  Plaintiffs are committed to the vigorous prosecution of this action and, to that end, Plaintiffs have retained counsel who are competent and experienced in handling class action litigation on behalf of consumers.

138.   <u>Superiority</u>:  A class action is superior to all other available methods of the

fair and efficient adjudication of the claims asserted in this action under Federal Rule of Civil Procedure 23(b)(3) because:

> (a)  The expense and burden of individual litigation make it economically unfeasible for members of the Class to seek to redress their claims other than through the procedure of a class action.

> (b)  If separate actions were brought by individual members of the Class, the resulting duplicity of lawsuits would cause members to seek to redress their claims other than through the procedure of a class action; and

> (c)  Absent a class action, Defendants likely would retain the benefits of their wrongdoing, and there would be a failure of justice.

139.  Common questions of law and fact exist as to the members of the Class, as required by Federal Rule of Civil Procedure 23(a)(2), and predominate over any questions which affect individual members of the Class within the meaning of Federal Rule of Civil Procedure 23(b)(3).

140.  The common questions of fact include, but are not limited to, the following:

> (a)  Whether Defendants engaged in unlawful, unfair, misleading, or deceptive business acts or practices in violation of California Business & Professions Code sections 17200 *et seq.*;

> (b)  Whether Defendants' practice of charging marked-up fees to borrowers, as alleged herein, is illegal;

> (c)  Whether Defendants were members of, or participants in the conspiracy alleged herein;

> (d)  Whether Defendants engaged in a pattern or practice of racketeering, as alleged herein;

> (e)  Whether documents and statements provided to Plaintiffs and members of the Class omitted material facts;

> (f)  Whether Plaintiffs and members of the class sustained damages, and if

so, the appropriate measure of damages; and

(g)   Whether Plaintiffs and members of the Class are entitled to an award of reasonable attorneys' fees, pre-judgment interest, and costs of this suit.

141.   In the alternative, this action is certifiable under the provisions of Federal Rule of Civil Procedure 23(b)(1) and/or 23(b)(2) because:

(a)   The prosecution of separate actions by individual members of the Class would create a risk of inconsistent or varying adjudications with respect to individual members of the Class which would establish incompatible standards of conduct for Defendants;

(b)   The prosecution of separate actions by individual members of the Class would create a risk of adjudications as to them which would, as a practical matter, be dispositive of the interests of the other members of the Class not parties to the adjudications, or substantially impair or impede their ability to protect their interests; and

(c)   Defendants have acted or refused to act on grounds generally applicable to the Class, thereby making appropriate final injunctive relief or corresponding declaratory relief with respect to the Class as a whole and necessitating that any such relief be extended to members of the Class on a mandatory, class-wide basis.

142.   Plaintiffs are not aware of any difficulty which will be encountered in the management of this litigation which should preclude its maintenance as a class action

# FIRST CAUSE OF ACTION

## BROUGHT AGAINST THE CHASE AND WELLS FARGO DEFENDANTS
## ON BEHALF OF THE WELLS FARGO SUBCLASS
## AND CHASE CALIFORNIA SUBCLASS
### Violation of Unfair Business Practices Act
### (California Business & Professions Code §§ 17200 *et seq.*)

143.   Plaintiffs incorporate by reference in this cause of action each and every allegation of the preceding paragraphs, with the same force and effect as though fully set forth herein.

144.   Plaintiffs Bias, Breaux, White-Price, and Ellis bring this cause of action on behalf of themselves and the members of the Wells Fargo Subclass and Chase California Subclasses.

145.   California Business and Professions Code section 17200 prohibits "any unlawful, unfair or fraudulent business act or practice." For the reasons described above, Chase and Wells Fargo have engaged in unfair, or fraudulent business acts or practices in violation of California Business and Professions Code sections 17200 *et seq*.

146.   In the course and conduct of their loan servicing and collection, Chase and Wells Fargo omit a true itemization that identifies the nature of each fee, and they fail to disclose the nature of the charges and fees assessed. Chase and Wells Fargo conceal the fact the category identified as "Miscellaneous Fees" or "Other Charges" reflects marked-up and/or unnecessary fees that were never incurred by Chase and Wells Fargo. Relying on Chase and Wells Fargo, Plaintiffs Bias, Breaux, White-Price, and Ellis, and members of the Wells Fargo Subclass and Chase California Subclass believe they are obligated to pay the amounts specified in Chase and Wells Fargo's communications for default-related services.

147.   In truth and in fact, borrowers are not obligated to pay the amounts that have been specified in Chase and Wells Fargo's communications for default-related services, such as BPOs. Chase and Wells Fargo omit the fact that the amounts they represent as

1   being owed have been marked-up beyond the actual cost of the services, or they are

2   unnecessary, in violation of the mortgage contract.  Contrary to Chase and Wells Fargo's

3   communications, Chase and Wells Fargo are not legally authorized to assess and collect

4   these fees.

5        148.   Chase and Wells Fargo's omissions of material facts, as set forth herein,

6   constitute an unlawful practice because they violate Title 18 United States Code sections

7   1341, 1343, and 1962, as well as California Civil Code sections 1572, 1573, 1709, 1710,

8   and 1711, among others, and the common law.

9        149.   Chase and Wells Fargo's omissions of material facts, as set forth herein, also

10  constitute "unfair" business acts and practices within the meaning of California Business

11  and Professions Code sections 17200 *et seq.*, in that Chase and Wells Fargo's conduct was

12  injurious to consumers, offended public policy, and was unethical and unscrupulous.

13  Plaintiffs Bias, Breaux, White-Price, and Ellis also assert a violation of public policy by

14  withholding material facts from consumers.  Defendants' violation of California's

15  consumer protection and unfair competition laws in California resulted in harm to

16  consumers.

17       150.   There were reasonable alternatives available to Chase and Wells Fargo to

18  further Chase and Wells Fargo's legitimate business interests, other than the conduct

19  described herein.

20       151.   California Business and Professions Code section 17200 also prohibits any

21  "fraudulent business act or practice."  Chase and Wells Fargo's concealment of material

22  facts, as set forth above, was false, misleading, or likely to deceive the public within the

23  meaning of California Business and Professions Code section 17200.  Chase and Wells

24  Fargo's concealment was made with knowledge of its effect, and was done to induce

25  Plaintiffs Bias, Breaux, White-Price, and Ellis and members of the Wells Fargo Subclass

26  and Chase California Subclass to pay the marked-up and/or unnecessary fees for default-

27  related services.

28       152.   Plaintiffs Bias, Breaux, White-Price, and Ellis relied their reasonable

expectation that Chase and Wells Fargo comply with the plain meaning of the mortgage agreement, Notes, Security Instruments, court orders and confirmed plans, and as a result, Plaintiffs Bias, Breaux, White-Price, and Ellis relied on Chase and Wells Fargo's disclosures about the fees on their statements, reasonably believing the "Other Charges," "Other Fees," "Miscellaneous Fees," or "Corporate Advances" to be valid charges that were not unlawfully marked-up and/or unnecessary.  Indeed, to lull borrowers into a sense of trust and dissuade them from challenging Chase and Wells Fargo's unlawful fee assessments, Chase and Wells Fargo further conceal their scheme by telling borrowers, in statements and other documents, that such fees are "allowed by [borrowers'] Note and Security Instrument," or that they are "[i]n accordance with the terms of your mortgage." Had the true nature of the fees been disclosed to Plaintiffs Bias, Breaux, White-Price, and Ellis and members of the Wells Fargo Subclass and Chase California Subclass, they would have been aware of the mark-ups, or unnecessary nature of the fees, and Plaintiffs Bias, Breaux, White-Price, and Ellis would have disputed the charges and not paid them.

153.   Plaintiffs Bias, Breaux, White-Price, and Ellis and members of the Wells Fargo Subclass and Chase California Subclass have been injured in fact and suffered a loss of money or property as a result of Chase and Wells Fargo's fraudulent, unlawful, and unfair business practices.  Plaintiffs Bias, Breaux, White-Price, and Ellis and members of the Wells Fargo Subclass and Chase California Subclass would not have paid Chase and Wells Fargo's unlawful fees or they would have challenged the assessment of such fees on their accounts had it not been for Chase and Wells Fargo's concealment of material facts.

154.   Chase and Wells Fargo have thus engaged in unlawful, unfair, and fraudulent business acts entitling Plaintiffs Bias, Breaux, White-Price, and Ellis and members of the Wells Fargo Subclass and Chase California Subclass to judgment and equitable relief against Chase and Wells Fargo, as set forth in the Prayer for Relief.

155.   Additionally, under Business and Professions Code section 17203, Plaintiffs Bias, Breaux, White-Price, and Ellis and members of the Wells Fargo Subclass and Chase

California Subclass seek an order requiring Chase and Wells Fargo to immediately cease such acts of unlawful, unfair, and fraudulent business practices, and requiring Chase and Wells Fargo to correct their actions.

## SECOND CAUSE OF ACTION

### BROUGHT AGAINST ALL DEFENDANTS ON BEHALF OF THE WELLS FARGO SUBCLASS, CHASE SUBCLASS, AND CITI SUBCLASS

### Violations of the Racketeer Influenced and Corrupt Organizations Act

### (18 U.S.C. § 1962(c))

156.    Plaintiffs incorporate by reference in this cause of action each and every allegation of the preceding paragraphs, with the same force and effect as though fully set forth herein.

157.    Plaintiffs bring this cause of action on behalf of themselves and the members of the Wells Fargo Subclass, Chase Subclass, and Citi Subclass.

### THE ENTERPRISES

### The Wells Fargo Enterprise

158.    Defendants Wells Fargo & Company and Wells Fargo Bank, N.A. are each persons within the meaning of Title 18 United States Code section 1961(3).

159.    At all relevant times, in violation of Title 18 United States Code section 1962(c), Wells Fargo & Company, Wells Fargo Bank, N.A., including their directors, employees, and agents, along with their "property preservation" vendors – including First American Financial Corporation d/b/a First American Field Services, and Fidelity National Financial, Inc. d/b/a Fidelity National Field Services – and the real estate brokers who provide BPOs for Wells Fargo conducted the affairs of an association-in-fact enterprise, as that term is defined in Title 18 United States Code section 1961(4) (the "Wells Fargo Enterprise"). The affairs of the Wells Fargo Enterprise affected interstate commerce through a pattern of racketeering activity.

160.    The Wells Fargo Enterprise is an ongoing, continuing group or unit of persons and entities associated together for the common purpose of limiting costs and

maximizing profits by fraudulently concealing assessments for unlawfully marked-up or unnecessary fees for default-related services on borrowers' accounts.

161.   While the members of the Wells Fargo Enterprise participate in and are part of the enterprise, they also have an existence separate and distinct from the enterprise.

162.   Operating the Wells Fargo Enterprise according to policies and procedures developed and established by their executives, Wells Fargo & Company and Wells Fargo Bank, N.A. control and direct the affairs of the Wells Fargo Enterprise and use the other members of the Wells Fargo Enterprise as instrumentalities to carry out Wells Fargo's fraudulent scheme.  These policies and procedures established by Wells Fargo's executives include providing statements that fail to disclose the true nature of the marked-up or unnecessary fees, cryptically identifying default-related service fees as "Other Charges," using mortgage loan management software designed to assess undisclosed marked-up fees on borrowers' accounts, and failing to provide borrowers with accurate documentation to support assessments of fees for BPOs.

### The Chase Enterprise

163.   Defendants J.P. Morgan Chase & Co., J.P. Morgan Chase Bank, N.A., and Chase Home Finance LLC are each persons within the meaning of Title 18 United States Code section 1961(3).

164.   At all relevant times, in violation of Title 18 United States Code section 1962(c), J.P. Morgan Chase & Co., J.P. Morgan Chase Bank, N.A., Chase Home Finance LLC, including their directors, employees, and agents, along with their "property preservation" vendors – including Safeguard Real Estate Properties, LLC d/b/a of Safeguard Properties, LLC, Mortgage Contracting Services, LLC, and LPS Field Services, Inc. – and the real estate brokers who provide BPOs for Chase conducted the affairs of an association-in-fact enterprise, as that term is defined in Title 18 United States Code section 1961(4) (the "Chase Enterprise").  The affairs of the Chase Enterprise affected interstate commerce through a pattern of racketeering activity.

165.   The Chase Enterprise is an ongoing, continuing group or unit of persons and

1  entities associated together for the common purpose of limiting costs and maximizing

2  profits by fraudulently concealing assessments for unlawfully marked-up and/or

3  unnecessary fees for default-related services on borrowers' accounts.

4     166.   While the members of the Chase Enterprise participate in and are part of the

5  enterprise, they also have an existence separate and distinct from the enterprise.

6     167.   Operating the Chase Enterprise according to policies and procedures

7  developed and established by their executives, J.P. Morgan Chase & Co., J.P. Morgan

8  Chase Bank, N.A., and Chase Home Finance LLC control and direct the affairs of the

9  Chase Enterprise and use the other members of the Chase Enterprise as instrumentalities

10  to carry out Chase's fraudulent scheme.  These policies and procedures established by

11  Chase's executives include providing statements that fail to disclose the true nature of the

12  marked-up or unnecessary fees, cryptically identifying default-related service fees as

13  "Miscellaneous Fees," or "Corporate Advances," using mortgage loan management

14  software designed to increase the fees assessed on borrowers' accounts, without

15  consideration for whether the assessment of such fees is appropriate, reasonable, or

16  necessary under the circumstances, failing to provide borrowers with documentation to

17  support assessments of fees for BPOs, and directing property preservation vendors to

18  conduct services without consideration for whether they are necessary or appropriate.

19  **The Citi Enterprise**

20     168.   Defendants Citibank, N.A., and CitiMortgage, Inc. are each persons within

21  the meaning of Title 18 United States Code section 1961(3).

22     169.   At all relevant times, in violation of Title 18 United States Code section

23  1962(c), Citibank, N.A., CitiMortgage, Inc., including their directors, employees, and

24  agents, along with their "property preservation" vendors – including Safeguard Real

25  Estate Properties, LLC d/b/a of Safeguard Properties, LLC – and the real estate brokers

26  who provide BPOs for Citi, conducted the affairs of an association-in-fact enterprise, as

27  that term is defined in Title 18 United States Code section 1961(4) (the "Citi Enterprise").

28  The affairs of this enterprise affected interstate commerce through a pattern of

racketeering activity

170.   The Citi Enterprise is an ongoing, continuing group or unit of persons and entities associated together for the common purpose of limiting costs and maximizing profits by fraudulently concealing assessments for unlawfully marked-up and/or unnecessary fees for default-related services on borrowers' accounts.

171.   While the members of the Citi Enterprise participate in and are part of the enterprise, they also have an existence separate and distinct from the enterprise.

172.   Operating the Citi Enterprise according to policies and procedures developed and established by their executives, Citibank, N.A., and CitiMortgage, Inc. control and direct the affairs of the Citi Enterprise and use the other members of the Citi Enterprise as instrumentalities to carry out Citi's fraudulent scheme.  These policies and procedures established by Citi's executives include providing statements that fail to disclose the true nature of the marked-up or unnecessary fees, cryptically identifying default-related service fees as "Delinquency Expenses," using mortgage loan management software designed to increase the fees assessed on borrowers' accounts, without consideration for whether the assessment of such fees is appropriate, reasonable, or necessary under the circumstances, failing to provide borrowers with documentation to support assessments of fees for BPOs, and directing property preservation vendors to conduct services without consideration for whether they are necessary or appropriate.

## THE PREDICATE ACTS

173.   Defendants' systematic schemes to fraudulently conceal assessments of unlawfully marked-up or unnecessary fees on the accounts of borrowers who have mortgage loans administered by Wells Fargo, Chase, and Citi, as described above, was facilitated by the use of the United States Mail and wire.  Defendants' schemes constitute "racketeering activity" within the meaning of Title 18 United States Code section 1961(1), as acts of mail and wire fraud, under Title 18 United States Code sections 1341 and 1343.

174.   In violation of Title 18 United States Code sections 1341 and 1343, Wells Fargo, Chase, and Citi utilized the mail and wire in furtherance of their scheme to defraud

borrowers whose loans are serviced by Wells Fargo, Chase, Citi by obtaining money from borrowers using false or fraudulent pretenses.

175. Through the mail and wire, the Wells Fargo Enterprise, Chase Enterprise, and Citi Enterprise provided mortgage invoices, loan statements, payoff demands, or proofs of claims to borrowers, demanding that borrowers pay fraudulently concealed marked-up or unnecessary fees for default-related services, such as BPOs or property inspections. Defendants also accepted payments and engaged in other correspondence in furtherance of their scheme through the mail and wire.

176. Defendants fraudulently and unlawfully marked-up fees in violation of borrowers' mortgage agreements because the fees exceed the actual cost of the services, and therefore, they are not, as the mortgage agreements require, "reasonable" or "appropriate" to protect the note holder's interest in the property. Defendants' assessment of fees that were unnecessary are also unlawful because unnecessary fees are not, as the mortgage agreements require, "reasonable" or "appropriate" to protect the note holder's interest in the property.

177. The mortgage invoices, loan statements, or proofs of claims provided to borrowers fraudulently concealed the true nature of assessments made on borrowers' accounts. Using false pretenses, identifying the fees on mortgage invoices, loan statements, or proofs of claims only as "Other Charges," "Other Fees," "Miscellaneous Fees," "Corporate Advances," or "Delinquency Expenses" to obtain full payments from borrowers, Defendants disguised the true nature of these fees and omitted the fact that the fees include undisclosed mark-ups or were unnecessary. By omitting and fraudulently concealing the true nature of amounts purportedly owed in communications to borrowers, Defendants made false statements using the Internet, telephone, facsimile, United States mail, and other interstate commercial carriers.

178. Furthermore, to lull borrowers into a sense of trust, conceal Defendants' unlawful fees, and dissuade borrowers from challenging Defendants' unlawful fee assessments, Defendants further conceal their scheme from borrowers by telling them, in

statements and other documents, that such fees are "allowed by [borrowers'] Note and Security Instrument," or that they are "[i]n accordance with the terms of your mortgage."

179.   Defendants' omissions were material to Plaintiffs and the members of the Class.  Had Defendants disclosed the true marked-up or unnecessary nature of the fees for default-related services, Plaintiffs would have been aware and would have challenged Defendants' unlawful fee assessments or they would not have paid them.

180.   Each of these acts constituted an act of mail fraud for purposes of Title 18 United States Code section 1341.

181.   Additionally, using the Internet, telephone, and facsimile transmissions to fraudulently communicate false information about these fees to borrowers, to pursue and achieve their fraudulent scheme, Defendants engaged in repeated acts of wire fraud in violation of Title 18 United States Code section 1343.

182.   In an effort to pursue their fraudulent scheme, Defendants knowingly fraudulently concealed or omitted material information from Plaintiffs and members of the Class.  Defendants' knowledge that their activities were fraudulent and unlawful is evidenced by, among other things, the fact that they did not disclose the mark-ups or unnecessary nature of the fees in their communications to borrowers.

183.   The predicate acts specified above constitute a "pattern of racketeering activity" within the meaning of Title 18 United States Code section 1961(5) in which Defendants have engaged under Title 18 United States Code section 1962(c).

184.   All of the predicate acts of racketeering activity described herein are part of the nexus of the affairs and functions of the Wells Fargo Enterprise, Chase Enterprise, and Citi Enterprise racketeering enterprises.  The racketeering acts committed by the Wells Fargo Enterprise employed a similar method, were related, with a similar purpose, and they involved similar participants, with a similar impact on the members of the Wells Fargo Subclass.   The racketeering acts committed by the Chase Enterprise employed a similar method, were related, with a similar purpose, and they involved similar participants, with a similar impact on the members of the Chase Subclass.  The

1  racketeering acts committed by the Citi Enterprise employed a similar method, were

2  related, with a similar purpose, and they involved similar participants, with a similar

3  impact on the members of the Citi Subclass.

4      185.   The pattern of racketeering activity is currently ongoing and open-ended, and

5  threatens to continue indefinitely unless this Court enjoins the racketeering activity.

6      186.   Numerous schemes have been completed involving repeated unlawful

7  conduct that by its nature, projects into the future with a threat of repetition.

8      187.   As a direct and proximate result of these violations of Title 18 United States

9  Code sections 1962(c) and (d), Plaintiffs and members of the class have suffered

10  substantial damages.  Defendants are liable to Plaintiffs and members of the Class for

11  treble damages, together with all costs of this action, plus reasonable attorney's fees, as

12  provided under Title 18 United States Code section 1964(c).

13  **THIRD CAUSE OF ACTION**

14  **BROUGHT AGAINST ALL DEFENDANTS ON BEHALF OF THE**

15  **WELLS FARGO SUBCLASS, CHASE SUBCLASS, AND CITI SUBCLASS**

16  **Violation of the Racketeer Influenced and Corrupt Organizations Act,**

17  **Conspiracy to Violate Title 18 United States Code section 1962(c)**

18  **(18 U.S.C. § 1962(d))**

19      188.   Plaintiffs incorporate by reference in this cause of action each and every

20  allegation of the preceding paragraphs, with the same force and effect as though fully set

21  forth herein.

22      189.   Plaintiffs bring this cause of action on behalf of themselves and the members

23  of the Wells Fargo Subclass, Chase Subclass, and Citi Subclass.

24      190.   As set forth above, in violation of Title 18 United States Code section

25  1962(d), defendants Wells Fargo & Company and Wells Fargo Bank, N.A. conspired to

26  violate the provisions of Title 18 United States Code section 1962(c).

27      191.   As set forth above, in violation of Title 18 United States Code section

28  1962(d), defendants J.P. Morgan Chase & Co., J.P. Morgan Chase Bank, N.A., and Chase

1  Home Finance LLC conspired to violate the provisions of Title 18 United States Code
2  section 1962(c).

3      192.   As set forth above, in violation of Title 18 United States Code section
4  1962(d), defendants Citibank, N.A., and CitiMortgage, Inc. conspired to violate the
5  provisions of Title 18 United States Code section 1962(c).

6      193.   As a direct and proximate result, Plaintiffs and the members of the Wells
7  Fargo, Chase, and Citi Subclasses have been injured in their business or property by the
8  predicate acts which make up Defendants' patterns of racketeering activity in that
9  unlawfully marked-up and/or unnecessary fees for default-related services were assessed
10  on their mortgage accounts.

11  **FOURTH CAUSE OF ACTION**
12  **BROUGHT AGAINST ALL DEFENDANTS ON BEHALF OF THE**
13  **WELLS FARGO SUBCLASS, CHASE SUBCLASS, AND CITI SUBCLASS**
14  **Unjust Enrichment**

15      194.   Plaintiffs incorporate by reference in this cause of action each and every
16  allegation of the preceding paragraphs, with the same force and effect as though fully set
17  forth herein.

18      195.   Plaintiffs bring this cause of action on behalf of themselves and the members
19  of the Wells Fargo Subclass, Chase Subclass, and Citi Subclass.

20      196.   By their wrongful acts and omissions of material facts, Defendants were
21  unjustly enriched at the expense of Plaintiffs and members of the Class.

22      197.   The mortgage contract between Defendants and borrowers like Plaintiffs and
23  the members of the Class allows Chase, Wells Fargo, and Citi to pay for default-related
24  services when necessary or appropriate, and to be reimbursed by the borrower, but it does
25  not authorize Defendants to mark-up the actual cost of those services to make a profit, nor
26  does it allow Defendants to incur unnecessary fees.

27      198.   Nevertheless, Defendants mark-up the prices charged by vendors, often by
28  100% or more, and then, without disclosing the mark-up, assess borrowers' accounts for

the higher, marked-up fee so that Defendants can earn a profit.  Additionally, Defendants assess such fees on borrowers' accounts without adequate concern for whether they are necessary or appropriate under the circumstances.

199.  Thus, Plaintiffs and members of the Class were unjustly deprived.

200.  Defendants are aware that it is improper to mark-up or assess unnecessary fees on borrowers' accounts for default-related services.  Therefore, Defendants fraudulently conceal these fees on borrowers' accounts, omitting any information about Defendants' additional profits, by identifying them on mortgage statements only as "Other Charges," "Other Fees," "Miscellaneous Fees," "Corporate Advances," or "Delinquency Expenses."

201.  Furthermore, to lull borrowers into a sense of trust, conceal Defendants' unlawful fees, and dissuade borrowers from challenging Defendants' unlawful fee assessments, Defendants further conceal their scheme from borrowers by telling them, in statements and other documents, that such fees are "allowed by [borrowers'] Note and Security Instrument," or that they are "[i]n accordance with the terms of your mortgage."

202.  It would be inequitable and unconscionable for Defendants to retain the profit, benefit and other compensation they obtained from their fraudulent, deceptive, and misleading conduct alleged herein.

203.  Plaintiffs and members of the Class seek restitution from Defendants, and seek an order of this Court disgorging all profits, benefits, and other compensation obtained by Defendants from their wrongful conduct.

## PRAYER FOR RELIEF

Plaintiffs, and on behalf of themselves and all others similarly situated, request the Court to enter judgment against Defendants, as follows:

1.  Certifying the Class, as requested herein, certifying Plaintiffs as the representatives of the Class, and appointing Plaintiffs' counsel as counsel for the Class;

2.  Ordering that Defendants are financially responsible for notifying all members of the Class of the alleged misrepresentations discussed herein;

1     3.     Awarding Plaintiffs and the members of the Class compensatory damages in
2 an amount according to proof at trial;

3     4.     Awarding restitution and disgorgement of Defendants' revenues to Plaintiffs
4 and members of the Class;

5     5.     Awarding Plaintiffs and the members of the Class treble damages in an
6 amount according to proof at trial;

7     6.     Awarding declaratory and injunctive relief as permitted by law or equity,
8 including:  enjoining Defendants from continuing the unlawful practices as set forth
9 herein, and directing Defendants to identify, with Court supervision, victims of its conduct
10 and pay them restitution and disgorgement of all monies acquired by Defendants by
11 means of any act or practice declared by this Court to be wrongful;

12     7.     Ordering Defendants to engage in corrective advertising;

13     8.     Awarding interest on the monies wrongfully obtained from the date of
14 collection through the date of entry of judgment in this action;

15     9.     Awarding attorneys' fees, expenses, and recoverable costs reasonably
16 incurred in connection with the commencement and prosecution of this action; and

10.     For such other and further relief as the Court deems just and proper.

Dated: April 6, 2012

BARON & BUDD, P.C.

By: _____
    Mark Pifko

Daniel Alberstone (SBN 105275)
Roland Tellis (SBN 186269)
Mark Pifko (SBN 228412)
BARON & BUDD, P.C.
1999 Avenue of the Stars, Suite 3450
Los Angeles, California 90067
Telephone:  (310) 860-0476
Facsimile:  (310) 860-0480

Attorneys for Plaintiffs
LATARA BIAS, ERIC BREAUX,
NAN WHITE-PRICE, DIANA ELLIS,
JAMES SCHILLINGER, RONALD
LAZAR, GLORIA STITT, RONALD
STITT, JUDI SHATEZER, MARK
ZIRLOTT, and TERRI LOUISE
ZIRLOTT, individually, and on behalf of
other members of the public similarly
situated

## **DEMAND FOR JURY TRIAL**

Plaintiffs hereby demand a trial of their claims by jury to the extent authorized by law.

Dated: April 6, 2012

BARON & BUDD, P.C.

By: _____
Mark Pifko

Daniel Alberstone (SBN 105275)
Roland Tellis (SBN 186269)
Mark Pifko (SBN 228412)
BARON & BUDD, P.C.
1999 Avenue of the Stars, Suite 3450
Los Angeles, California  90067
Telephone:   (310) 860-0476
Facsimile:   (310) 860-0480

Attorneys for Plaintiffs
LATARA BIAS, ERIC BREAUX,
NAN WHITE-PRICE, DIANA ELLIS,
JAMES SCHILLINGER, RONALD
LAZAR, GLORIA STITT, RONALD
STITT, JUDI SHATEZER, MARK
ZIRLOTT, and TERRI LOUISE
ZIRLOTT, individually, and on behalf of
other members of the public similarly
situated