Daniel Alberstone (SBN 105275)
dalberstone@baronbudd.com
Roland Tellis (SBN 186269)
rtellis@baronbudd.com
Mark Pifko (SBN 228412)
mpifko@baronbudd.com
BARON & BUDD, P.C.
15910 Ventura Boulevard, Suite 1600
Encino, California  91436
Telephone:   (818) 839-2333
Facsimile:   (818) 986-9698

Attorneys for Plaintiffs
LATARA BIAS, ERIC BREAUX,
and NAN WHITE-PRICE, individually, and
on behalf of other members of the public
similarly situated

# UNITED STATES DISTRICT COURT

# NORTHERN DISTRICT OF CALIFORNIA

| LATARA BIAS, ERIC BREAUX, and NAN WHITE-PRICE, individually, and on behalf of other members of the general public similarly situated,<br><br>        Plaintiffs,<br><br>vs.<br><br>WELLS FARGO & COMPANY, a Delaware corporation, and WELLS FARGO BANK, N.A., a national association,<br><br>        Defendants. | Case Number:  4:12-cv-00664-YGR<br><br>**SECOND AMENDED CLASS ACTION COMPLAINT FOR:**<br><br>(1) Violations of California's Unfair Competition Law (Cal. Bus. & Prof. Code §§ 17200 *et seq.*);<br><br>(2) Violations of the Racketeer Influenced and Corrupt Organizations Act (18 U.S.C. § 1962(c));<br><br>(3) Violations of the Racketeer Influenced and Corrupt Organizations Act (18 U.S.C. § 1962(d));<br><br>(4) Unjust Enrichment; and<br><br>(5) Fraud<br><br>**Jury Trial Demanded** |

For their complaint against Wells Fargo & Company, and Wells Fargo Bank, N.A. (collectively "Defendants"), Plaintiffs Latara Bias, Eric Breaux, and Nan White-Price ("Plaintiffs"), individually, and on behalf of all other members of the public similarly situated, based on information and belief, allege as follows:

## NATURE OF THE ACTION

1.      This case concerns fraudulent practices committed by Defendants in connection with their home mortgage loan servicing businesses.  Taking advantage of economic downturn and the increasing number of loans in default, Defendants service these loans according to uniform practices designed to maximize fees assessed on borrowers' accounts when they are behind on their payments.  Consistent with these practices, Defendants use automated mortgage loan management systems, made up of an enterprise of subsidiaries, inter-company departments, divisions, and third-party "property preservation" vendors, to engage in a scheme to conceal the unlawful assessment of improperly marked-up third party fees for default-related services, cheating borrowers who can least afford it.

2.      More specifically, when home mortgage borrowers get behind on their payments and go into "default," Defendants assess fees on borrowers' accounts for various default-related services, typically performed by third parties, purportedly designed to protect the lender's interest in the property.  However, Defendants are not permitted to mark-up the fees for such services to earn a profit.  Nevertheless, as discussed in detail below, using false pretenses to conceal the truth from borrowers, that is precisely what Defendants do.

3.      In effect, to generate hefty profits, the lending industry has substituted inflated interest rates with inflated fees.  Defendants formed enterprises, associations of subsidiaries, affiliated companies, and "property preservation" vendors, and designed schemes to disguise hidden, marked-up fees so that they could earn additional, undisclosed profits.  Through these unlawful enterprises, Defendants mark-up the fees charged by vendors, often by 100% or more, and then, without disclosing the mark-up,

assess borrowers' accounts for the hidden profits.  Employing this strategy, Defendants are able to quietly profit from default-related service fees at the expense of struggling consumers.  Indeed, in the fourth quarter of 2011 alone, defendant Wells Fargo & Company saw a 20% increase in profits.[1]  Wells Fargo & Company's profits for the second quarter of 2012 increased by 17%.[2]

4.     Many borrowers reasonably believe the lender from whom they obtained their mortgage will hold and service their loan until it is paid off.  Instead, however, through relatively recent mortgage industry practices, such as securitization and the sale of mortgage backed securities, that is often not the case.  In today's market, loans and the rights to service them are bought and sold at will, multiple times over.

5.     A borrower's relationship is typically with the mortgage servicer rather than the lender who originated the loan.  Wells Fargo Bank, N.A. is one of the largest mortgage servicers in the United States.  As a mortgage servicer, Wells Fargo Bank, N.A. responsible for the day-to-day management of loan accounts, including handling customer inquiries, collecting and crediting loan payments, sending default notices to delinquent borrowers, negotiating loan modifications, and directing foreclosure activities, including engaging the services of foreclosure counsel, even if the foreclosure is brought in the name of the owner of the loan, rather than the servicer.

6.     Borrowers depend on their mortgage servicers to handle servicing-related tasks accurately and with skill.  Because financial institutions like Defendants who service loans do not profit directly from interest payments made by borrowers, rather than ensuring that borrowers stay current on their loans, Defendants are more concerned with generating revenue from fees assessed against the mortgage accounts they service.

---

[1] *See* Ben Protess, New York Times, *Wells Fargo Profit Rose 20% in Fourth Quarter*, Jan. 17, 2012, available at http://dealbook.nytimes.com/2012/01/17/wells-fargo-fourth-quarter-profit-up-20/ (last visited Jan. 17, 2012).

[2] *See* Scott Reckard, Los Angeles Times, *Wells Fargo profit up 17% as lending increases*, July 14, 2012, available at http://www.latimes.com/business/la-fi-0714-wells-fargo-earnings-20120714,0,3540081.story (last visited July 18, 2012).

According to one member of the Board of Governors of the Federal Reserve System, "a foreclosure almost always costs the investor [who owns the loan] money, but [it] may actually earn money for the servicer in the form of fees."[3]

7.      Financial institutions like Defendants see opportunity where investors see failure because borrowers are captives to companies who service their loans. Accordingly, when borrowers go into default and Defendants unilaterally decide to perform default-related services, borrowers have no option but to accept Defendants' choice of providers.

8.      Taking advantage of these circumstances, the Defendants formed an enterprise with their respective subsidiaries, affiliates, and "property preservation" vendors, and then, developed a uniform practice of unlawfully marking up default-related fees charged by third parties and assessing them against borrowers' accounts so that Defendants can earn undisclosed profits in connection with these services.

9.      Defendants are aware that it is improper to mark-up the fees assessed on borrowers' accounts for default-related services.  Therefore, Defendants fraudulently conceal these fees on borrowers' accounts, omitting any information about Defendants' additional profits, by identifying them on mortgage statements with cryptic descriptions, such as "Other Charges" or "Other Fees."

10.      Indeed, Defendants' practices are designed to avoid detection even when examined in bankruptcy proceedings.  As one court has explained, "[l]enders have apparently been operating under the assumption that the fees and costs in their proofs of claim are invulnerable to challenge because debtors lack the sophistication, the debtors' bar lacks the financial motivation, and bankruptcy courts lack the time."[4]  "[T]he Court

---

[3] *See* Sarah Bloom Raskin, Member Board of Governors of the Federal Reserve System, *Remarks at the National Consumer Law Center's Consumer Rights Litigation Conference*, Boston Massachusetts, Nov. 12, 2010, available at www.federalreserve.gov/newsevents/speech/raskin20101112a.htm (last visited Jan. 23, 2012).

[4] *In re: Prevo*, 394 B.R. 847, 848 (Bankr. S.D. Tex. 2008).

1  believes that certain members of the mortgage industry are *intentionally* attempting to

2  game the system by requesting undocumented and potentially excessive fees."[5]

3      11.    The rampant abuses by mortgage servicers have led federal regulators to

4  enter into numerous Consent Orders, but according to Mark Pearce, Director, Division of

5  Depositor and Consumer Protection, Federal Deposit Insurance Corporation, "these

6  consent orders do not fully identify and remedy past errors in mortgage-servicing

7  operations of large institutions; in fact, the scope of the interagency review did not

8  include a review of . . . the fees charged in the servicing process.  Much work remains to

9  identify and correct past errors and to ensure that the servicing process functions

10 effectively, efficiently, and fairly going forward."[6]  Moreover, the Consent Orders do not

11 reach the type of conduct at issue here.

12     12.    Plaintiffs bring this action, seeking injunctive relief and damages on behalf of

13 themselves and the thousands of borrowers who have been victimized by the Defendants'

14 uniform schemes.

15                         **JURISDICTION AND VENUE**

16     13.    Jurisdiction is proper in this Court under 28 U.S.C. § 1332(d)(2).  The matter

17 in controversy, exclusive of interest and costs, exceeds the sum or value of $5,000,000

18 and is a class action in which members of the class of plaintiffs are citizens of states

19 different from Defendants.  Further, greater than two-thirds of the members of the Class

20 reside in states other than the states in which Defendants are a citizens.

21     14.    This Court also has jurisdiction over this matter under 28 U.S.C. §§ 1331,

22 1961, 1962 and 1964.  This Court has personal jurisdiction over Defendants under 18

23

---

24 [5] *Id.* at 851 (emphasis added).

25 [6] *See* Mark Pearce, Director, Division of Depositor and Consumer Protection, Federal Deposit Insurance
   Corporation, *Mortgage Servicing:  An Examination of the Role of Federal Regulators in Settlement
26 Negotiations and the Future of Mortgage Servicing Standards*, before the Subcommittees on Financial
   Institutions and Consumer Credit, and Oversight and Investigations Committee on Financial Services,
27 U.S. House of Representatives, July 7, 2011, available at
   http://financialservices.house.gov/UploadedFiles/070711pearce.pdf (last visited, Feb. 1, 2012).
28

1  U.S.C. §1965.  In addition, under 28 U.S.C. § 1367, this Court may exercise supplemental

2  jurisdiction over the state law claims because all of the claims are derived from a common

3  nucleus of operative facts and are such that Plaintiffs ordinarily would expect to try them

4  in one judicial proceeding.

5     15. Venue lies within this judicial district under 28 U.S.C. § 1391(b)(1) because

6  defendants Wells Fargo & Company and Wells Fargo Bank, N.A.'s principal place of

7  business is in this District, and Defendants' contacts are sufficient to subject them to

8  personal jurisdiction in this District, and therefore, Defendants reside in this District for

9  purposes of venue, or under 28 U.S.C. § 1391(b)(2) because the acts giving rise to the

10  claims at issue in this lawsuit occurred, among other places, in this District.

11            **Intradistrict Assignment**

12     16. Consistent with Northern District of California Civil Local Rule 3-5(b),

13  assignment to the San Francisco or Oakland Division is appropriate under Civil Local

14  Rules 3-2(c) and 3-2(d), because acts giving rise to the claims at issue in this lawsuit

15  occurred, among other places, in this District, in the City of San Francisco.

16              **<u>PARTIES</u>**

17     17. Plaintiff Latara Bias is an individual and a citizen of Louisiana.

18     18. Plaintiff Eric Breaux is an individual and a citizen of Louisiana.

19     19. Plaintiff Nan White-Price is an individual and a citizen of Louisiana.

20     20. Defendant Wells Fargo & Company is a corporation organized under the

21  laws of Delaware and headquartered in San Francisco, California.

22     21. Defendant Wells Fargo Bank, N.A. is a subsidiary of Wells Fargo &

23  Company, and is a national bank organized and existing as a national association under

24  the National Bank Act, 12 U.S.C. §§ 21 *et seq.*, with its principal place of business in San

25  Francisco, California.

26     22. Whenever, in this Complaint, reference is made to any act, deed, or conduct

27  of Defendants committed in connection with the enterprise, the allegation means that

28  Defendants engaged in the act, deed, or conduct by or through one or more of their

officers, directors, agents, employees or representatives, each of whom was actively engaged in the management, direction, control or transaction of the ordinary business and affairs of Defendants and the enterprise.

23.    Plaintiffs are informed and believe, and based thereon, allege that, at all material times herein, each Wells Fargo defendant, Wells Fargo & Company and Wells Fargo Bank, N.A. (collectively "Wells Fargo"), was the agent, servant, or employee of, and acted within the purpose, scope, and course of said agency, service, or employment, and with the express or implied knowledge, permission, and consent of the other Wells Fargo defendant, and ratified and approved the acts of the other Wells Fargo defendant.

24.    Wells Fargo & Company exercises specific and financial control over the operations of Wells Fargo Bank, N.A., and it dictates the policies and practices of Wells Fargo Bank, N.A.  Wells Fargo & Company also exercises power and control over the specific activities at issue in this lawsuit, and it is the ultimate recipient of the ill-gotten gains described herein.

25.    Wells Fargo & Company attributes the acts of Wells Fargo Bank, N.A. to itself, with statements acknowledging that when it comes to dealing with its customers, parts of the company are "organized to reflect the way customers think of us, as One Wells Fargo offering many financial services and products:  mortgages, home equity lines, credit cards, student loans, personal loans, and lines of credit."[7]  Wells Fargo & Company further confirms its unity with Wells Fargo Bank, N.A. in other representations, such as, "*We* provide one out of every four home mortgages and are the largest servicer of mortgages in the U.S.," "*We* service more home loans than anyone else," and "*We* want to be there to satisfy not just their mortgage needs, but *all* their other financial needs that connect to their mortgage."[8]

---

[7] *See* Wells Fargo & Company, 2011 Annual Report at 5-6, available at https://www.wellsfargo.com/downloads/pdf/invest_relations/wf2011annualreport.pdf (last visited July 23, 2012).

[8] *Id.* at 13, 2, and 3, respectively (emphasis added).

26.     Additionally, with respect to loan servicing policies and practices, Wells Fargo Bank, N.A., states, "We service loans and lines of credit both that we originate and that are originated by other lenders.  For all the products we service, we follow the Wells Fargo & Company Responsible Servicing Principles for U.S. Residential Real Estate Lending."[9]

## FACTUAL BACKGROUND

27.     America's lending industry is in turmoil, and the lending community has divorced itself from the borrowers it once served.  Traditionally, when people wanted to borrow money, they went to a bank or a "savings and loan."  Banks loaned money and borrowers promised to repay the bank, with interest, over a specific period of time.  The originating bank kept the loan on its balance sheet, and serviced the loan -- processing payments, and sending out applicable notices and other information -- until the loan was repaid.  The originating bank had a financial interest in ensuring that the borrower was able to repay the loan.

28.     Today, however, the process has changed.  Mortgages are now packaged, bundled, and sold to investors on Wall Street through what is referred to in the financial industry as mortgage backed securities or MBS.  This process is called securitization. Securitization of mortgage loans provides financial institutions like Defendants with the benefit of immediately being able to recover the amounts loaned.  Securitization essentially eliminates the bank's risk from potential default.  But, by eliminating the risk of default, mortgage backed securities have disassociated the lending community from borrowers.  Numerous unexpected consequences have resulted from the divide between lenders and borrowers.

29.     Among other things, securitization has created an industry of companies in the lending industry like Defendants, who no longer make money primarily from interest

---

[9] *See* https://www.wellsfargo.com/mortgage/fair-lending-principles (last visited July 23, 2012).

on the loans they originate.  Thus, lenders no longer have the financial interest in the repayment of loans that they once did.  Instead, financial institutions like Defendants service or administer mortgages for hedge funds and investment houses who own the loans.  Rather than earn income from the interest on these loans, financial institutions like Defendants are paid a fee for their loan administration services.

30.     Additionally, under agreements with investors (pooling and service agreements), loan servicers like Wells Fargo Bank, N.A. assess fees on borrowers' accounts for default-related services in connection with their administration of borrowers' loans.  These fees include Broker's Price Opinion fees and appraisal fees.  Defendants' collection of these fees, however, exemplifies how America's lending industry has run off the rails.

31.     As one Member of the Board of Governors of the Federal Reserve System has explained, "[w]hile an investor's financial interests are tied more or less directly to the performance of a loan, the interests of a third-party servicer are tied to it only indirectly, at best.  The servicer makes money, to oversimplify it a bit, by maximizing fees earned and minimizing expenses while performing the actions spelled out in its contract with the investor. . . . The broad grant of delegated authority that servicers enjoy under pooling and servicing agreements (PSAs), combined with an effective lack of choice on the part of consumers, creates an environment ripe for abuse."[10]

32.     For financial institutions like Defendants, who are determined to maximize the money they earn for servicing loans, the right to charge servicing fees has opened the door to a world of exploitation.  As a result of the disassociation between loan servicers and the monies generated from the interest borrowers pay on their loans, Defendants have been incentivized to find other ways to grow their profits.

---

[10] *See* Sarah Bloom Raskin, Member Board of Governors of the Federal Reserve System, *Remarks at the National Consumer Law Center's Consumer Rights Litigation Conference*, Boston Massachusetts, Nov. 12, 2010, available at www.federalreserve.gov/newsevents/speech/raskin20101112a.htm (last visited Jan. 23, 2012).

33.     Defendants, with their subsidiaries, affiliated companies, intercompany divisions, and third-party "property preservation" vendors, formed an unlawful enterprise and decided to game the system, under the guise of collecting default-related service fees, charged by third parties, and then, they sought to increase mortgage servicing revenues by fraudulently concealing marked-up fees assessed on borrowers' accounts.

34.     In short, as explained by Adam J. Levitin, Associate Professor of Law at the Georgetown University Law Center, in testimony to the United States House Financial Services Committee, Subcommittee on Housing and Community Opportunity, "Servicers' business model also encourages them to cut costs wherever possible, even if this involves cutting corners on legal requirements, and to lard (sic) on junk fees and in-sourced expenses at inflated prices."[11]

## DEFENDANTS' AUTOMATED LOAN SERVICING PRACTICES

35.     To maximize profits, Defendants assign the complex task of administering the millions of loans serviced by Wells Fargo Bank, N.A. to computer software programs. The software programs are designed to manage borrowers' accounts and assess fees, according to protocols designed by the executives at Wells Fargo & Company and Wells Fargo Bank, N.A.

### Automated Loan Management Practices

36.     According to protocols and policies established by executives employed by Wells Fargo & Company and Wells Fargo Bank, N.A., Wells Fargo Bank, N.A.'s loan servicing business is automated through a computer software program provided by Fidelity National Information Services, Inc., which is called Mortgage Servicing Package ("Fidelity MSP").  Fidelity MSP is a sophisticated home loan management program, and is one of the most widely used such programs in the United States.

---

[11] *See* Adam J. Levitin, *Robo-Singing, Chain of Title, Loss Mitigation, and Other Issues in Mortgage Servicing*, before the House Financial Services Committee, Subcommittee on Housing and Community Opportunity, Nov. 18, 2010, available at http://financialservices.house.gov/Media/file/hearings/111/Levitin111810.pdf (last visited Feb. 1, 2012).

37.     When a loan is originated, guidelines for managing the loan are imported into Fidelity MSP.  Loans serviced by Wells Fargo Bank, N.A. are then automatically managed by the software according to those guidelines.  For example, among other things, if a loan in Wells Fargo Bank, N.A.'s system is past due, the guidelines instruct the computer when to impose default-related fees.  Wells Fargo Bank, N.A. also assess other charges and fees against borrowers' accounts by using "wrap around" software packages that work with the Fidelity MSP system.  Based on parameters inputted into these programs, Wells Fargo Bank, N.A.'s computer systems automatically implement decisions about how to manage borrowers' accounts based on internal software logic. Wells Fargo Bank, N.A. assess fees for default-related services on borrowers' accounts through these systems.

38.     The Fidelity MSP software used by Wells Fargo Bank, N.A. also has a platform called Bankruptcy Work Station ("BWS") that is purportedly infused with computer logic designed to manage a loans during a pending bankruptcy.

## MARKED-UP THIRD PARTY FEES
## FOR DEFAULT-RELATED SERVICES

39.     In their loan servicing operations, Defendants follow a strategy to generate fraudulently concealed default-related fee income.  Rather than simply obtain default-related services directly from independent third-party vendors, and charge borrowers for the actual cost of these services, Defendants unlawfully add additional, undisclosed profits on to the third party charges before they are assessed on borrowers' accounts.

40.     Defendants' scheme works as follows.  Defendants order default-related services from their subsidiaries and affiliated companies, who, in turn, obtain the services from third-party vendors.  The third-party vendors charge Defendants for their services. Defendants, in turn, assess borrowers a fee that is significantly marked-up from the third-party vendors' actual fees for the services.  As a result, even though the mortgage market has collapsed, and more and more borrowers are falling into delinquency, Defendants continue to earn substantial profits by assessing undisclosed, marked-up fees for default-

related services on borrowers' accounts.

41.     The mortgage contract between a lender and a borrower generally consists of two documents:  the promissory note ("Note") and the mortgage or deed of trust ("Security Instrument").  The mortgage contacts serviced by Defendants are substantially similar because they conform to the standard Fannie Mae/Freddie Mac form contract. These contracts contain disclosures regarding what occurs if borrowers default on their loans.  The Security Instrument discloses to borrowers that, in the event of default, the loan servicer will:

> pay for whatever is reasonable or appropriate to protect the note holder's interest in the property and rights under the security instrument, including protecting and/or assessing the value of the property, and securing and/or repairing the property.

42.     The Security Instrument further discloses that any such amounts disbursed by the servicer shall become additional debt of the borrower secured by the Security Instrument and shall bear interest at the Note rate from the date of disbursement.  The Note further discloses that the note holder:

> will have the right to be paid back by [the borrower] for all of its costs and expenses in enforcing this Note to the extent not prohibited by applicable law.  Those expenses include, for example, reasonable attorneys' fees.

Thus, the mortgage contract discloses to borrowers that the servicer will pay for default-related services when necessary, and will be reimbursed by the borrower.  Nowhere is it disclosed to borrowers that the servicer may mark-up the actual cost of those services to make a profit.

43.     Broker's Price Opinions ("BPOs") are a significant category of third party default-related service fees that, in furtherance of Defendants' unlawful enterprise, are assessed on borrowers' accounts with substantial, undisclosed mark-ups, fraudulently generating revenue in the loan servicing business.

44.     As discussed above, by charging marked-up fees for BPOs, Defendants violate the disclosures made to borrowers.  Furthermore, the wrongful nature of the marked-up fees is demonstrated by the fact that Defendants conceal the marked-up profits assessed on borrowers' accounts.

45.     Although Defendants assess fees for BPOs on borrowers' accounts in amounts ranging from approximately $95 to $125, as of December 2010, under Fannie Mae guidelines, the maximum reimbursable rate for an exterior BPO is $80,[12] and in practice, the actual cost is much less.  According to the National Association of BPO Professionals, the actual cost of a BPO may be as little as $30.[13]

46.     Together Defendants, Wells Fargo Bank, N.A. and Wells Fargo & Company, acting in concert with its wholly-owned subsidiary, administer approximately 10.3 million home mortgage loans, which is about one out of every seven mortgages in the United States.  Defendants Wells Fargo & Company, Wells Fargo Bank, N.A., their third-party "property preservation" vendors, and the real estate brokers who provide BPOs for Wells Fargo, formed an enterprise and devised a scheme to defraud borrowers and obtain money from them by means of false pretenses.

47.     The vast majority of consumer real estate loans serviced by a Wells Fargo & Company affiliate are serviced by defendant Wells Fargo Bank, N.A., either through its division, Wells Fargo Home Mortgage, or its trade name, America's Servicing Company.  Approximately 70% of the loans serviced by Wells Fargo are serviced for investors,

[12] See Fannie Mae, *Broker Price Opinion Providers and Pricing Structure*, available at https://efanniemae.com/sf/guides/ssg/annltrs/pdf/2010/ntce121710a.pdf (last visited Feb. 1, 2012).

[13] See National Association of BPO Professionals (NABPOP), *Broker Price Opinion – BPO Brief*, available at http://www.nabpop.org/Advocacy-BPOBrief-2.php (last visited Feb. 2, 2012).

1    including Fannie Mae, Freddie Mac, and private investors.

2        48.    Using the enterprise and its automated mortgage loan management system,

3    Defendants engaged in a scheme to fraudulently conceal and assess unlawfully marked-up

4    BPO fees on borrowers' accounts, cheating hundreds of thousands of borrowers out of

5    hundreds of millions dollars.  Furthermore, to conceal their actions and mislead borrowers

6    about the true nature of its actions, Defendants employed a corporate practice that omits

7    the true nature of the fees that are being assessed on borrowers' accounts.  Defendants

8    conceal these marked-up BPO fees, by identifying the charges on borrowers' statements

9    only as "Other Charges," or "Other Fees."  These practices are common to all of

10   Defendants' files.

11       49.    Additionally, in order to further conceal its activities and mislead both

12   borrowers and the courts, Defendants established an inter-company division or d/b/a, who

13   participates as a member of the enterprise, called Premiere Asset Services ("PAS").  PAS

14   exists to generate revenues for Wells Fargo & Company and it does not operate at arms-

15   length with Wells Fargo & Company or Wells Fargo Bank, N.A.

50.   According to PAS' website, PAS is located, among other places, in San Bernardino, California:



**PREMIERE**
Asset Services

*Specialists* in REO Properties

| Home | Company Profile | Buying an REO | Property Search | Home Buying Resources | Business Partners |

**Company Profile**

Congratulations for discovering an alternative to the typical home buying process. In many areas of the United States the market is still slanted in favor of sellers, causing buyers to compete for homes, raising prices to their maximum, and effectively shutting many out of realizing the dream of home ownership.

We believe that REO (Real Estate Owned) properties still provide an excellent opportunity to acquire affordable properties in all areas of the country. Our clients' portfolios include properties in all states and cover the full range of property types and property conditions...everything from homes in "move-in" condition to homes that will require substantial renovations. So no matter if you are looking for your first home or are a veteran renovation enthusiast, we have the home for you.

Premiere Asset Services is an REO property management and marketing firm located in Frederick, MD, and San Bernardino, CA. Our mission is to provide property valuation, management, and marketing services to banks, mortgage companies, and other investors that own real estate as a result of foreclosure actions. We maintain a close relationship with real estate agents nationwide and utilize those agents to list properties. All offers or questions concerning any specific property should be addressed to the listing agent.

Privacy Policy | Copyright Notice
© Copyright 2003 Premiere Asset Services, All Rights Reserved

51.     In furtherance of the enterprise's unlawful activities, Defendants also have has used the Internet to make it appear as though PAS is an independent company that provides, among other things, BPOs, fraudulently concealing the fact that PAS is really just a vehicle that provides Wells Fargo & Company with a false pretense for obtaining money from borrowers so that it can earn undisclosed profits:



52.     Acting as Defendants' agent under the scheme, PAS performs the BPOs ordered by Wells Fargo Bank, N.A.  When Wells Fargo Bank, N.A. orders BPOs, PAS sub-contracts the BPOs to different local real estate brokers.  PAS does not actually perform the BPOs itself.  Nevertheless, consistent with the design of Defendants' illegal enterprise, when borrowers demand that Defendants substantiate charges for BPOs, PAS, at Defendants' direction, provides invoices to Wells Fargo Bank, N.A. as if PAS was an independent, third-party vendor.

53.     Defendants never actually pay the invoices because they are not legitimate

invoices.  Instead, as Wells Fargo Bank, N.A. has admitted in other federal court proceedings, PAS is merely a division of Wells Fargo Bank, N.A., and the "invoices" produced by PAS as purported evidence of third-party vendor costs for BPOs are actually internal memos between Defendants' departments allocating costs of administration.

54.     The amount paid by Defendants for the BPOs is approximately one-half to one-third as much as the amounts assessed on borrowers' accounts based on the invoices generated by PAS.  Wells Fargo Bank, N.A. assesses fees for BPOs on borrowers' accounts, charging from approximately $95 to $125, when in fact, the actual cost of each BPO is approximately $50 or less.

55.     Defendants never pay PAS for the BPOs, but rather when the BPOs are completed by real estate brokers, Wells Fargo Bank, N.A. issues checks directly to the real estate brokers.  Despite this reality, driven to increase profits with illegally marked-up charges, Wells Fargo Bank, N.A. assesses borrowers' accounts with fees for these "pass through" expenses, even though the assessed amounts include a profit of two to three times more than the actual expenses incurred by Defendants.

56.     In furtherance of its scheme to conceal its illegal charges, PAS was created as part of Defendants' enterprise to act as a phony third party vendor, making it appear to borrowers, and the courts as though the amounts assessed on borrowers' accounts are actual third party costs.  Defendants never disclose that they are generating profits from the BPO charges that are illegally and improperly assessed on borrowers' accounts.

57.     Similarly, Plaintiffs are informed and believe, and on that basis, allege that when, at Defendants' direction, Wells Fargo Bank, N.A. assesses borrowers' accounts for property inspections, Defendants include an unlawful and undisclosed mark-up.  The actual cost of property inspections performed by Defendants' vendors, such as First American Field Services, is $15.  Nevertheless, when Defendants assess borrowers' accounts for the fees, it adds an undisclosed profit for itself, and assesses borrowers' accounts $20 for the inspection.  Defendants conceal their unlawful profits by merely identifying the fee as "Other Charges," or "Inspection," without informing borrowers that

the fee is marked-up.  If borrowers inquire about the nature of these fees, Defendants further conceals and misleads borrowers, attempting to dissuade them from challenging the charge, by telling them that such fees are "[i]n accordance with the terms of your mortgage."

58.     As a result of Defendants' unlawful enterprise, hundreds of thousands of unsuspecting borrowers like Plaintiffs are cheated out of millions of dollars.

## BORROWERS SUFFER HARM
## AS A RESULT OF DEFENDANTS' PRACTICES

59.     In addition to the direct monetary damages caused to borrowers, in the form of the difference between the actual cost of the services provided and the marked-up fees assessed on borrowers' accounts, borrowers suffer other, less obvious injuries as a result of the practices described herein.

60.     The assessment of these marked-up fees can make it impossible for borrowers to become current on their loan.  Charges for default-related services can add hundreds or thousands of dollars to borrowers' loans over time, driving them further into default.

61.     When borrowers get behind on their mortgage, and fees for these default-related services are stacked on to the past-due principal and interest payments, Defendants' practices make it increasingly difficult for borrowers to ever bring their loan current.  Even if borrowers pay the delinquent principal and interest payments, the marked-up fees for default-related services ensure that borrowers stay in default.  After paying delinquent principal and interest, although the next payment comes in on time, often through automatic payment deductions from borrowers' bank accounts, part of the payment is applied to the fees first, so there is not enough to cover the entire monthly payment.  This makes that payment late, creating a cascade of more fees, and more arrears, that keeps borrowers in delinquency.  By the time borrowers are aware, Defendants are threatening to foreclose unless a huge payment is made, and the weight of these marked-up fees drops borrowers into a financial abyss.

62.    As a result of Defendants' practices, which force borrowers to move deeper into default, borrowers suffer damage to their credit score.  Defendants provide information about borrowers' payment history to credit reporting companies, including whether they have been late with a payment or missed any payments.  By keeping borrowers in default with these practices, Defendants affect whether borrowers can get a loan in the future – and what borrowers' interest rate will be on such loans.

63.    Additionally, as a result of Defendants' practices, which force borrowers to move deeper into default, borrowers are driven into foreclosure.

## PLAINTIFFS' CLAIMS AGAINST WELLS FARGO

64.    Plaintiff Latara Bias is a resident of Napoleonville, which is in Assumption Parish, Louisiana.  Plaintiff Eric Breaux is a resident of Napoleonville, which is in Assumption Parish, Louisiana.  Plaintiffs Bias and Breaux have a mortgage serviced by Wells Fargo.

65.    Wells Fargo continually assessed $95 fees for BPOs on the mortgage account of Plaintiffs Bias and Breaux, beginning on December 28, 2006.  Wells Fargo also assessed $95 fees for BPOs on the mortgage account of Plaintiffs Bias and Breaux on September 27, 2007 and March 28, 2008.  Defendants alone maintain a complete accounting of all fees assessed and paid, and the details of each and every fee assessed and paid cannot be alleged with complete precision without access to Defendants' records.  Nevertheless, Plaintiffs are informed and believe, and on that basis allege, that Plaintiffs Bias and Breaux paid some or all of the unlawful fees assessed on their account.

66.    Plaintiff White-Price is a resident of Abita Springs, which is in St. Tammany Parish, Louisiana.  Plaintiff White-Price has a mortgage serviced by Wells Fargo.

67.    A "Monthly Mortgage Statement," dated September 19, 2011, mailed to Plaintiff White-Price by defendant Wells Fargo included an assessment of $100.00 for "Other Charges."  Plaintiff is informed and believes, and on that basis, alleges that these charges included unlawful marked-up fees for default-related services.  Defendants alone maintain a complete accounting of all fees assessed and paid, and the details of each and

every fee assessed and paid cannot be alleged with complete precision without access to Defendants' records. Nevertheless, Plaintiffs are informed and believe, and on that basis allege, that Plaintiff White-Price paid some or all of the unlawful fees assessed on her account.

## STATUTE OF LIMITATIONS

68.   Any applicable statutes of limitations have been tolled by Defendants' knowing and active concealment, denial, and misleading actions, as alleged herein. Plaintiffs and members of the Class, as defined below, were kept ignorant of critical information required for the prosecution of their claims, without any fault or lack of diligence on their part. Plaintiffs and members of the Class could not reasonably have discovered the true nature of the Defendants' marked-up fee scheme.

69.   Defendants are under a continuous duty to disclose to Plaintiffs and members of the classes the true character, quality, and nature of the fees they assess on borrowers' accounts. Defendants knowingly, affirmatively, and actively concealed the true character, quality, and nature of their assessment of marked-up fees against borrowers' accounts. Plaintiffs and members of the Class reasonably relied upon Defendants' knowing, affirmative, and active concealment. Based on the foregoing, Defendants are estopped from relying on any statutes of limitation as a defense in this action.

70.   The causes of action alleged herein did or will only accrue upon discovery of the true nature of the charges assessed against borrowers' accounts, as a result of Defendants' fraudulent concealment of material facts. Plaintiffs and members of the Class did not discover, and could not have discovered, through the exercise of reasonable diligence, the true nature of the unlawful fees assessed against their accounts.

71.   Legal scholars have explained that, as a result of these deceptive practices, it is impossible for borrowers to determine that they are victims of these violations, because "without a true itemization that identifies the nature of each fee, parties cannot verify that a mortgage claim is correctly calculated . . . the servicer could be overreaching and charging fees that are not permitted by law or by the terms of the contract. . . . By

1 obscuring the information needed to determine the alleged basis for the charges, servicers

2 thwart effective review of mortgage claims. The system can only function as intended if

3 complete and appropriate disclosures are made."[14]

4     72.    Additionally, judges examining Wells Fargo's conduct have found that, "[a]t

5 the heart of the problem is Wells Fargo's failure to disclose to its borrowers/debtors, the

6 trustee, or the Court, the nature or amount of fees and charges assessed . . . [l]ack of

7 disclosure facilitates the injury.  Naive borrowers/debtors, trustees and creditors rightly

8 assume that Wells Fargo is complying with the plain meaning of its notes, mortgages,

9 court orders and confirmed plans.  Why would anyone assume otherwise?  . . . How are

10 they to challenge a practice or demand correction of an error they do not know exists."[15]

11 **CLASS ACTION ALLEGATIONS**

12     73.    Plaintiffs bring this action, on behalf of themselves and all others similarly

13 situated, as a class action under Rule 23 of the Federal Rules of Civil Procedure.

14     74.    The classes Plaintiffs seek to represent (collectively, the "Class") are defined

15 as follows:

16

17         All residents of the United States of America who had a loan
serviced by Wells Fargo Bank, N.A. or its subsidiaries or

18         divisions, and whose accounts were assessed fees for default-
related services, including Broker's Price Opinions, and

19         inspection fees, at any time, continuing through the date of final

20         disposition of this action.

21     75.    Plaintiffs reserve the right to amend the Class definitions if discovery and

22 further investigation reveals that the Class should be expanded or otherwise modified.

23     76.    Plaintiffs reserve the right to establish sub-classes as appropriate.

24     77.    This action is brought and properly may be maintained as a class action

25

26 [14] *See* Katherine Porter, *Misbehavior and Mistake in Bankruptcy Mortgage Claims*, 87 Tex. L. Rev. 121,

27 155 (2008).

28 [15] *See In re: Jones*, 418 B.R. 687, 699 (E.D. La. 2009).

under the provisions of Federal Rules of Civil Procedure 23(a)(1)-(4) and 23(b)(1), (b)(2) or (b)(3), and satisfies the requirements thereof.  As used herein, the term "Class Members" shall mean and refer to the members of the Class.

78.   <u>Community of Interest</u>:  There is a well-defined community of interest among members of the Class, and the disposition of the claims of these members of the Class in a single action will provide substantial benefits to all parties and to the Court.

79.   <u>Numerosity</u>:  While the exact number of members of the Class is unknown to Plaintiffs at this time and can only be determined by appropriate discovery, membership in the Class is ascertainable based upon the records maintained by Defendants.  At this time, Plaintiffs are informed and believe that the Class includes hundreds of thousands of members.  Therefore, the Class is sufficiently numerous that joinder of all members of the Class in a single action is impracticable under Federal Rule of Civil Procedure Rule 23(a)(1), and the resolution of their claims through the procedure of a class action will be of benefit to the parties and the Court.

80.   <u>Ascertainablity</u>:  Names and addresses of members of the Class are available from Defendants' records.  Notice can be provided to the members of the Class through direct mailing, publication, or otherwise using techniques and a form of notice similar to those customarily used in consumer class actions arising under California state law and federal law.

81.   <u>Typicality</u>:  Plaintiffs' claims are typical of the claims of the other members of the Class which they seek to represent under Federal Rule of Civil Procedure 23(a)(3) because each Plaintiff and each member of the Class has been subjected to the same deceptive and improper practices and has been damaged in the same manner thereby.

82.   <u>Adequacy</u>:  Plaintiffs will fairly and adequately represent and protect the interests of the Class as required by Federal Rule of Civil Procedure Rule 23(a)(4). Plaintiffs are adequate representatives of the Class, because they have no interests which are adverse to the interests of the members of the Class.  Plaintiffs are committed to the vigorous prosecution of this action and, to that end, Plaintiffs have retained counsel who

are competent and experienced in handling class action litigation on behalf of consumers.

83.   Superiority: A class action is superior to all other available methods of the fair and efficient adjudication of the claims asserted in this action under Federal Rule of Civil Procedure 23(b)(3) because:

(a)   The expense and burden of individual litigation make it economically unfeasible for members of the Class to seek to redress their claims other than through the procedure of a class action.

(b)   If separate actions were brought by individual members of the Class, the resulting duplicity of lawsuits would cause members to seek to redress their claims other than through the procedure of a class action; and

(c)   Absent a class action, Defendants likely would retain the benefits of their wrongdoing, and there would be a failure of justice.

84.   Common questions of law and fact exist as to the members of the Class, as required by Federal Rule of Civil Procedure 23(a)(2), and predominate over any questions which affect individual members of the Class within the meaning of Federal Rule of Civil Procedure 23(b)(3).

85.   The common questions of fact include, but are not limited to, the following:

(a)   Whether Defendants engaged in unlawful, unfair, misleading, or deceptive business acts or practices in violation of California Business & Professions Code sections 17200 et seq.;

(b)   Whether Defendants' practice of charging marked-up fees to borrowers, as alleged herein, is illegal;

(c)   Whether Defendants were members of, or participants in the conspiracy alleged herein;

(d)   Whether Defendants engaged in a pattern or practice of racketeering, as alleged herein;

(e)   Whether documents and statements provided to Plaintiffs and

members of the Class omitted material facts;

(f)    Whether Plaintiffs and members of the class sustained damages, and if so, the appropriate measure of damages; and

(g)    Whether Plaintiffs and members of the Class are entitled to an award of reasonable attorneys' fees, pre-judgment interest, and costs of this suit.

86.    In the alternative, this action is certifiable under the provisions of Federal Rule of Civil Procedure 23(b)(1) and/or 23(b)(2) because:

(a)    The prosecution of separate actions by individual members of the Class would create a risk of inconsistent or varying adjudications with respect to individual members of the Class which would establish incompatible standards of conduct for Defendants;

(b)    The prosecution of separate actions by individual members of the Class would create a risk of adjudications as to them which would, as a practical matter, be dispositive of the interests of the other members of the Class not parties to the adjudications, or substantially impair or impede their ability to protect their interests; and

(c)    Defendants have acted or refused to act on grounds generally applicable to the Class, thereby making appropriate final injunctive relief or corresponding declaratory relief with respect to the Class as a whole and necessitating that any such relief be extended to members of the Class on a mandatory, class-wide basis.

87.    Plaintiffs are not aware of any difficulty which will be encountered in the management of this litigation which should preclude its maintenance as a class action

# FIRST CAUSE OF ACTION

### Violation of Unfair Business Practices Act
### (California Business & Professions Code §§ 17200 *et seq.*)

88.     Plaintiffs incorporate by reference in this cause of action each and every allegation of the preceding paragraphs, with the same force and effect as though fully set forth herein.

89.     Plaintiffs bring this cause of action on behalf of themselves and the members of the Class.

90.     California Business and Professions Code section 17200 prohibits "any unlawful, unfair or fraudulent business act or practice."  For the reasons described above, Defendants have engaged in unfair, or fraudulent business acts or practices in violation of California Business and Professions Code sections 17200 *et seq.*

91.     In the course and conduct of their loan servicing and collection, Defendants omit a true itemization that identifies the nature of each fee, and they fail to disclose the nature of the charges and fees assessed.  Defendants conceal the fact the category identified as "Other Charges" reflects marked-up fees that were never incurred by Defendants.  Relying on Defendants, Plaintiffs and members of the Class believe they are obligated to pay the amounts specified in Defendants' communications for default-related services.

92.     In truth and in fact, borrowers are not obligated to pay the amounts that have been specified in Defendants' communications for default-related services, such as BPOs.  Defendants omit the fact that the amounts they represent as being owed have been marked-up beyond the actual cost of the services, violating the disclosures in the mortgage contract.  Contrary to Defendants' communications, Defendants are not legally authorized to assess and collect these fees.

93.     Defendants' omissions of material facts, as set forth herein, constitute an unlawful practice because they violate Title 18 United States Code sections 1341, 1343, and 1962, as well as California Civil Code sections 1572, 1573, 1709, 1710, and 1711,

1    among others, and the common law.

2        94.    Defendants' omissions of material facts, as set forth herein, also constitute

3    "unfair" business acts and practices within the meaning of California Business and

4    Professions Code sections 17200 *et seq.*, in that Defendants' conduct was injurious to

5    consumers, offended public policy, and was unethical and unscrupulous.  Plaintiffs also

6    assert a violation of public policy by withholding material facts from consumers.

7    Defendants' violation of California's consumer protection and unfair competition laws in

8    California resulted in harm to consumers.

9        95.    There were reasonable alternatives available to Defendants to further

10   Defendants' legitimate business interests, other than the conduct described herein.

11       96.    California Business and Professions Code section 17200 also prohibits any

12   "fraudulent business act or practice."  Defendants' concealment of material facts, as set

13   forth above, was false, misleading, or likely to deceive the public within the meaning of

14   California Business and Professions Code section 17200.  Defendants' concealment was

15   made with knowledge of its effect, and was done to induce Plaintiffs and members of the

16   Class to pay the marked-up fees for default-related services.

17       97.    Plaintiffs relied their reasonable expectation that Defendants comply with the

18   plain meaning of the mortgage agreement, Notes, Security Instruments, court orders and

19   confirmed plans, and as a result, Plaintiffs relied on Defendants' disclosures about the fees

20   on their statements, reasonably believing the "Other Charges" and "Other Fees" to be

21   valid charges that were not unlawfully marked-up.  Indeed, to lull borrowers into a sense

22   of trust and dissuade them from challenging Defendants' unlawful fee assessments,

23   Defendants further conceal their scheme by telling borrowers, in statements and other

24   documents, that such fees are "[i]n accordance with the terms of your mortgage."  Had the

25   true nature of the fees been disclosed to Plaintiffs and members of the Class, they would

26   have been aware of the mark-ups, and Plaintiffs would have disputed the charges and not

27   paid them.

28       98.    Plaintiffs and members of the Class have been injured in fact and suffered a

loss of money or property as a result of Defendants' fraudulent, unlawful, and unfair business practices.  Plaintiffs and members of the Class would not have paid Defendants' unlawful fees or they would have challenged the assessment of such fees on their accounts had it not been for Defendants' concealment of material facts.

99.   Defendants have thus engaged in unlawful, unfair, and fraudulent business acts entitling Plaintiffs and members of the Class to judgment and equitable relief against Defendants, as set forth in the Prayer for Relief.

100.   Additionally, under Business and Professions Code section 17203, Plaintiffs and members of the Class seek an order requiring Defendants to immediately cease such acts of unlawful, unfair, and fraudulent business practices, and requiring Defendants to correct their actions.

## SECOND CAUSE OF ACTION

### Violations of the Racketeer Influenced and Corrupt Organizations Act
### (18 U.S.C. § 1962(c))

101.   Plaintiffs incorporate by reference in this cause of action each and every allegation of the preceding paragraphs, with the same force and effect as though fully set forth herein.

102.   Plaintiffs bring this cause of action on behalf of themselves and the members of the Class.

### THE ENTERPRISE

103.   Defendants Wells Fargo & Company and Wells Fargo Bank, N.A. are each persons within the meaning of Title 18 United States Code section 1961(3).

104.   At all relevant times, in violation of Title 18 United States Code section 1962(c), Wells Fargo & Company, Wells Fargo Bank, N.A., including their directors, employees, and agents, along with their "property preservation" vendors – including First American Financial Corporation d/b/a First American Field Services, and Fidelity National Financial, Inc. d/b/a Fidelity National Field Services – and the real estate brokers who provide BPOs for Wells Fargo conducted the affairs of an association-in-fact

enterprise, as that term is defined in Title 18 United States Code section 1961(4) (the "Wells Fargo Enterprise").  The affairs of the Wells Fargo Enterprise affected interstate commerce through a pattern of racketeering activity.

105.   The Wells Fargo Enterprise is an ongoing, continuing group or unit of persons and entities associated together for the common purpose of limiting costs and maximizing profits by fraudulently concealing assessments for unlawfully marked-up fees for default-related services on borrowers' accounts.

106.   While the members of the Wells Fargo Enterprise participate in and are part of the enterprise, they also have an existence separate and distinct from the enterprise. The Wells Fargo Enterprise has a systematic linkage because there are contractual relationships, agreements, financial ties, and coordination of activities between Defendants, the real estate brokers who perform BPOs, and the vendors that perform property inspections.

107.   As discussed above, operating the Wells Fargo Enterprise "as One Wells Fargo,"[16] according to policies and procedures developed and established by their executives, including the servicing guidelines established by Wells Fargo & Company,[17] Wells Fargo & Company and Wells Fargo Bank, N.A. control and direct the affairs of the Wells Fargo Enterprise and use the other members of the Wells Fargo Enterprise as instrumentalities to carry out Wells Fargo's fraudulent scheme.

108.   These policies and procedures established by Wells Fargo's executives include providing statements that fail to disclose the true nature of the marked-up fees, cryptically identifying default-related service fees as "Other Charges," using mortgage loan management software designed to assess undisclosed marked-up fees on borrowers' accounts, and failing to provide borrowers with accurate documentation to support

[16] *See* Wells Fargo & Company, 2011 Annual Report at 5, available at https://www.wellsfargo.com/downloads/pdf/invest_relations/wf2011annualreport.pdf (last visited July 23, 2012).

[17] *See* https://www.wellsfargo.com/mortgage/fair-lending-principles (last visited July 23, 2012).

assessments of fees for BPOs.

## THE PREDICATE ACTS

109.   Defendants' systematic schemes to fraudulently conceal assessments of unlawfully marked-up third party fees on the accounts of borrowers who have mortgage loans administered by Defendants, as described above, was facilitated by the use of the United States Mail and wire.  Defendants' schemes constitute "racketeering activity" within the meaning of Title 18 United States Code section 1961(1), as acts of mail and wire fraud, under Title 18 United States Code sections 1341 and 1343.

110.   In violation of Title 18 United States Code sections 1341 and 1343, Defendants utilized the mail and wire in furtherance of their scheme to defraud borrowers whose loans are serviced by Wells Fargo Bank, N.A. by obtaining money from borrowers using false or fraudulent pretenses.

111.   Through the mail and wire, the Wells Fargo Enterprise provided mortgage invoices, loan statements, payoff demands, or proofs of claims to borrowers, demanding that borrowers pay fraudulently concealed marked-up fees for default-related services, such as BPOs or property inspections.  Defendants also accepted payments and engaged in other correspondence in furtherance of their scheme through the mail and wire.

112.   Defendants fraudulently and unlawfully marked-up fees in violation of borrowers' mortgage agreements because the fees exceed the actual cost of the services, and therefore, they violate the disclosures made to borrowers.

113.   The mortgage invoices, loan statements, or proofs of claims provided to borrowers fraudulently concealed the true nature of assessments made on borrowers' accounts.  Using false pretenses, identifying the fees on mortgage invoices, loan statements, or proofs of claims only as "Other Charges" or "Other Fees" to obtain full payments from borrowers, Defendants disguised the true nature of these fees and omitted the fact that the fees include undisclosed mark-ups.  By omitting and fraudulently concealing the true nature of amounts purportedly owed in communications to borrowers, Defendants made false statements using the Internet, telephone, facsimile, United States

mail, and other interstate commercial carriers.

114.   Furthermore, to lull borrowers into a sense of trust, conceal Defendants' unlawful fees, and dissuade borrowers from challenging Defendants' unlawful fee assessments, Defendants further conceal their scheme from borrowers by telling them, in statements and other documents, that such fees are "[i]n accordance with the terms of your mortgage."

115.   Defendants' omissions were material to Plaintiffs and the members of the Class.  Had Defendants disclosed the true marked-up nature of the fees for default-related services, Plaintiffs would have been aware and would have challenged Defendants' unlawful fee assessments or they would not have paid them.

116.   Each of these acts constituted an act of mail fraud for purposes of Title 18 United States Code section 1341.

117.   Additionally, using the Internet, telephone, and facsimile transmissions to fraudulently communicate false information about these fees to borrowers, to pursue and achieve their fraudulent scheme, Defendants engaged in repeated acts of wire fraud in violation of Title 18 United States Code section 1343.

118.   In an effort to pursue their fraudulent scheme, Defendants knowingly fraudulently concealed or omitted material information from Plaintiffs and members of the Class.  Defendants' knowledge that their activities were fraudulent and unlawful is evidenced by, among other things, the fact that they did not disclose the marked-up fees in their communications to borrowers.

119.   The predicate acts specified above constitute a "pattern of racketeering activity" within the meaning of Title 18 United States Code section 1961(5) in which Defendants have engaged under Title 18 United States Code section 1962(c).

120.   All of the predicate acts of racketeering activity described herein are part of the nexus of the affairs and functions of the Wells Fargo Enterprise racketeering enterprise.  The racketeering acts committed by the Wells Fargo Enterprise employed a similar method, were related, with a similar purpose, and they involved similar

participants, with a similar impact on the members of the Class.  Because this case is brought on behalf of a class of similarly situated borrowers and there are numerous acts of mail and wire fraud that were used to carry out the scheme, it would be impracticable for Plaintiffs to plead all of the details of the scheme with particularity.  Plaintiffs cannot plead the precise dates of all of Defendants' uses of the mail and wire because this information cannot be alleged without access to Defendants' records.

121.   The pattern of racketeering activity is currently ongoing and open-ended, and threatens to continue indefinitely unless this Court enjoins the racketeering activity.

122.   Numerous schemes have been completed involving repeated unlawful conduct that by its nature, projects into the future with a threat of repetition.

123.   As a direct and proximate result of these violations of Title 18 United States Code sections 1962(c) and (d), Plaintiffs and members of the class have suffered substantial damages.  Defendants are liable to Plaintiffs and members of the Class for treble damages, together with all costs of this action, plus reasonable attorney's fees, as provided under Title 18 United States Code section 1964(c).

## THIRD CAUSE OF ACTION

### Violation of the Racketeer Influenced and Corrupt Organizations Act, Conspiracy to Violate Title 18 United States Code section 1962(c) (18 U.S.C. § 1962(d))

124.   Plaintiffs incorporate by reference in this cause of action each and every allegation of the preceding paragraphs, with the same force and effect as though fully set forth herein.

125.   Plaintiffs bring this cause of action on behalf of themselves and the members of the Class.

126.   As set forth above, in violation of Title 18 United States Code section 1962(d), Wells Fargo & Company and Wells Fargo Bank, N.A. conspired to violate the provisions of Title 18 United States Code section 1962(c).

127.   As set forth above, Defendants, having directed and controlled the affairs of

the Wells Fargo Enterprise, were aware of the nature and scope of the enterprise's unlawful scheme, and they agreed to participate in it.

128.   As a direct and proximate result, Plaintiffs and the members of the Class have been injured in their business or property by the predicate acts which make up Defendants' patterns of racketeering activity in that unlawfully marked-up fees for default-related services were assessed on their mortgage accounts.

## FOURTH CAUSE OF ACTION

### Unjust Enrichment

129.   Plaintiffs incorporate by reference in this cause of action each and every allegation of the preceding paragraphs, with the same force and effect as though fully set forth herein.

130.   Plaintiffs bring this cause of action on behalf of themselves and the members of the Class.

131.   By their wrongful acts and omissions of material facts, Defendants were unjustly enriched at the expense of Plaintiffs and members of the Class.

132.    The mortgage contract with borrowers like Plaintiffs and the members of the Class discloses that Defendants will pay for default-related services when necessary, and they will be reimbursed by the borrower.  Nowhere in the mortgage contract is it disclosed that Defendants may mark-up the actual cost of those services to make a profit.

133.   Nevertheless, Defendants mark-up the prices charged by vendors, often by 100% or more, and then, without disclosing the mark-up, assess borrowers' accounts for the higher, marked-up fee so that Defendants can earn a profit.

134.   Thus, Plaintiffs and members of the Class were unjustly deprived.

135.   Defendants are aware that it is improper to mark-up fees on borrowers' accounts for default-related services.  Therefore, Defendants fraudulently conceal these fees on borrowers' accounts, omitting any information about Defendants' additional profits, by identifying them on mortgage statements only as "Other Charges" or "Other Fees."

136.   Furthermore, to lull borrowers into a sense of trust, conceal Defendants' unlawful fees, and dissuade borrowers from challenging Defendants' unlawful fee assessments, Defendants further conceal their scheme from borrowers by telling them, in statements and other documents, that such fees are "[i]n accordance with the terms of your mortgage."

137.   It would be inequitable and unconscionable for Defendants to retain the profit, benefit and other compensation they obtained from their fraudulent, deceptive, and misleading conduct alleged herein.

138.   Plaintiffs and members of the Class seek restitution from Defendants, and seek an order of this Court disgorging all profits, benefits, and other compensation obtained by Defendants from their wrongful conduct.

## FIFTH CAUSE OF ACTION

### Fraud

139.   Plaintiffs incorporate by reference in this cause of action each and every allegation of the preceding paragraphs, with the same force and effect as though fully set forth herein.

140.   Plaintiffs bring this cause of action on behalf of themselves and the members of the Class.

141.   Defendants concealed and suppressed material facts, namely, the fact that Defendants mark-up the prices charged by vendors, often by 100% or more, and then, without disclosing the mark-up, assess borrowers' accounts for the higher, marked-up fee so that Defendants can earn a profit.  In truth and in fact, borrowers are not obligated to pay the amounts that have been specified in Defendants' communications for default-related services, such as BPOs.  Contrary to Defendants' communications, Defendants are not legally authorized to assess and collect these fees.

142.   Defendants omit a true itemization that identifies the nature of each fee, and they fail to disclose the nature of the charges and fees assessed.  Defendants conceal the fact the category identified as "Other Charges" reflects marked-up fees.

143.   Plaintiffs relied their reasonable expectation that Defendants comply with the disclosures set forth in the mortgage agreement, Notes, and Security Instruments, and as a result, Plaintiffs relied on Defendants' disclosures about the fees on their statements, reasonably believing the "Other Charges" and "Other Fees" to be valid charges that were not unlawfully marked-up.

144.   Indeed, to lull borrowers into a sense of trust and dissuade them from challenging Defendants' unlawful fee assessments, Defendants further conceal their scheme by telling borrowers, in statements and other documents, that such fees are "[i]n accordance with the terms of your mortgage."

145.   Had the true nature of the fees been disclosed to Plaintiffs and members of the Class, they would have been aware of the marked-up fees, and Plaintiffs would have disputed the charges and not paid them.

146.   Defendants knew their concealment and suppression of materials facts was false, misleading, and in violation of the disclosures made to borrowers because the fees exceed the actual cost of the services.

147.   As a result of Defendants' fraudulent omissions and failures to disclose, Plaintiffs and members of the Class have been injured in fact and suffered a loss of money or property.  Plaintiffs and members of the Class would not have paid Defendants' fraudulently marked-up fees or they would have challenged the assessment of such fees on their accounts had it not been for Defendants' concealment of material facts.

148.   Defendants omitted and concealed material facts, as discussed above ,with knowledge of the effect of concealing of these material facts.  Defendants knew that by misleading consumers, they would generate higher profits.

149.   Plaintiffs and members of the Class justifiably relied upon Defendants' knowing, affirmative, and active concealment.  By concealing material information about their scheme to assess undisclosed marked-up fees on borrowers' accounts, Defendants intended to induce Plaintiffs and members of the Class into believing that they owed Defendants money that Defendants were not actually entitled.

150.    Defendants acted with malice, oppression, or fraud.

151.    As a direct and proximate result of Defendants' omissions and active concealment of material facts, Plaintiffs and each member of the Class has been damaged in an amount according to proof at trial.

## PRAYER FOR RELIEF

Plaintiffs, and on behalf of themselves and all others similarly situated, request the Court to enter judgment against Defendants, as follows:

1.    Certifying the Class, as requested herein, certifying Plaintiffs as the representatives of the Class, and appointing Plaintiffs' counsel as counsel for the Class;

2.    Ordering that Defendants are financially responsible for notifying all members of the Class of the alleged omissions discussed herein;

3.    Awarding Plaintiffs and the members of the Class compensatory damages in an amount according to proof at trial;

4.    Awarding restitution and disgorgement of Defendants' revenues and/or profits to Plaintiffs and members of the Class;

5.    Awarding Plaintiffs and the members of the Class treble damages in an amount according to proof at trial;

6.    Awarding declaratory and injunctive relief as permitted by law or equity, including:  enjoining Defendants from continuing the unlawful practices as set forth herein, and directing Defendants to identify, with Court supervision, victims of its conduct and pay them restitution and disgorgement of all monies acquired by Defendants by means of any act or practice declared by this Court to be wrongful;

7.    Ordering Defendants to engage in corrective advertising;

8.    Awarding interest on the monies wrongfully obtained from the date of collection through the date of entry of judgment in this action;

9.    Awarding attorneys' fees, expenses, and recoverable costs reasonably incurred in connection with the commencement and prosecution of this action; and

10.   For such other and further relief as the Court deems just and proper.

Dated: July 24, 2012                    BARON & BUDD, P.C.


                                        By: _____
                                              Mark Pifko

                                        Daniel Alberstone (SBN 105275)
                                        Roland Tellis (SBN 186269)
                                        Mark Pifko (SBN 228412)
                                        BARON & BUDD, P.C.
                                        15910 Ventura Boulevard, Suite 1600
                                        Encino, California  91436
                                        Telephone:  (818) 839-2333
                                        Facsimile:   (818) 986-9698

                                        Attorneys for Plaintiffs
                                        LATARA BIAS, ERIC BREAUX,
                                        and NAN WHITE-PRICE, individually,
                                        and on behalf of other members of the
                                        public similarly situated

## **DEMAND FOR JURY TRIAL**

Plaintiffs hereby demand a trial of their claims by jury to the extent authorized by law.

Dated: July **24**, 2012

BARON & BUDD, P.C.

By: _____
      Mark Pifko

Daniel Alberstone (SBN 105275)
Roland Tellis (SBN 186269)
Mark Pifko (SBN 228412)
BARON & BUDD, P.C.
15910 Ventura Boulevard, Suite 1600
Encino, California 91436
Telephone: (818) 839-2333
Facsimile: (818) 986-9698

Attorneys for Plaintiffs
LATARA BIAS, ERIC BREAUX,
and NAN WHITE-PRICE, individually,
and on behalf of other members of the
public similarly situated