1   MARK D. LONERGAN (State Bar No. 143622)
    mdl@severson.com
2   MICHAEL J. STEINER (State Bar No. 112079)
    mjs@severson.com
3   MICHELLE T. McGUINNESS (State Bar No. 257151)
    mtm@severson.com
4   SEVERSON & WERSON
    A Professional Corporation
5   One Embarcadero Center, Suite 2600
    San Francisco, California 94111
6   Telephone: (415) 398-3344
    Facsimile: (415) 956-0439
7
    Attorneys for Defendants
8   WELLS FARGO & COMPANY and
    WELLS FARGO BANK, N.A.
9

10                  UNITED STATES DISTRICT COURT

11          NORTHERN DISTRICT OF CALIFORNIA — OAKLAND DIVISION

12

13  LATARA BIAS, ERIC BREAUX, NAN              Case No. 4:12-cv-00664-YGR
    WHITE-PRICE, DIANA ELLIS, JAMES
14  SCHILLINGER, RONALD LAZAR,                 **WELLS FARGO DEFENDANTS'**
    GLORIA STITTI, RONALD STITTI, JUDI         **NOTICE OF MOTION AND MOTION TO**
15  SHATZER, MARK ZIRLOTT, and TERRI           **DISMISS PURSUANT TO FED. R. CIV. P.**
    LOUISE ZIRLOTT individually, and on        **12(b)(6); MEMORANDUM OF POINTS**
16  behalf of other members of the general public  **AND AUTHORITIES**
    similarly situated,
17                                             Date:      October 9, 2012
                Plaintiffs,                    Time:      2 p.m.
18                                             Room:      TBD
                vs.                            Judge:  The Hon. Yvonne Gonzalez Rogers
19
    WELLS FARGO & COMPANY, a Delaware          **Accompanying Documents:**  Request for
20  corporation, WELLS FARGO BANK, N.A., a     Judicial Notice
    national association, J.P. MORGAN CHASE
21  & CO., a Delaware corporation, J.P.
    MORGAN CHASE BANK, N.A., a national
22  association, and CHASE HOME FINANCE
    LLC, a Delaware limited liability company,
23  CITIBANK, N.A., a national association, and
    CITIMORTGAGE, INC., a New York
24  corporation,

25              Defendants.

26

27

28

07685.1127/2293461.2                                          4:12-cv-00664-YGR

DEFENDANT WELLS FARGO'S MOTION TO DISMISS SECOND AMENDED COMPLAINT

# TABLE OF CONTENTS

Page

NOTICE OF MOTION AND MOTION TO DISMISS .................................................. 1

I. INTRODUCTION ........................................................................................................ 1

II. STATEMENT OF ISSUES ........................................................................................ 2

III. LEGAL STANDARDS AND PERTINENT FACTS ............................................... 3

IV. PLAINTIFFS HAVE NOT STATED A VALID UCL CLAIM................................ 4

    A.    Plaintiffs Cannot Seek Redress Under the UCL ......................................... 5

          1.    Louisiana Law, and Not California's UCL, Applies........................ 5

          2.    Constitutional and Choice-of-Law Principles Prohibit Application of the UCL ...................................................................... 7

    B.    Plaintiffs Lack Standing, Having Not Adequately Pled Injury or Reliance........... 10

    C.    The UCL Claim Is Not Sufficiently Pled .................................................. 12

          1.    The UCL Claim Must Be Alleged With Particularity.................... 12

          2.    The SAC Does Not Plead An Unlawful Act ................................... 12

          3.    Wells Fargo's Conduct Was Not Unfair ........................................ 15

          4.    Wells Fargo's Conduct Was Not Fraudulent ................................. 17

V. COUNT II FAILS TO STATE A PRIMARY RICO VIOLATION .......................... 18

    A.    Plaintiffs Lack Standing to Allege a RICO Claim ................................... 18

    B.    The Complaint Alleges No Fraudulent Scheme....................................... 18

    C.    The SAC Does Not Properly Allege a Separate Enterprise Conducted by Wells............................................................................................... 20

VI. NO CONSPIRACY TO VIOLATE RICO IS ALLEGED ..................................... 22

VII. COUNT IV ALLEGES NO CLAIM FOR UNJUST ENRICHMENT ................. 23

VIII. THE SAC DOES NOT STATE A CLAIM FOR FRAUD ................................... 24

IX. CONCLUSION ........................................................................................................ 25

# TABLE OF AUTHORITIES

Page(s)

**FEDERAL CASES**

*All Direct Travel Serv., Inc. v. Delta Air Lines, Inc.,*
   120 Fed.Apx. 673 (9th Cir. 2005) ....................................................................... 20

*Allstate Ins. Co. v. Hague,*
   449 U.S. 302 (1981) ............................................................................................ 8

*Amakua Dev. LLC v. Warner,*
   411 F.Supp.2d 941 (N.D. Il. 2006) ...................................................................... 6

*Aquino v. Credit Control Servs,*
   4 F.Supp.2d 927 (N.D.Cal. 1998) ....................................................................... 15

*Ashcroft v. Iqbal,*
   129 S.Ct. 1937 (2009) ......................................................................................... 3

*Assoc. Gen. Contractors of Calif., Inc. v. Calif. State Council of Carpenters,*
   459 U.S. 519 (1983) ............................................................................................ 3

*AT&T Mobility LLC v. Concepcion,*
   131 S.Ct. 1740 (2011) ......................................................................................... 6

*Baumer v. Pachl,*
   8 F.3d 1341 (9th Cir. 1993) ................................................................................ 22, 23

*Bell Atlantic Corp. v. Twombly,*
   550 U.S. 544 (2007) ............................................................................................ 23

*BMW of N.Am. v. Gore,*
   517 U.S. 559 (1996) ............................................................................................ 7

*Brownfield v. Bayer Corp.,*
   2009 WL 1953035 (E.D.Cal. July 6, 2009) ........................................................ 12

*Cal. Architectural Building Products, Inc. v. Franciscan Ceramics, Inc.,*
   818 F.2d 1466 (9th Cir. 1987) ............................................................................. 20

*Castrillo v. American Home Mortg. Servicing, Inc.,*
   670 F. Supp.2d 516 (E.D. La. 2009) .................................................................... 25

*Cedric Kushner Promotions, Ltd. v. King,*
   533 U.S. 158 (2001) ............................................................................................ 20

*Chris Albritton Constr. Co. v. Pitney Bowes,*
   304 F.3d 527 (5th Cir. 2002) ............................................................................... 20

*Crichton v. Golden Rule Ins. Co.*,
    576 F.3d 392 (7th Cir. 2009) ........................................................................ 21

*Diaz v. Gates*,
    420 F.3d 897 (9th Cir. 2005) (en banc) ........................................................ 18

*Drs. Bethea, Maustoukas and Weaver LLC v. St. Paul Guardian Ins. Co.*,
    376 F.3d 399 (5th Cir. 2004) ........................................................................ 23

*Gen. Signal Corp. v. MCI Telecomms. Corp.*,
    66 F.3d 1500 (9th Cir. 1995) .......................................................................... 6

*Gerlinger v. Amazon Com, Inc.*
    311 F.Supp.2d 838 (N.D.Cal. 2004) ............................................................. 23

*Gianino v. Alacer Corp.*,
    __ F.Supp.2d __, 2012 WL 724322 (C.D. Cal. Feb. 27, 2012) .................... 10

*Gomez v. Wells Fargo*,
    676 F.3d 655 (8th Cir. 2012) ................................................................... 11, 18

*Grauberger v. St. Francis Hosp.*,
    169 F.Supp.2d 1172 (N.D. Cal. 2001) ........................................................... 20

*Healy v. Beer Inst.*,
    491 U.S. 324 (1989) ......................................................................................... 7

*In re Apple & AT & TM Antitrust Litigation*,
    596 F.Supp.2d 1288 (N.D.Cal. 2008) ............................................................. 8

*In re Countrywide Fin. Corp. Mortgage Marketing*,
    601 F.Supp.2d 1201 (S.D. Cal. 2009) ........................................................... 20

*In re Detropan XL Antitrust Litigation*,
    529 F.Supp.2d 1098 (N.D.Cal. 2007) ............................................................. 8

*In re Gilead Sci. Sec. Litig.*,
    536 F.3d 1049 (9th Cir. 2008) ......................................................................... 3

*JMP Securities LLP v. Altair Nanotechnologies Inc.*,
    2012 WL 892157 (N.D.Cal. Mar. 14, 2012) .................................................... 6

*Johnson v. Riverside Healthcare Sys.*,
    534 F.3d 1116 (9th Cir. 2008) ......................................................................... 3

*Kearns v. Ford Motor Co.*,
    567 F.3d 1120 (9th Cir. 2009) ....................................................................... 17

*Lee v. General Nutrition Cos., Inc.*,
    2001 WL 34032651 (C.D.Cal. Nov. 26, 2001) .............................................. 21

DEFENDANT WELLS FARGO'S MOTION TO DISMISS SECOND AMENDED COMPLAINT

*Lum v. Bank of America*,
    361 F.3d 217 (3d Cir. 2004) .................................................................... 20

*Majchrowski v. Norwest Mortgage, Inc.*,
    6 F.Supp.2d 946 (N.D. Ill. 1998) ...................................................... 13, 19

*Marceau v. Blackfeet Hous. Auth.*,
    540 F.3d 916 (9th Cir. 2008) ..................................................................... 3

*Mazza v. Honda Motor Co., Inc.*,
    666 F.3d 581 (9th Cir. 2012) ............................................................... 9, 10

*McNearhy-Calloway v. JP Morgan Chase Bank, N.A.*,
    ___ F.Supp.2d ___, 2012 WL 1029502 (N.D.Cal. Mar. 26, 2012) ........................... 11

*Medimatch v. Lucent Technologies, Inc.*,
    120 F.Supp.2d 842 (N.D.Cal. 2000) ............................................................ 7

*Morales v. Countrywide Home Loans, Inc.*,
    531 F. Supp. 2d 1225 (C.D. Cal. 2008) ................................................. 16, 17

*Muehlbauer v. Gen. Motors Corp.*,
    431 F.Supp.2d 847 (N.D. Ill. 2006) ......................................................... 12

*Omstead v. Dell, Inc.*,
    533 F.Supp.2d 1012 (N.D. Cal. 2008) ......................................................... 6

*Paracor Fin. v. Gen. Elec. Capital Corp.*,
    96 F.3d 1151 (9th Cir. 1996) .................................................................. 23

*Ralston v. Mortgage Investors Group*,
    2012 WL 1094633 (N.D.Cal. Mar. 30, 2012) .................................................. 10

*Reves v. Ernst & Young*,
    507 U.S. 170 (1993) ........................................................................... 21

*Riverwoods Chappaqua Corp. v. Marine Midland Bank, N.A.*,
    30 F.3d 339 (2d Cir. 1994) ................................................................... 21

*Sandberg. v. McDonald*,
    248 U.S. 185 (1918) ............................................................................ 7

*Sebastian Intern., Inc. v. Russolillo*,
    128 F.Supp.2d 630 (C.D.Cal. 2001) ........................................................... 18

*Sedima, S.P.R.L. v. Imrex Co.*,
    473 U.S. 479 (1985) ....................................................................... 2, 18

*Sosa v. Chase Manhattan Mortgage Corporation*,
    348 F.3d 979 (11th Cir. 2003) ................................................................ 16

*Sosa v. DIRECTV, Inc.*,
    437 F.3d 923 (9th Cir. 2006) ........................................................................ 17, 19

*Stickrath v. Globalstar, Inc.*,
    527 F.Supp.2d 992 (N.D. Cal. 2007) ............................................................ 12

*Turner v. Cook*,
    362 F.3d 1219 (9th Cir. 2004) ..................................................................... 23

*Vess v. Ciba-Geigy Corp.*,
    317 F.3d 1097 (9th Cir.) .............................................................................. 12, 17

*Vignolo v. Miller*,
    120 F.3d 1075 (9th Cir. 1999) ...................................................................... 3

*Westways World Travel, Inc. v. AMR Corp.*,
    2965 Fed.Appx. 472 (9th Cir. 2008) ........................................................... 19

**STATE CASES**

*Becnel v. Grodner*,
    982 So. 2d 891 (La. Ct. Appeal 2008) ......................................................... 24

*Bradley v. Prange*,
    897 So. 2d 717 (La. Ct. Appeal 2004) ......................................................... 24

*Byars v. SCME Mortgage Bankers, Inc.*,
    109 Cal.App.4th 1134 (2003) ....................................................................... 15

*Davis v. Ford Motor Credit Co.*,
    179 Cal.App.4th 581 (2009) ......................................................................... 15

*Discover Bank v. Superior Court*,
    36 Cal.4th 148 (Cal. 2005) ........................................................................... 6

*Greene v. Gulf Coast Bank*,
    593 So.2d 630 (La. 1992) .............................................................................. 24

*Guimmo v. Albarado*,
    739 So.2d 973 (La. Ct. Appeal 1999) ......................................................... 24

*Hobby Indus. Ass'n of America, Inc. v. Younger*,
    101 Cal.App.3d 358 (1980) ........................................................................... 12

*Kwikset Corp. v. Super. Ct.*,
    246 P.3d 877 (2011) ...................................................................................... 11

*Morris v. Sears Roebuck*,
    765 So.2d 419 (La.Ct.App. 2000) ................................................................ 9

DEFENDANT WELLS FARGO'S MOTION TO DISMISS SECOND AMENDED COMPLAINT

*Nedloyd Lines B.V. v. Superior Court,*
    3 Cal.4th 459 (1992) ............................................................................... 6, 7

*Norwest Mortgage, Inc. v. Superior Court,*
    72 Cal.App.4th 214 (1999) ............................................................... 8, 9, 10

*Twentieth Century-Fox Distribution Corp. v. Lakeside Theatres, Inc.,*
    267 So. 2d 225 (La. App. 1972) ................................................................ 25

*Walker v. Countrywide Home Loans, Inc.,*
    98 Cal.App.4th 1158 (2002) ............................................................. *passim*

*Wash. Mutl. Bank v. Superior Court,*
    24 Cal.4th 906 (Cal. 2001) ...................................................................... 6, 8

*Wong v. Tenneco Co.,*
    39 Cal. 3d 126 (1985) .................................................................................. 7


STATUTES

United States Code
    Title 12
        § 2607 .............................................................................................. 16
    Title 18
        § 1341 .............................................................................................. 18
        § 1343 .............................................................................................. 18
        § 1961 .............................................................................................. 18
        § 1962 ................................................................................ 20, 22-24
        § 1964 .............................................................................................. 18

Business & Professions Code
        § 17200 .............................................................................................. 4
        § 17204 ............................................................................................ 11
        § 17208 .............................................................................................. 9

La. CCP, Article 856 ............................................................................................ 24


RULES AND REGULATIONS

Federal Rules of Civil Procedure
        Rule 8 ............................................................................................... 22
        Rule 9 ............................................................................... 12, 17, 24
        Rule 12 .......................................................................................... 3, 4

Code of Federal Regulations
    Title 12
        § 1.1 et seq. .................................................................................. 14

vi                                                        4:12-cv-00664-YGR

§ 7.4002 .................................................................................................... 14

61 F.Reg. 4849-03, at 4869-70 (Feb. 9, 1996)
(to be codified at 12 C.F.R. pts. 7 and 31) ..................................... 14

66 Fed.Reg. 34, 784-01, at 34-787 (July 2, 2001)
(to be codified at 12 C.F.R. pts. 1, 7, and 23) ................................ 14

**OTHER AUTHORITIES**

Mortgagee Letter 97-46, 1997 WL 33483463, at *1 (Dec. 8, 1997) ........................... 14

OCC Interpretive Letter 1069 (August 21, 2006) ......................................................... 14

DEFENDANT WELLS FARGO'S MOTION TO DISMISS SECOND AMENDED COMPLAINT

1

**NOTICE OF MOTION AND MOTION TO DISMISS**

2    PLEASE TAKE NOTICE that on October 9, 2012, at 2 p.m., or as soon thereafter as

3 counsel may be heard, in the Oakland Courthouse of the federal district court for the Northern

4 District of California, 1301 Clay Street, Oakland, California 94612, Defendants Wells Fargo &

5 Co. and Wells Fargo Bank, N.A. (collectively, "Wells Fargo") will and hereby do move for an

6 Order dismissing the Second Amended Complaint ("SAC") in its entirety without leave to amend,

7 pursuant to Federal Rule of Civil Procedure 12(b)(6).

8    Count I, the claim for relief under California's Unfair Competition ("UCL"), should be

9 dismissed for several reasons.  *First*, Plaintiffs are residents of Louisiana who executed mortgages

10 specifying that Louisiana law applies to all claims arising under those agreements, and whose

11 claims have no connection to California.  Consequently, they cannot avail themselves of the

12 protections afforded by the UCL and the claim must be dismissed.  Moreover, even if they could

13 bring such claims, they nevertheless have failed to allege standing and have failed to state a claim

14 under the UCL.  Counts II through Count V, for RICO, RICO conspiracy, unjust enrichment, and

15 fraud, similarly fail to state a claim upon which relief may be granted and should be dismissed

16 under Rule 12(b)(6).

17    This motion is based on this notice of motion, the accompanying memorandum of points

18 and authorities, the pleadings and records on file in this action, and any further briefs, evidence,

19 authorities, or argument presented before or at the hearing of this motion.

20

**I.    INTRODUCTION**

21    Latara Bias, Eric Breaux and Nan White-Price allege that Wells Fargo carries out property

22 inspections and obtain broker's price opinions ("BPOs") for properties securing loans when

23 payments on such loans are delinquent.  While conceding that the mortgage documents governing

24 such loans entitle Wells Fargo Bank, N.A. (the "Bank") to pay for reasonable and appropriate

25 measures to protect the note holder's interest in the property, Plaintiffs allege that the manner by

26 which Wells Fargo ordered and obtained the inspection reports and BPOs, and subsequently

27 charged affected borrowers, somehow violated disclosures in the mortgage documents.

28    Eschewing any breach of contract claim, Plaintiffs take the dispute to another level,

seeking to utilize the "themonuclear device" of the federal Racketeer Influenced and Corrupt Organizations Act statute ("RICO"),[1] as well as the California Unfair Competition Law, which, unlike the consumer protection statute of their own state, permits class actions.  In addition, they allege claims for unjust enrichment and fraud.

Their efforts fail for many reasons set forth below.  In particular, as citizens of Louisiana and parties to a contract governed by Louisiana law, Plaintiffs cannot avail themselves of the protections of the UCL and in any event, such claims are inadequately pled.  Their unjust enrichment claim fails because a valid and enforceable contract is alleged by Plaintiffs themselves, rendering the unjust enrichment remedy unavailable.  Their fraud claim fails to plead fraud with the particularity required by the applicable rules of civil procedure.  Plaintiffs' most ambitious (indeed, most far-fetched) claims—that Wells Fargo conducted an enterprise engaged in an ongoing practice of racketeering activity—are in fact the most infirm, completely lacking in the particular allegations required to state such claims.  For all these reasons, the Court should dismiss the Second Amended Complaint.

## II.   STATEMENT OF ISSUES

Issues to be decided in this motion to dismiss include:

•   Whether Plaintiffs, who are Louisiana residents and parties to a contract requiring the application of Louisiana law, can state claims under the California Unfair Competition Law ("UCL");

•   Whether the SAC states a cause of action under the UCL;

•   Whether the SAC states a cause of action under the Racketeer-Influenced and Corrupt Organizations ("RICO") statute; and

•   Whether the SAC adequately states causes of action for unjust enrichment or fraud under Louisiana law.

---

[1]   *Sedima, S.P.R.L. v. Imrex Co.*, 473 U.S. 479 (1985).

DEFENDANT WELLS FARGO'S MOTION TO DISMISS SECOND AMENDED COMPLAINT

### III.   LEGAL STANDARDS AND PERTINENT FACTS

A dismissal under Rule 12(b)(6) may be based on the lack of a cognizable legal theory or on the absence of sufficient facts alleged under a cognizable legal theory.[2]  In reviewing a complaint under Rule 12(b)(6), all allegations of material fact are taken as true and construed in the light most favorable to the non-moving party.[3]  The Court, however, is not required "to accept as true allegations that are merely conclusory, unwarranted deductions of fact, or unreasonable inferences."[4]  Although they may provide the framework for a complaint, legal conclusions need not be accepted as true and "[t]hreadbare recitals of elements of a cause of action, supported by mere conclusory statements, do not suffice."[5]  Furthermore, courts will not assume that plaintiffs "can prove facts which [they have] not alleged, or that the defendants have violated . . . laws in ways that have not been alleged."[6]  The Court may also consider matters of public record that are properly subject to judicial notice.

In keeping with these rules, and without conceding the truth of Plaintiffs' allegations for any other purpose, Wells Fargo[7] sets forth the facts pertinent to this motion.  In the Second Amended Complaint ("SAC"), Bias, Breaux, and White-Price allege that they are citizens of Louisiana.  (SAC, ¶¶ 17-19.)  They further allege that Bias and Breaux collectively, and Nan White-Price individually, have mortgages serviced by Wells Fargo.  (SAC, ¶¶ 64, 66.)  Plaintiffs concede that the mortgage contracts authorize a loan servicer such as Wells Fargo, in the event of default, to "pay for whatever is reasonable or appropriate to protect the note holder's interest in the property[.]"  (SAC, ¶ 41.)

---

[2]   *Johnson v. Riverside Healthcare Sys.*, 534 F.3d 1116, 1121 (9th Cir. 2008).

[3]   *Marceau v. Blackfeet Hous. Auth.*, 540 F.3d 916, 919 (9th Cir. 2008); *Vignolo v. Miller*, 120 F.3d 1075, 1077 (9th Cir. 1999).

[4]   *In re Gilead Sci. Sec. Litig.*, 536 F.3d 1049, 1056-57 (9th Cir. 2008).

[5]   *Ashcroft v. Iqbal*, 129 S.Ct. 1937, 1949-50 (2009).

[6]   *Assoc. Gen. Contractors of Calif., Inc. v. Calif. State Council of Carpenters*, 459 U.S. 519, 526 (1983).

[7]   Plaintiffs refer to defendants collectively as "Wells Fargo" in their complaint.  Although this convention ignores distinctions between the entities which are important, defendants will, nevertheless, use this same convention for simplicity, while pointing out the differences between the various Wells entities when those differences are material.

Wells Fargo allegedly manages and administers its "default-related servicing" tasks by making use of a computer system and software platform known as Fidelity Mortgage Servicing Package ("Fidelity MSP"). (*Id*., ¶¶ 36-38.) Fidelity MSP is automated to impose fees and other charges on a borrower's account. (*Id*., ¶ 37.) Fees for inspections and BPOs are identified on the borrower's monthly statement as "other charges" or "other fees." (*Id*., ¶ 48.) Plaintiffs allege that an inter-company division of Wells Fargo Bank, "Premiere Asset Services," subcontracts with local real estate brokers, who conduct the actual BPOs, and then invoices the BPOs to Wells Fargo as if it were an independent third-party vendor. (*Id*., ¶¶ 49-53.) Plaintiffs contend that the actual cost of a BPO is $50 or less, but that borrowers are charged $95 to $125; similarly they allege that the actual cost of a property inspection is $15, but borrowers are charged $20. (*Id*., ¶¶ 54, 57.)

Plaintiffs contend that borrowers were not obligated to pay these amounts because the amounts were "marked-up beyond the actual cost of the services provided, violating the disclosues in the mortgage contract." (*Id.*, ¶ 92.) Plaintiffs do not define "actual cost."

Plaintiffs allege that Wells Fargo, along with Wells Fargo's property inspection vendors and the real estate brokers performing the BPOs, were an ongoing, continuing group or unit associated together as an "enterprise" that is controlled by Wells Fargo. (SAC, ¶¶ 103-108.)

Plaintiffs contend that they were deceived, either by Wells Fargo's concealment—its alleged failure to disclose that it allegedly charged borrowers more than the "actual cost" of services—or its affirmative representations, in invoices and statements, that the fees charged were "in accordance with the terms of [borrowers'] mortgages." (SAC, ¶¶ 92; 96-97.) Plaintiffs allege that, had they known of the marked-up nature of the charges, they "would have challenged Defendants' unlawful assessments or would not have paid them." (*Id.*, ¶ 98.)

## IV.   PLAINTIFFS HAVE NOT STATED A VALID UCL CLAIM.

Plaintiffs' first cause of action against Wells Fargo purports to state a claim under Section 17200 of the Business & Professions Code, commonly known as the Unfair Competition Law ("UCL"). Plaintiffs base their claim on both defendants' alleged omission of relevant facts relating to fees charged for property inspections and BPOs (*id.*, ¶¶ 94-96), alleged affirmative representations that fees were in accordance with the terms of their mortgages (*id.*, ¶ 152).

1    These allegations cannot be maintained against Wells Fargo for two reasons.  Bias,

2  Breaux, and White-Price are not California residents and cannot seek redress under the UCL

3  because their mortgages require the application of Louisiana law, and in any event they have not

4  adequately alleged any connection to California.  *Second*, even if the Plaintiffs are proper

5  plaintiffs, they nevertheless fail to state a claim under any prong of the UCL.

6  **A.    Plaintiffs Cannot Seek Redress Under the UCL**

7    The UCL count must be dismissed as to each of the Plaintiffs because they agreed to have

8  Louisiana law govern any disputes arising under the mortgages they executed in favor of their

9  lender and its successors and assignees.  Moreover, even if the Court declines to enforce these

10  contractual choice-of-law provisions, it should still find that the UCL may not be applied to the

11  Plaintiffs' claims because they fail to allege a nexus between the transactions at issue and

12  California.  Absent this nexus, the UCL cannot be applied extraterritorially.

13    **1.    Louisiana Law, and Not California's UCL, Applies**

14    Plaintiffs' claims arise out of mortgages they executed, which mortgages granted a security

15  interest in real property.  (SAC, ¶¶ 64, 66.)  These mortgages were executed in Louisiana by Bias

16  and Breaux on March 13, 2006, and White-Price on January 12, 2007.  (Request for Judicial

17  Notice ("RJN"), Exs. 1 and 2.)  Plaintiffs concede that the security instruments authorize the loan

18  servicer, in the event of default, to "pay for whatever is reasonable or appropriate to protect the

19  note holder's interest in the property and rights under the security instrument."  (*Id.*; SAC, ¶¶ 41-

20  42.)  They contend, however, that the property inspection fees and BPO fees assessed "violat[e]

21  the disclosures in the mortgage contract."  (*Id.*, ¶ 92.)

22    Rather than alleging a straight breach of contract claim, Plaintiffs purport to state a claim

23  for violation of the UCL.  They cannot state such a claim, however, because the very contracts that

24  form the basis of the SAC explicitly state that they are governed by federal law and the law of the

25  state in which the encumbered property is located—that is, Louisiana.  (RJN, Exs. 1 and 2, at

26  Par. 16.)

27    These choice-of-law clauses are fully enforceable under California law.  When a choice-of-

28  law clause states that a contract is "governed by" a chosen state's law—as the Bias and White

1   Price mortgages do—the chosen state's law applies not only to breach of contract claims but also

2   to "all causes of action arising from or related to that agreement, regardless of how they are

3   characterized, including tortious breaches of duties emanating from the agreement or the legal

4   relationships it creates."[8]

5        Under California rules, which apply here,[9] a contract's choice-of-law provision determines

6   the governing law unless: (1) the chosen state has no substantial relationship to the contracting

7   parties and no reasonable basis for selecting the state exists; or (2) application of the chosen state's

8   law would contradict a fundamental policy of the state of California and California has a

9   materially greater interest in the matter.[10]  The party advocating application of the choice-of-law

10  provision has the burden of establishing a substantial relationship between the chosen state and the

11  contracting parties.[11]  The burden then shifts to the party opposing application to show that

12  application would violate a fundamental policy of California.[12]

13       Wells Fargo's burden to establish a substantial relationship between Louisiana and

14  Plaintiffs is easily met.  Bias, Breaux, and White-Price are residents of Louisiana (SAC, ¶¶ 96-97,

15  100), and own property there (*id.*).  They executed contracts in Louisiana granting a security

16  interest in such Louisiana properties.  These facts are sufficient to establish a "substantial

17  relationship" between Louisiana and the parties,[13] and there is a reasonable basis for selecting

18  Louisiana law.

19  _____

20  [8]     *Nedloyd Lines B.V. v. Superior Court*, 3 Cal.4th 459, 470 (1992); *see also Amakua Dev.
    LLC v. Warner*, 411 F.Supp.2d 941, 955-56 (N.D. Il. 2006) (chosen state's law applies to claims
21  of fraud in inducement and fraud concealing breach).

    [9]     Jurisdiction in this action is based both on diversity jurisdiction (CAFA) and a federal
22  question.  (SAC, ¶¶ 13-14.)  Under either formulation, a federal court applies the choice of law of
    the forum state—here, California.  *JMP Securities LLP v. Altair Nanotechnologies Inc.*, Case
23  No. 11-4498 SC, 2012 WL 892157, at *4 n.1 (N.D.Cal. Mar. 14, 2012).

24  [10]    *See, e.g., Discover Bank v. Superior Court*, 36 Cal.4th 148 (Cal. 2005), abrogated on other
    grounds, *AT&T Mobility LLC v. Concepcion*, 131 S.Ct. 1740 (2011); *see also Gen. Signal Corp. v.
25  MCI Telecomms. Corp.*, 66 F.3d 1500, 1506 (9th Cir. 1995).

    [11]    *See Wash. Mutl. Bank v. Superior Court*, 24 Cal.4th 906, 916-17 (Cal. 2001); *see also
26  Omstead v. Dell, Inc.*, 533 F.Supp.2d 1012, 1035 (N.D. Cal. 2008).

27  [12]    *Id.*
    [13]    *Nedloyd Lines B.V.*, 3 Cal.4th at 467.

28

1    The burden next switches to Plaintiffs to show that selection of Louisiana law would

2    contradict a "fundamental policy" of California.  The standard is strict: A chosen law must be "so

3    offensive to California public policy as to be prejudicial to recognized standards of morality and to

4    the general interest of the citizens."[14]  The SAC has made no allegations that could support such a

5    showing.  Therefore, the Court should respect the choice of law made by the parties at the

6    inception of the contract giving rise to the claims here and disallow the application of the law of

7    any other state.[15]

8         **2.    Constitutional and Choice-of-Law Principles Prohibit Application of the UCL**

9    Even if the Court were, for some reason, to decline to enforce the choice-of-law provisions

10   in Plaintiffs' mortgages, Plaintiffs still cannot avail themselves of the UCL.

11   There is a heavy presumption that a state's laws do not apply extraterritorially to

12   transactions that do not occur within that state's borders and do not affect its residents.[16]  The

13   Commerce and Due Process Clauses of the Constitution severely restrict any attempt to apply state

14   laws to extraterritorial conduct.[17]  Accordingly, courts routinely decline to apply a state's laws to

15   out-of-state transactions that do not involve a resident of the state.

16   A party seeking to have California's law applied to non-residents bears the initial burden to

17   show that California has "significant contact or significant aggregation of contacts" to the claims

18   of the non-residents.[18]  Such a showing is necessary to ensure that application of California law is

19   constitutional.[19]  Here, the SAC does not allege the sufficient aggregation of contacts necessary to

20

21   [14]    *Medimatch v. Lucent Technologies, Inc.*, 120 F.Supp.2d 842, 862 (N.D.Cal. 2000) (citing
*Wong v. Tenneco Co.*, 39 Cal. 3d 126, 135 (1985)).

22
23   [15]    *Id.* (dismissing with prejudice UCL claims where parties' contract specified New Jersey
law applied).

24   [16]    *Sandberg. v. McDonald*, 248 U.S. 185, 195 (1918) (state laws are "presumptively
territorial and confined to limits over which the law-making power has jurisdiction").

25   [17]    *See BMW of N.Am. v. Gore*, 517 U.S. 559, 571-72 (1996); *Healy v. Beer Inst.,* 491 U.S.
324, 335-37 (1989).

26
27   [18]    *Wash. Mut. Bank*, 24 Cal.4th at 921 (Cal. 2001) (citations omitted) (discussing application
of law to non-resident class members).

28   [19]    *See Allstate Ins. Co. v. Hague*, 449 U.S. 302, 310-11 (1981).

render application of the UCL to Louisiana Plaintiffs constitutional.  While Plaintiffs contend that Wells Fargo & Co. is headquartered in San Francisco and allege that Wells Fargo Bank, N.A. has its principal place of business in San Francisco, they do not plead sufficient facts showing a nexus between Plaintiffs' claims, on the one hand, and the state of California on the other.  The mortgage documents forming the basis of Plaintiffs' allegations were executed in Louisiana, relate to property in Louisiana, and, as discussed above, contain Louisiana choice of law provisions.  The inspections and BPOs that Plaintiffs allege were improper were conducted in Louisiana, and mortgage statements reflecting the fees for such services were, presumably, mailed to Plaintiffs in their home state.  Indeed, there are no allegations of any conduct occurring in California that Plaintiffs can connect to their claims.  Plaintiffs' injury, if any, occurred when they purportedly read the allegedly deceptive statements (in Louisiana), and allegedly acted or refrained from acting in reliance on such statements (in Louisiana).  As such, the SAC fails to allege sufficient contacts with California that would warrant application of the UCL in a constitutionally sound manner.[20]

*Norwest Mortgage, Inc. v. Superior Court*[21] involved claims similar to those at issue here.  Specifically, plaintiffs contended that the fees assessed by Norwest for forced-place insurance (FPI) it purchased under the terms of security instruments executed by borrowers were unnecessarily expensive, because they included amounts rebated to Norwest.  Out-of-state plaintiffs for whom FPI had been purchased sought to maintain a claim under the UCL.  The California Court of Appeal held that the UCL was not applicable to the claims of non-California residents who alleged injury-producing conduct occurring outside of California, despite the fact that Norwest was incorporated and did business in California.[22]  Because the transactions at issue

---

[20]    That plaintiffs purport to bring this Action as a nationwide class action does not give them free rein to sue under a law of a state for which there is no resident plaintiff.  *In re Apple & AT & TM Antitrust Litigation*, 596 F.Supp. 2d 1288, 1309-1310 (N.D.Cal. 2008) (Ware, J.) (dismissing consumer protection claims for all states except three states where named plaintiffs resided); *In re Detropan XL Antitrust Litigation*, 529 F.Supp.2d 1098, 1107 (N.D.Cal. 2007) (White, J.).  ("[A]t least one named plaintiff must have standing with respect to each claim the class representatives seek to bring.") (partially granting motion to dismiss).

[21]    72 Cal.App.4th 214 (1999).

[22]    *Id*. at 222-26.

1  had "little or no relationship" to California, the UCL could not apply.[23]

2       Moreover, even if the Court finds that the Constitutional "contact" threshold has been met,

3  it nevertheless must still undertake a three-step analysis to determine whether the UCL can apply

4  to a plaintiff's claims.  First, the court determines whether the relevant law of a potentially

5  affected jurisdiction is the same or different with regard to the particular issue in question.  If

6  different, the court examines each jurisdiction's interest in the application of its own law under the

7  circumstances of the case to determine whether a true conflict exists.  Lastly, if the court finds that

8  there is a true conflict, it carefully evaluates and compares the nature and strength of the interest of

9  each jurisdiction in the application of its own law to determine which state's interest would be

10  more impaired if its policy were subordinated to the policy of the other state, and then ultimately

11  applies the law of the state whose interest would be more impaired if its law were not applied.[24]

12       Here, there are crucial differences between the UCL and the Louisiana Unfair Trade

13  Practices and Consumer Protection Law ("CPL"), LSA R.S. 51:1401 *et seq*.  Foremost is the fact

14  that the Louisiana CPL prohibits class actions.[25]  In addition, whereas the UCL has a four-year

15  statute of limitations, the Louisiana CPL has a one year statute of limitations.[26]  These differences

16  are material and create a conflict.

17       Given this conflict, the Court must consider the nature and strength of Louisiana's interest

18  in the application of its law and the potential impairment of that interest if, as implicitly requested

19  here, the policy of Louisiana is subordinated to the policy of California.

20       The recent decision of the Ninth Circuit in *Mazza v. Honda Motor Co., Inc.*[27] is instructive.

21  There, the appellate court considered the ability of non-California residents to bring claims under

22  the UCL in the context of assessing a motion for class certification.  Applying the three-step

23  _____

24  [23]      *Id.* at 226.

      [24]      *Mazza v. Honda Motor Co., Inc.*, 666 F.3d 581 (9th Cir. 2012) (denying class

25  certification).

      [25]      LSA R.S. 51:1409(A); *Morris v. Sears Roebuck*, 765 So.2d 419, at *40-5 (La.Ct.App.

26  2000).

      [26]      Bus. & Prof. Code § 17208; LSA R.S. 51:1409(E); *Morris*, 765 So.2d at *5.

27  [27]      *Mazza, supra,* 666 F.3d 581.

28

1  choice of law analysis set forth above, the court in *Mazza* found that the consumer protection

2  statutes of the fifty states are materially different and held that foreign jurisdictions have a strong

3  interest in applying their own laws.  This interest outweighed California's interest in applying its

4  law to residents of foreign states.  Consequently, the appellate court vacated the district court's

5  nationwide certification order.

6        The principles set forth in *Mazza* have already been applied in at least one mortgage loan

7  case.  In *Ralston v. Mortgage Investors Group,*[28] plaintiffs sought to certify a class of mortgagors

8  that had received Pay Option ARM loans from defendant Countrywide, alleging that the

9  applicable promissory notes were misleading.  Citing *Mazza*, Judge Fogel declined to certify a

10  nationwide class and limited the class to California residents.  The court rejected plaintiffs'

11  contention that because the loan documents were identical and all originated from Countrywide in

12  California, *Mazza* was distinguishable.  The court relied, instead, on the undisputed fact that the

13  loans there—as here— had been obtained *locally*.  Noting that there "is a wide disparity between

14  the rights afforded to California residents under [California's] consumer protection laws and the

15  rights afforded to residents of other states," it limited the certified class to California residents.[29]

16  The principles of *Norwest Mortgage*, *Mazza*, and *Ralston* are equally applicable at the motion to

17  dismiss stage, where, as here, no plaintiff alleges he has property located in California.[30]  For all

18  these reasons, the Court should dismiss the UCL claim against Wells Fargo.

19  **B.**   **Plaintiffs Lack Standing, Having Not Adequately Pled Injury or Reliance**

20        Plaintiffs' claims under the UCL also fail because they have not alleged an economic

21  injury that resulted from a misrepresentation on which they relied.  A claim for unfair competition

22  under the UCL may be brought by a person who has suffered injury in fact and lost money or

23  property as a result of the unfair competition.  To state a cognizable UCL claim, Bias, Breaux and

---

25  [28]   2012 WL 1094633 (N.D.Cal. Mar. 30, 2012).

26  [29]   *Id.; see also Gianino v. Alacer Corp.,*____ F.Supp.2d ____, 2012 WL 724322 (C.D. Cal.
Feb. 27, 2012) (applying *Mazza* and denying certification of nationwide class of purchasers of a
27  cold remedy).

28  [30]   *See, supra,* n. 20.

DEFENDANT WELLS FARGO'S MOTION TO DISMISS SECOND AMENDED COMPLAINT

1  White-Price must allege that they "lost money or property," that is, that they suffered an

2  "economic injury."[31]  "[B]ecause economic injury is but one among many types of injury in fact,

3  the Proposition 64 requirement that injury be economic renders standing under section 17204

4  substantially narrower than" Article III standing.[32]

5  The SAC's allegations are insufficient to confer UCL standing.  In *Gomez v. Wells*

6  *Fargo*,[33] plaintiffs purported to state a claim under the UCL, alleging that Wells Fargo charged

7  "more than the actual cost" of appraisals obtained during the loan underwriting process, while

8  conceding that they had been charged market rates.  The trial court found that plaintiffs had not

9  pled a "concrete financial loss" and thus lacked standing under the UCL.[34]  The Eighth Circuit

10  recently affirmed this result.[35]  Here, documents referenced in the SAC state that the market rate

11  for BPOs varies, with the price "typically $30 - $100."  (See BPO Brief, Wells Fargo RJN at

12  Ex. 3, referenced at fn. 12 of SAC.)  The SAC alleges that the fee assessed by Wells Fargo for a

13  BPO is $95.  (SAC, ¶ 65.)  Thus, the SAC alleges that Plaintiffs were assessed the market rate;

14  under *Gomez*, they have failed to allege an economic injury sufficient to confer standing.

15  In addition, a plaintiff must plead "actual reliance," regardless of which prong of the UCL

16  the claim arises under: the "unfair," "unlawful," or "fraudulent" prongs.[36]  Here, the SAC fails to

17  allege that each of the Plaintiffs read and relied upon the misrepresentations that form the basis of

18  his or her claim.  Although they allege that defendants' scheme included "telling borrowers," in

19  statements and other documents, that the fees were allowed by the applicable mortgage documents

20  (SAC, ¶ 97), they do not specifically allege that Bias, Breaux and White-Price ever read these

21

22

23  [31]  Cal.Bus. & Prof. Code § 17204.

24  [32]  *Kwikset Corp. v. Super. Ct.*, 246 P.3d 877, 886 (2011).

25  [33]  676 F.3d 655 (8th Cir. 2012).

   [34]  *Gomez v. Wells Fargo*, 676 F.3d 655, 659 (8th Cir. 2012).

26  [35]  *Id.* at 662.

27  [36]  *McNearhy-Calloway v. JP Morgan Chase Bank, N.A.,* ____ F.Supp.2d ___, 2012 WL
1029502, at * 26 (N.D.Cal. Mar. 26, 2012).

28

**DEFENDANT WELLS FARGO'S MOTION TO DISMISS SECOND AMENDED COMPLAINT**

1   statements or how Bias, Breaux and White-Price each specifically acted in reliance on them.[37]

2   This failure further shows that they have no standing under the UCL.[38]

3   **C.      The UCL Claim Is Not Sufficiently Pled**

4            Finally, even if the Court finds that the Plaintiffs have standing under the UCL, that claim

5   must nevertheless fail because it does not sufficiently state a cause of action.

6            **1.      The UCL Claim Must Be Alleged With Particularity**

7            Under Fed. R. Civ. P. 9(b), the circumstances constituting fraud must be alleged with

8   particularity.  The circumstances of fraud, as the term is used in Rule 9(b), include such matters as

9   the time, place and contents of false representations, as well as the identity of the person making

10  the misrepresentation and what was obtained or given up thereby.  This means the "who, what,

11  when, where, and how" of the misconduct charged.[39]

12           In addition to applying to the civil RICO claims discussed below, Rule 9(b) applies to

13  claims under the UCL, where, as here, they are grounded in fraud.[40]  Plaintiffs allege that Wells

14  Fargo's practices were unlawful, unfair, and fraudulent (SAC, ¶¶ 96-97), but they have not

15  pleaded facts to support such claims with the specificity required by Rule 9.  As such, their UCL

16  claim should be dismissed.

17           **2.      The SAC Does Not Plead An Unlawful Act**

18           To state a claim under the "unlawful" prong of the UCL, Plaintiffs must tether the claim to

19  a violation of some other law or statute.[41]  Plaintiffs contend Defendants violated RICO, and the

20  fraud and deceit provisions of the California Civil Code (sections 1572-1573 and 1709-1711).

---

[37]     Plaintiffs nebulously claim that Bias, Breaux and White-Price "relied on… Wells Fargo's disclosures about the fees on their statement."  (SAC, ¶ 97.)  This allegation fails to specify which mortgage statements they read, and when and how they relied upon them.  This is not sufficiently specific under Rule 9, which as discussed below, applies to all elements of a fraud claim.

[38]     *See, e.g., Brownfield v. Bayer Corp.*, No. 2:09-CV-444, 2009 WL 1953035, at *6 (E.D.Cal. July 6, 2009) (dismissing UCL claim for failure to plead fraud with particularity where, among other reasons, complaint failed to allege when plaintiff viewed the allegedly deceptive statements).

[39]     *Vess v. Ciba-Geigy Corp.*, 317 F.3d 1097, 1107 (9th Cir.).

[40]     *Id.; Stickrath v. Globalstar, Inc.*, 527 F.Supp.2d 992, 998 (N.D. Cal. 2007); *Muehlbauer v. Gen. Motors Corp.*, 431 F.Supp.2d 847, 860 (N.D. Ill. 2006).

[41]     *See Hobby Indus. Ass'n of America, Inc. v. Younger,* 101 Cal.App.3d 358, 371 (1980).

1   (SAC, ¶¶ 93-94.)  As described herein, Plaintiffs have failed to allege fraud (RICO or otherwise)

2   with particularity, so those predicate acts cannot serve as the basis for a UCL claim.

3          Indeed, the practices of the defendants were and are entirely lawful, as reflected in case

4   law and regulations.  Other courts have considered whether property inspection fees such as those

5   at issue here are reasonable and properly chargeable to delinquent borrowers.  Those decisions—

6   particularly *Majchrowski*, which involved Wells Fargo's corporate predecessor[42]—are relevant

7   here.  In *Majchrowski v. Norwest Mortgage, Inc.*,[43] for example, Judge Castillo held that the

8   security instruments utilized by Norwest Mortgage, which is now part of Wells Fargo, were

9   unambiguous and unequivocally permitted lenders to take all action necessary to protect the

10  property when a borrower breaches a covenant.  The court found that "[t]here is no limitation on

11  what the lender may do and pay for except that it must be necessary to protect its rights in or the

12  value of the property.  The lender's actions do not, for example, have to be reasonable,

13  economical, or fair to the borrower."[44]  Because the issue had not been fully briefed, the court

14  declined to dismiss the RICO claims based solely on its contract interpretation, but acknowledged

15  that its finding that the property inspection fees were "authorized by the mortgage contract has

16  serious, if not fatal consequences for plaintiffs' RICO claims, which are premised entirely on

17  Norwest's alleged scheme to charge its customers 'bogus' fees."[45]

18         Similarly, in *Walker v. Countrywide Home Loans, Inc.*,[46] the California Court of Appeal

19  considered whether Countrywide Home Loans' practice of passing on the cost of property

20  inspections to delinquent borrowers was unlawful, unfair or deceptive under the UCL.  There, as

21  here, the deed of trust governing the relevant loan provided that a lender "may do and pay for

22  whatever is necessary to protect the value of the Property and the Lender's rights in the Property."

---

23  [42]     Norwest Mortgage, the defendant in *Majchrowski* was a subsidiary of Norwest Bank,

24  which merged with Wells Fargo Bank in 1998.  *See Jeffrey Pfeffer et al.*, *Wells Fargo and

25  Norwest: "Merger of Equals"* (Stanford 2004).

26  [43]     6 F.Supp.2d 946 (N.D. Ill. 1998).

    [44]     *Id.*, at 965.

27  [45]     *Id.* at 967.

28  [46]     *Walker v. Countrywide Home Loans, Inc.*, 98 Cal.App.4th 1158 (2002).

1    The trial court granted summary judgment in favor of Countrywide, finding that the practice of

2    charging inspection fees was not unlawful, unfair or deceptive.  The Court of Appeal upheld the

3    trial court's decision, finding that the imposition of inspection fees did not violate any law, and

4    was not unfair or deceptive.[47]

5            Moreover, there was and is no basis from which to infer that the manner in which fees

6    were assessed to borrowers was unlawful.  Regulations promulgated by the Office of the

7    Comptroller of the Currency ("OCC"), with which Wells Fargo must comply as a national bank,[48]

8    authorize national banks to establish the amount of non-interest charges and fees in their own

9    discretion pursuant to safe and sound banking practices.  They specifically provide that "the

10   establishment of non-interest charges and fees, their amounts, and the method of calculating them

11   are business decisions to be made by each bank, in its discretion, according to sound banking

12   judgment and safe and sound banking principles."[49]  A prior version of this OCC regulation

13   explicitly allowed consideration of "[t]he cost incurred by the bank, plus a profit margin, in

14   providing the service"; the current regulation does so implicitly.[50]  Indeed, there is nothing in the

15   applicable federal regulatory scheme that prohibits a bank from charging a reasonable fee for its

16   services.  In short, there is no basis for Plaintiffs' unsupported allegation that the fees at issue here

17   are "unlawful."[51]  Because Plaintiffs come far short of alleging any violation of law, they cannot

18   maintain a claim for an "unlawful" business act under the UCL.[52]

19   _____

20   [47]      98 Cal.App.4th at 1175.

     [48]      12 C.F.R. §1.1 et seq.

21   [49]      12 C.F.R. § 7.4002.

22   [50]      Interpretive Rulings, 61 F.Reg. 4849-03, at 4869-70 (Feb. 9, 1996) (to be codified at
     12 C.F.R. pts. 7 and 31).  In 2001, the OCC simplified the regulation and removed this particular
23   phrase, along with other unnecessary phrases.  In the Federal Register release accompanying the
     issuance of the final amended regulation, the OCC made clear that the amendments were intended
24   to eliminate certain ambiguities in the text of § 7.4002 without altering the substance of the
     regulation or the way in which the OCC intends that it operate."  Investment Securities, Bank
25   Activities and Operations; Leasing, 66 Fed.Reg. 34, 784-01, at 34-787 (July 2, 2001) (to be
     codified at 12 C.F.R. pts. 1, 7, and 23); see also OCC Interpretive Letter 1069 (August 21, 2006)
26   (finding national bank's consideration of the enumerated factors, including the cost of the services
     provided and a margin for profit, established the fee determination was based on safe and sound
27   banking practices).

28   [51]      Moreover, the U.S. Department of Housing and Urban Development has considered and
     (footnote continued)

**3.      Wells Fargo's Conduct Was Not Unfair**

Plaintiffs also cannot satisfy any of the tests that California courts use to evaluate whether conduct is "unfair" under the UCL.  Plaintiffs have not pled any facts showing that Wells Fargo's alleged conduct "threatens an incipient violation of an antitrust law, or violates the policy or spirit of one of those laws because its effects are comparable to or the same as a violation of the law, or otherwise significantly threatens or harms competition."[53]  Nor have Plaintiffs pled facts sufficient to establish any of the three factors that California courts have used to identify an "unfair" business practice:  "(1) the consumer injury must be substantial; (2) the injury must not be outweighed by any countervailing benefits to consumers or competition; and (3) it must be an injury that consumers themselves could not reasonably have avoided."[54]  To the contrary, Plaintiffs acknowledge that the fees that they challenge are assessed only where "home mortgage borrowers get behind on their payments and go into 'default'" (SAC, ¶ 2), and are authorized by the mortgage documents.  That Plaintiffs could have avoided these charges is fatal to this claim.[55]

Moreover, as recognized by the *Walker* court, there are countervailing benefits to conducting frequent property inspections.  Such inspections allow a lender to determine in a timely fashion whether the borrower is maintaining the property, and to take steps to "protect the real estate security from damage or deterioration."[56]  Such steps would benefit consumers, whose property values are adversely affected when vacant and abandoned properties are not timely identified, secured, and maintained.

_____

rejected a policy that would have limited the fee charged to a mortgagor "to the amount actually paid to [an] appraiser" when an appraisal management firm was used.  Mortgagee Letter 97-46, 1997 WL 33483463, at \*1 (Dec. 8, 1997).  Instead, the Department explicitly allows a mortgagor to be charged "a fee for [an] appraisal which may encompass fees for services performed by an appraisal management firm as well as fees for the appraisal itself."

[52]    *See, e.g., Aquino v. Credit Control Servs*, 4 F.Supp.2d 927, 930 (N.D.Cal. 1998) (dismissing UCL claim based on rejection of underlying claim under federal Fair Debt Collection Practices Act).

[53]    *Byars v. SCME Mortgage Bankers, Inc.*, 109 Cal.App.4th 1134, 1147 (2003).

[54]    *Davis v. Ford Motor Credit Co.*, 179 Cal.App.4th 581, 597 (2009) (citation omitted).

[55]    *Id*, at 598.

[56]    *Walker, supra*, 98 Cal.App.4th at 1175.

1    Indeed, the *Walker* court vigorously rejected plaintiffs' suggestion that the fees at issue

2  there were unfair because the harm to the borrower outweighed the utility of charging the fees,

3  noting that the cost of the inspections was "insignificant when compared with their utility."[57]  The

4  Court also found that even where an initial inspection reveals that a home continued to be

5  occupied, a lender has a legitimate reason to reinspect every 30 to 60 days thereafter, because "the

6  status and ability of a borrower unable to make monthly loan payments is uncertain and

7  conceivably could change from month to month.  Such a borrower might be unable to maintain the

8  property and is less likely to occupy the property than a borrower current on a loan."[58]  Later, the

9  court noted that the fact that federal agency servicing guidelines require inspections confirmed the

10  utility of performing inspections and was persuasive evidence that the "fees are fair as a necessary

11  expense incurred by a lender to protect its security.  It is not unfair to transfer a necessary,

12  reasonable and actual expense to the delinquent borrower."[59]

13    Moreover, several courts have considered whether the pricing of appraisals, akin to the

14  pricing of BPOs that is challenged here, violates RESPA, which prohibits accepting any part of a

15  fee "other than for services actually performed."  12 U.S.C. § 2607(b).  In *Sosa v. Chase*

16  *Manhattan Mortgage Corporation*,[60] for example, plaintiffs alleged that Chase violated RESPA

17  when it charged borrowers fees for courier or messenger fees, paid only a portion of those fees to

18  third-party contractors, and "created the misimpression" that the fees were paid entirely to third

19  parties.[61]  The Eleventh Circuit Court of Appeals affirmed the district court's dismissal, noting

20  that "even if Chase could not be credited with the actual delivery, [it] benefitted the borrowers by

21  arranging for third party contractors to perform the deliveries."[62]  It concluded that "it [was]

22  impossible to say that Chase performed no services," and as such its retention of a portion of the

---

23

24  [57]  *Id.* at 1176.

    [58]  *Id.* at 1178.

25  [59]  *Id.*

26  [60]  348 F.3d 979 (11th Cir. 2003).

27  [61]  *Sosa*, 348 F.3d at 983.

    [62]  *Id.* at 983-984.

28

1   fees at issue was justified.[63]  Similarly, in *Morales v. Countrywide Home Loans, Inc.*, 531 F. Supp.

2   2d 1225, 1227 (C.D. Cal. 2008) (emphasis in original), the court held that "the charging company

3   in a mark-up situation *is* performing a service: they are locating and engaging the third-party

4   vendor."  Here, while the SAC alleges that BPOs are completed by third party real estate brokers

5   (SAC, ¶ 52), it also reflects that Premiere Asset Services' "in-house valuation specialists

6   scrutinize each completed product" (*id.*, ¶ 51).  In other words, PAS performs a service.  Thus, the

7   alleged "mark-up" is not a mark-up at all, and cannot be considered "unfair."

8           **4.    Wells Fargo's Conduct Was Not Fraudulent**

9           Plaintiffs also cannot maintain a claim under the "fraudulent" prong of the UCL.  First,

10  Plaintiffs have not alleged any fraud with particularity as they must to state a "fraudulent"

11  business practices claim, including "the who, what, when, where, and how" of the misconduct

12  charged.[64]  Paragraph 113 alleges that Wells Fargo used the mail and wires to transmit mortgage

13  invoices, loan statements or proofs of claim that "fraudulently concealed the true nature of

14  assessments made on borrowers' accounts."  Specifically, Plaintiffs allege that borrowers were

15  told that such fees are "allowed by [borrowers'] Note and Security Instrument," or that they were

16  "[i]n accordance with the terms of your mortgage."  (SAC, ¶ 114.)  It is well established, however,

17  that misrepresentations of the law are not actionable as fraud, because statements of the law are

18  considered merely opinions and may not be relied upon absent special circumstances not present

19  here.[65]

20          Moreover, the SAC alleges no facts showing Wells Fargo knew its property inspections or

21  BPOs were legally improper, or had no reasonable basis for characterizing them as consistent with

22  the applicable mortgages.  Plaintiffs admit that their loan agreements permit a servicer such as

---

23

24  [63]    *Id.*

25  [64]    *Kearns v. Ford Motor Co.*, 567 F.3d 1120, 1124 (9th Cir. 2009) (affirming dismissal of UCL claims because plaintiff failed to plead fraud allegations with particularity under Rule 9(b)) (quoting *Vess v. Ciba-Geigy Corp. USA*, 317 F.3d 1097, 1106 (9th Cir. 2003)).

26

27  [65]    *Sosa v. DIRECTV, Inc.*, 437 F.3d 923, 940-41 (9th Cir. 2006) ("DIRECTV's assertions that Sosa's conduct was unlawful, therefore, cannot support the [RICO] mail and wire fraud predicates, even if DIRECTV intentionally misstated the law.").

28

1 Wells Fargo to "pay for whatever is reasonable and appropriate to protect the note holder's interest
2 in the property and rights under the security instrument," and that the servicer has the right to be
3 reimbursed for the cost or necessary and appropriate default-related services.  (SAC, ¶¶ 41-42.)
4 Indeed, as described herein, Wells had every reason to believe that its practices were consistent
5 with its rights under the mortgage, the OCC regulations, and judicial precedent.

6      For all these reasons, the SAC fails to state a cause of action under the UCL.

7 ### V.      COUNT II FAILS TO STATE A PRIMARY RICO VIOLATION

8      Not content to simply allege a UCL and common-law fraud claim (discussed below),
9 Plaintiffs take their complaint to a new level of absurdity by adding a RICO claim.  This claim,
10 however, is just as infirm as the other fatally deficient claims.

11 **A.     Plaintiffs Lack Standing to Allege a RICO Claim**

12      In addition to constitutional standing requirements, a civil RICO claimant must suffer an
13 injury that satisfies § 1964(c).  A civil RICO plaintiff must allege "harm to a specific business or
14 property interest—a categorical inquiry typically determined by reference to state law."[66]  A claim
15 that fees were "marked-up" does not allege a sufficient RICO injury.[67]  Accordingly, Plaintiffs'
16 civil RICO claims must be dismissed.

17 **B.     The Complaint Alleges No Fraudulent Scheme**

18      To plead a RICO claim, Plaintiffs must allege, among other things, a pattern of
19 racketeering activity including at least two predicate acts of racketeering.[68]  Predicate acts may
20 include violations of the federal mail and wire fraud statutes.[69]  "[M]ail and wire fraud are
21 established by showing the following four elements:  (1) a scheme to defraud; (2) intent to
22 defraud; (3) reasonable foreseeability that the mails or wires would be used; and (4) use of the
23 mails or wires in furtherance of the scheme."[70]

24 ────────────

25 [66]   *Diaz v. Gates*, 420 F.3d 897, 900 (9th Cir. 2005) (en banc).

   [67]   *Gomez*, 676 F.3d at 661-62.

26 [68]   18 U.S.C. § 1961(5); *Sedima*, 473 U.S. at 496.

27 [69]   18 U.S.C. §§ 1341, 1343, 1961(1).

28 [70]   *Sebastian Intern., Inc. v. Russolillo*, 128 F.Supp.2d 630, 636 (C.D.Cal. 2001).

1    In this case, Plaintiffs rely solely on purported mail and wire fraud to meet the pattern of

2  racketeering element of their RICO claim.  (*See* SAC, ¶¶ 109-120.)  However, the complaint fails

3  to allege a fraudulent scheme or intent to defraud.

4    Here, the SAC alleges that Wells Fargo ordered property inspections and BPOs and sent

5  Plaintiffs monthly statements showing charges for those measures.  (SAC, ¶¶ 111-114.)  Plaintiffs

6  claim that the fees charged "violate the disclosures" in the mortgage contracts, because they do not

7  reflect the "actual cost" of the services provided.  (*Id.*, ¶¶ 44, 92.)

8    As already noted, other courts have upheld property inspection practices and fees similar to

9  Wells Fargo's, finding periodic inspections reasonably necessary to protect the lender's interest

10  since the "status and ability of a borrower unable to make monthly loan payments is uncertain and

11  conceivably could change from month to month."[71]  Moreover, the OCC and courts  recognized

12  that the fees assessed can include a profit margin.  But even were Plaintiffs right and *Walker* and

13  *Majchrowski* and the OCC wrong in these regards, Wells Fargo's practice would, at most, amount

14  to a breach of the loan agreements, not deceptive conduct or a fraudulent scheme prohibited by the

15  mail and wire fraud statutes.

16    Trying to supply the missing element of deception, Plaintiffs aver that the monthly

17  statements Wells Fargo sent them represented that the fees were "in accordance with the terms of

18  your mortgage" (SAC, ¶ 97), a legal and not factual assertion.  Courts have repeatedly rejected

19  similar efforts to turn simple billing disputes into fraud or RICO claims.  As one court put it,

> [t]he fact that the parties take different positions under the contract as to the appropriate prime rate, or the fact that the defendant charged too high a "prime rate" and thereby concealed or refused to disclose what the plaintiff considers the true prime rate called for under the contract, does not give rise to a valid claim for fraud. … Sending a financial statement which misconstrues the prime rate provided by the terms of the contract may breach the contract but it does not amount to a RICO mail fraud cause of action.[72]

---

[71]    *Walker*, 98 Cal.App.4th at 1175-76.

[72]    *Westways World Travel, Inc. v. AMR Corp.*, 2965 Fed.Appx. 472, 474 (9th Cir. 2008) ("[Defendants] communicated its interpretation of the contracts to the [plaintiffs] and demanded payment pursuant to this interpretation.  Such direct communications and demands do not (footnote continued)

Similarly, Wells Fargo's listing property inspection and BPOs fees as "other fees" on the monthly statements does not change what is, at most, a breach of contract into mail fraud.  (*See, e.g.*, SAC, ¶ 48.)  Wells Fargo was under no duty to specifically identify each charge on its monthly statements beyond "other fees"; absent such duty, there can be no claim for RICO.[73]  Nor are any facts (as opposed to conclusions) alleged to show that a more specific identification of the charge would have made any difference to the named plaintiffs or to class members.[74]  In short, the complaint alleges no fraudulent scheme or intent and, hence, neither mail or wire fraud nor a RICO violation.

**C.     The SAC Does Not Properly Allege a Separate Enterprise Conducted by Wells**

The SAC also fails to allege the existence of an enterprise distinct from Wells Fargo. Section 1962(c) makes it "unlawful for any person employed by or associated with any enterprise" to conduct the enterprise's affairs through a pattern of racketeering.  "[T]o establish liability under § 1962(c) one must allege and prove the existence of two distinct entities: (1) a 'person'; and (2) an 'enterprise' that is not simply the same 'person' referred to in a different name."[75]  Each RICO defendant must be separate and distinct from the enterprise because liability "depends on showing that the defendants conducted or participated in the conduct of the 'enterprise's affairs,' not just their own affairs."[76]

---

constitute a 'scheme or artifice,' nor do they evidence a specific intent to defraud."); *Sosa*, 437 F.3d at 940-42 (presuit demand letters not mail fraud or RICO violation even if they misstated the law and some facts); *All Direct Travel Serv., Inc. v. Delta Air Lines, Inc.*, 120 Fed.Apx. 673, 676 (9th Cir. 2005) (Where defendant had right under agreement to issue debit memos, "the debit memos do not falsely represent that Delta is authorized to collect these funds" even though plaintiff disagrees with the debit calculation; *Lum v. Bank of America*, 361 F.3d 217, 225-227 (3d Cir. 2004); *Grauberger v. St. Francis Hosp.*, 169 F.Supp.2d 1172, 1176-77 (N.D. Cal. 2001) ("Surely, Congress did not intend to turn garden variety disputes over statutory interpretation into criminal acts sufficient to justify a RICO claim.").

[73]     *In re Countrywide Fin. Corp. Mortgage Marketing*, 601 F.Supp.2d 1201, 1218 (S.D. Cal. 2009) (quoting *Cal. Architectural Building Products, Inc. v. Franciscan Ceramics, Inc.*, 818 F.2d 1466, 1471-72 (9th Cir. 1987)).

[74]     *See Chris Albritton Constr. Co. v. Pitney Bowes*, 304 F.3d 527, 530-31, 532 (5th Cir. 2002) (labeling insurance premium "ValueMAX" not fraud or RICO violation).

[75]     *Cedric Kushner Promotions, Ltd. v. King*, 533 U.S. 158, 161 (2001).

[76]     *Id.* at 163.

1    Plaintiffs' RICO Claim treats Wells Fargo Bank, N.A. and Wells Fargo & Co. as the

2  "person."  (SAC, ¶ 103.)  Plaintiffs try to create a separate "association-in-fact" enterprise

3  comprised of the Wells entities and the vendors and brokers they utilize to perform inspections

4  and BPOs.  (*Id.*, ¶ 104.)  However, that construct fails to satisfy RICO's requirement of a distinct

5  "enterprise."  The vendors and brokers operated only as Wells Fargo's agents, providing it

6  requested services.  (SAC, ¶¶ 52, 55.)  The distinctness requirement is not satisfied by "a RICO

7  enterprise that consists merely of a corporate defendant associated with its own

8  employees[, consultants] or agents carrying on the regular affairs of the defendant."[77]  Plaintiffs

9  allege only the ordinary operation of a garden-variety vendor-vendee agreement between Wells

10  Fargo and the relevant inspectors and brokers.  Such an agreement does not create a separate

11  association-in-fact enterprise, nor is it what RICO punishes.[78]

12    Moreover, RICO "liability depends on showing that the defendants conducted or

13  participated in the conduct of the 'enterprise's affairs,' not just their own affairs."[79]  The SAC fails

14  to allege this required element of a RICO claim.

15    No facts are averred to show that Wells Fargo conducted any affairs of the supposed

16  enterprise that were distinct from Wells Fargo's own affairs.  All the alleged conduct was action

17  taken by Wells Fargo in the course of its normal business dealings with the borrowers on the loans

18  it services.  No separate "enterprise" ordered that BPOs and inspections be conducted and fees

19  assessed to borrowers in the manner described in the SAC.  Most importantly, all the supposed

20  racketeering activity that Plaintiffs allege was solely conduct that Wells Fargo undertook in the

21  conduct of its own affairs, not the affairs of any joint enterprise.  The alleged misrepresentations

22  and omissions were solely Wells Fargo's doing.  Wells Fargo Bank, N.A. alone issued the

23  mortgage statements and other loan documents Plaintiffs allege reflect the supposedly wrongful

24

25  [77]    *Lee v. General Nutrition Cos., Inc.*, Case No. CV 00-13550, 2001 WL 34032651, at *14
(C.D.Cal. Nov. 26, 2001) (citing *Riverwoods Chappaqua Corp. v. Marine Midland Bank, N.A.*, 30

26  F.3d 339, 344 (2d Cir. 1994) (plaintiffs failed to allege enterprise).

27  [78]    *See Crichton v. Golden Rule Ins. Co.*, 576 F.3d 392, 399-400 (7th Cir. 2009).

  [79]    *Reves v. Ernst & Young*, 507 U.S. 170, 185 (1993) (quotations and citations omitted).

28

1   charges and contain the alleged misrepresentations.  Finally, the SAC alleges that Wells Fargo

2   alone engaged in the alleged use of the mail or wire facilities, when it sent the Plaintiffs their

3   account statements.  (SAC, ¶¶ 111, 113.)

4          In short, the SAC alleges only that Wells Fargo conducted its own affairs, not that it

5   conducted the affairs of a distinct enterprise.  For this additional reason, the RICO Claim fails to

6   state a claim on which relief may be granted.

7                    **VI.    NO CONSPIRACY TO VIOLATE RICO IS ALLEGED**

8          In addition to their claims alleging that Wells Fargo violated 18 U.S.C. § 1962(a) and (c),

9   Plaintiffs also bring a claim against these defendants alleging that they conspired together to

10  violate these subsections under 18 U.S.C. § 1962(d).  (SAC, ¶¶ 124-128.)  That subsection simply

11  makes it "unlawful for any person to conspire to violate any of the provisions of subsection (a),

12  (b), or (c)."[80]  Plaintiffs' conspiracy claims, like their other RICO claims against Wells Fargo, are

13  wholly without merit and should be dismissed without leave to amend.

14         To establish a civil conspiracy to violate RICO, the plaintiff must show:  (1) an agreement

15  to conduct or participate in the affairs of an enterprise through a pattern of racketeering activity;

16  and (2) an agreement to the commission of at least two predicate acts.[81]  "If either aspect of the

17  agreement is lacking then there is insufficient evidence that the defendant embraced the objective

18  of the alleged conspiracy."[82]

19         Plaintiffs' conclusory assertions of a racketeering conspiracy are plainly inadequate.  The

20  Supreme Court's discussion of Rule 8(a)'s standard in *Twombly*, an antitrust case, proves

21  instructive.  To allege a conspiracy, a complaint must have "enough factual matter (taken as true)

22  to suggest that an agreement was made ... [A]n allegation of parallel conduct and a bare assertion

23  of conspiracy will not suffice.  Without more, parallel conduct does not suggest conspiracy, and a

24

25  _____

26  [80]    18 U.S.C., § 1962(d); *Baumer v. Pachl*, 8 F.3d 1341, 1345-46 (9th Cir. 1993).

27  [81]    *Baumer*, 8 F.3d at 1346.

    [82]    *Id.* (citations omitted).

28

1   conclusory allegation of agreement at some unidentified point does not supply facts adequate to

2   show illegality."[83]

3       The same is true here.  "In a RICO conspiracy, as in all conspiracies, agreement is

4   essential."[84]  "Here, the bare allegations of the complaint provide no basis to infer assent to

5   contribute to a common enterprise."[85]  There is only the barest, conclusory allegations of

6   agreements at an unidentified point between unspecified parties.  As *Twombly* held, this is

7   insufficient, and Plaintiffs' claim that Wells Fargo violated 18 U.S.C. § 1962(d) should therefore

8   be dismissed without leave to amend.[86]

9       **VII.   COUNT IV ALLEGES NO CLAIM FOR UNJUST ENRICHMENT**

10      Count IV should be dismissed.  It does not allege a viable claim for unjust enrichment

11  because, as the SAC itself alleges, the parties' rights and obligations are governed by express

12  contracts—Plaintiffs' loan agreements.  (*See* SAC, ¶¶ 41-42.)  They contend, however, that the

13  property inspection fees and BPO fees assessed "violat[e] the disclosures in the mortgage

14  contract."  (*Id.*, ¶ 92.)

15      Despite setting forth a contract and its alleged breach, Plaintiffs nevertheless attempt to

16  state a claim for unjust enrichment.  Unjust enrichment, however, is a quasi-contract theory of

17  recovery which cannot lie where a valid express contract covering the same subject matter exists

18  between the parties.[87]  Moreover, even if the unjust enrichment claim could coexist with the

19  express contracts, it would nevertheless fail because Plaintiffs do not allege grounds on which

---

20

21  [83]   *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544 (2007).

22  [84]   *Baumer*, 8 F.3d at 1346 (citations omitted).

    [85]   *Id.* at 1347.

23  [86]   Moreover, as shown above, plaintiffs do not adequately allege that Wells Fargo managed a
    RICO enterprise or participated in its affairs through a pattern of racketeering activity.  "Because
24  [Plaintiffs] failed to allege the requisite substantive elements of a RICO claim under 18 U.S.C.
    § 1962(c), [Plaintiffs'] claim under 18 U.S.C. § 1962(d), which makes it 'unlawful for any person
25  to conspire to violate any of the provisions of subsections (a), (b), or (c) of this section,' also
    fails."  *Turner v. Cook*, 362 F.3d 1219, 1231, n. 17 (9th Cir. 2004).
26  [87]   *See Drs. Bethea, Maustoukas and Weaver LLC v. St. Paul Guardian Ins. Co.,* 376 F.3d
    399, 408 (5th Cir. 2004) (applying Louisiana law); *Paracor Fin. v. Gen. Elec. Capital Corp.*, 96
27  F.3d 1151, 1167 (9th Cir. 1996) (applying  Cal. law); *Gerlinger v. Amazon Com, Inc*. 311
    F.Supp.2d 838, 856 (N.D.Cal. 2004) (same).
28

---

defendants' practices could lawfully be deemed unjust. As discussed above, the fees were specifically provided for under the parties' contracts and were in accord with applicable regulations and interpretations issued by federal regulators and courts interpreting them. Therefore, Plaintiffs fail to state a claim for unjust enrichment.

## VIII.   THE SAC DOES NOT STATE A CLAIM FOR FRAUD

For their fifth cause of action, Plaintiffs purport to state a claim for fraud. Plaintiffs contend that Wells Fargo "concealed and suppressed material facts, namely the fact that Defendants mark-up prices" and fail to disclose such mark-up. (SAC, ¶ 141.) Further, they allege that Defendants "omit a true itemization that identifies the nature of each fee[.]" (*Id.*, ¶ 142.) These allegations fail to state a claim for fraud under Louisiana law, which, as explained above, governs here.

Under Louisiana and federal law, fraud must pled with specificity. La. CCP, Art. 856; Fed. R. Civ. P. 9(b). To recover under a cause of action, a plaintiff must plead and then prove (1) a misrepresentation of material fact, (2) made with intent to deceive, (3) causing justifiable reliance with resultant injury.[88] To state a cause of action in fraud from silence or suppression of the truth—what it alleged here—"there must be a duty to speak or disclose information."[89] Plaintiffs imply that Wells Fargo had some sort of duty to affirmatively disclose to borrowers its pricing scheme for appraisals and inspections. But they allege no basis for such duty. For example, they allege no special relationship that would give rise to a duty to disclose, and it is generally held that a lender and its affiliates has no fiduciary relationship with a borrower.[90] Nor do Plaintiffs allege that a statute or regulation requires that a servicer disclose the components of a given charge or "itemize" charges.

As explained herein, Wells' lending operations are overseen by various federal and state

---

[88]   *Becnel v. Grodner*, 982 So. 2d 891 (La. Ct. Appeal 2008).

[89]   *Id.* at 894, citing *Greene v. Gulf Coast Bank*, 593 So.2d 630, 639 (La. 1992).

[90]   *See Guimmo v. Albarado*, 739 So.2d 973, 975 (La. Ct. Appeal 1999) ("Dealings between lending institutions and borrowers are generally considered to be arm's length transactions which do not impose any independent duty of care on the part of the lender[.]"); *Bradley v. Prange*, 897 So. 2d 717, 719 (La. Ct. Appeal 2004).

**DEFENDANT WELLS FARGO'S MOTION TO DISMISS SECOND AMENDED COMPLAINT**

1  entities, but Plaintiffs can cite to no regulation setting forth a duty to disclose that was breached

2  here.  As such, they have failed to allege a duty to disclose, and their fraud claim must fail for that

3  reason.  To the extent the SAC purports to state a claim for fraud based on an affirmative

4  misrepresentation, that effort, too fails.  At the threshold, Plaintiffs have failed to allege  a

5  misrepresentation of material *fact*.  As explained above (*see supra* at 17-18), the alleged

6  representations set out in the SAC are legal opinions, which cannot form the basis of a claim for

7  fraud.[91]  Similarly, as explained above, Plaintiffs have not alleged an "injury," where the SAC and

8  the documents referenced in it establish that Plaintiffs were charged the market rate for the

9  services at issue.  (*See supra* at 11, 18.)  Absent such an injury, a plaintiff fails to state a claim for

10  fraud.[92]  Finally, as also described above (*supra* at 12), Plaintiffs fail to specifically allege when

11  and how each plaintiff relied upon the purported misrepresentation or omission.  For all these

12  reasons, they have failed to state a cause of action for fraud under Louisiana law.  The Fifth Cause

13  of Action should be dismissed.

## IX.  CONCLUSION

15       For the reasons stated above, the Court should dismiss the Second Amended Complaint,

16  with prejudice.

18  DATED:  August 7, 2012                Respectfully submitted,

19                                        SEVERSON & WERSON
20                                        A Professional Corporation

21                                        By:  _____
                                               *Michelle T. McGuinness*
                                               Michelle T. McGuinness

23                                        Attorneys for Defendants
                                          WELLS FARGO & COMPANY and WELLS FARGO
24                                        BANK, N.A.

---

26  [91]     *Twentieth Century-Fox Distribution Corp. v. Lakeside Theatres, Inc.*, 267 So. 2d 225 (La.
    App. 1972) (opinion could not form basis of fraud claim).
27  [92]     *Castrillo v. American Home Mortg. Servicing, Inc.*, 670 F. Supp.2d 516 (E.D. La. 2009).

DEFENDANT WELLS FARGO'S MOTION TO DISMISS SECOND AMENDED COMPLAINT