UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| LATARA BIAS, ERIC BREAUX, and NAN WHITE-PRICE, individually and on behalf of other members of the general public similarly situated,<br><br>    Plaintiffs,<br><br>    vs.<br><br>WELLS FARGO & COMPANY and WELLS FARGO BANK, N.A.,<br><br>    Defendants. | Case No.: 12-cv-00664-YGR<br><br>**ORDER DENYING DEFENDANTS' MOTION TO DISMISS** |

Plaintiffs initiated this class action on February 10, 2012 concerning fraudulent practices in connection with the servicing of their home mortgage loans. (Dkt. No. 1.) After a previous round of motions, the Court ordered that claims against each of the three groups of defendants be severed into three separate actions. (Dkt. No. 59.) Thereafter, Named Plaintiffs Latara Bias, Eric Breaux, and Nan White-Price filed the Second Amended Class Action Complaint ("SAC") against Defendants Wells Fargo & Company and Wells Fargo Bank, N.A. (collectively, "Wells Fargo" or "Defendants"). (Dkt. No. 61.)

Wells Fargo filed a Motion to Dismiss Pursuant to Fed. R. Civ. P. 12(b)(6) on August 7, 2012, seeking dismissal of the SAC without leave to amend. (Dkt. No. 66.) On August 21, 2012, Plaintiffs filed their Opposition to the Wells Fargo Defendants' Motion to Dismiss Pursuant to Fed. R. Civ. P. 12(b)(6). (Dkt. No. 67.) Wells Fargo filed their Reply Memorandum in Support of Motion to Dismiss on August 28, 2012. (Dkt. No. 68.) The Court held oral argument on November 6, 2012. (Dkt. No. 72.)

Having carefully considered the papers submitted and the pleadings in this action, oral argument at the hearing held on November 6, 2012, and for the reasons set forth below, the Court **DENIES** Wells Fargo's Motion to Dismiss.

## I. FACTUAL AND PROCEDURAL BACKGROUND

Plaintiffs allege that Defendants have engaged and continue to engage in fraudulent practices in connection with their home mortgage loan services, in which Defendants assess fraudulent fees upon a homeowner's default.[1] (SAC ¶¶ 1–2.) As part of a fraudulent scheme, Defendants "formed an enterprise with their respective subsidiaries, affiliates, and 'property preservation' vendors, . . . unlawfully mark[ed] up default-related fees charged by third parties[,] and assess[ed] them against borrowers' accounts" for an undisclosed profit. (*Id.* ¶ 8.) Specifically, "Defendants order[ed] default-related services from their subsidiaries and affiliated companies, who, in turn, obtain[ed] the services from third-party vendors." (*Id.* ¶ 40.) The third-party vendors charged Defendants for their services, but Defendants "assess[ed] borrowers a fee that [wa]s significantly marked-up from the third-party vendors' actual fees for the services." (*Id.*; *see also id.* ¶¶ 45, 54 & 57.)

Plaintiffs allege their mortgage contracts disclosed that Defendants will pay for default-related services when necessary, which would be reimbursed by borrowers, but "[n]owhere [wa]s it disclosed to borrowers that the servicer may mark-up the actual cost of those services to make a profit." (SAC ¶ 42.) Defendants identified the marked-up fees as "Other Charges" or "Other Fees" on mortgage statements. (*Id.* ¶¶ 9, 48 & 57.) When borrowers inquired about the fees, Defendants allegedly concealed and misled the borrowers to dissuade them from challenging the charges, and

---

[1] Plaintiffs are citizens of Louisiana whose mortgages Wells Fargo serviced. (SAC ¶¶ 17–19, 64 & 66.) Plaintiffs allege that Defendant Wells Fargo & Company is a corporation organized under the laws of Delaware and headquartered in San Francisco, California. (*Id.* ¶ 20.) Plaintiffs further allege that Defendant Wells Fargo Bank, N.A. is a subsidiary of Wells Fargo & Company, and is a national bank organized and existing as a national association under the National Bank Act, 12 U.S.C. section 21, *et seq.*, with its principal place of business in San Francisco. (*Id.* ¶ 21.) Plaintiffs assert that Wells Fargo & Company exercises specific and financial control over Wells Fargo Bank, N.A.'s operations, dictates its policies and practices, and exercises power and control over it with regard to the conduct alleged in the SAC. (*Id.* ¶ 24.) Wells Fargo & Company is also alleged to be the ultimate recipient of ill-gotten gains alleged therein. (*Id.*)

2

told them that the fees were in accordance with their mortgages.  (*Id.* ¶ 57.)

The allegedly marked-up fees included Broker's Price Opinion fees ("BPOs") and appraisal fees.  (SAC ¶¶ 30 & 43–57.)  With regard to BPOs, Plaintiffs allege that Defendants established an "inter-company division or d/b/a" called Premiere Asset Services ("Premiere"), which participated as a member of the enterprise and existed to generate revenue and undisclosed profits for Defendants.  (*Id.* ¶¶ 48–52.)  Although affiliated with Wells Fargo, Premiere advertised to "make it appear as though [it] [wa]s an independent company" providing BPOs.  (*Id.* ¶ 51.)  However, Plaintiffs allege Premiere was created to act as a "phony third party vendor" such that it would appear to borrowers that amounts assessed on accounts were third-party costs.  (*Id.* ¶ 56.)  Premiere sub-contracted BPOs to different local real estate brokers and, at Defendants' direction, invoiced Wells Fargo Bank, N.A. "as if [it] was an independent, third-party vendor."  (*Id.* ¶ 52.)  Plaintiffs allege that Defendants "never actually pa[id]" the invoices or Premiere for the BPOs, but paid a lesser amount directly to the local real estate brokers and assessed borrowers' accounts for a marked-up amount on the manufactured "invoices."  (*Id.* ¶¶ 53–57.)

Plaintiffs also allege that Defendants used a sophisticated home loan management program provided by Fidelity National Information System, Inc. called Mortgage Servicing Package (the "Program").  (SAC ¶ 36.)  The Program "automatically implement[ed] decisions about how to manage borrowers' accounts based on internal software logic" and imposed the default-related fees when a loan was past due.  (*Id.* ¶ 37.)  The parameters and guidelines for the Program were inputted by Defendants and "designed by the executives" at Wells Fargo.  (*Id.* ¶¶ 35–38.)

As stated *supra*, Wells Fargo serviced Plaintiffs' mortgages.  (SAC ¶¶ 64 & 66.)  As to Plaintiffs Bias and Breaux, Wells Fargo began assessing $95 BPOs on December 28, 2006.  (*Id.* ¶ 65 (also assessing on September 27, 2007 and March 28, 2008).)  Bias and Breaux allege they paid some or all of the unlawful fees assessed on their account.  (*Id.*)  Plaintiff White-Price was assessed $100 in "Other Charges" on September 19, 2011, and believes she paid some or all of the unlawful fees assessed on her account.  (*Id.* ¶ 67.)  In addition, borrowers have suffered additional harm resulting from: (i) charges for default-related services accumulated over time such that borrowers were driven further into default and/or more ensured to stay in default; (ii) damage to credit scores;

(iii) the inability to obtain favorable interest rates on future loans because of their default; and (iv) in some cases, foreclosure. (*Id.* ¶¶ 59–63.)

On the basis of the allegations summarized above, Plaintiffs bring this action on behalf of a class of "[a]ll residents of the United States of America who had a loan serviced by Wells Fargo Bank, N.A. or its subsidiaries or divisions, and whose accounts were assessed fees for default-related services, including Broker's Price Opinions, and inspection fees, at any time, continuing through the date of final disposition of this action." (SAC ¶ 74.) The SAC alleges five claims.

Plaintiffs' first claim alleges a violation of California Business and Professions Code section 17200, *et seq.* ("UCL" or "Section 17200") based on the allegedly unlawful, unfair, and fraudulent business practices summarized above. (SAC ¶¶ 88–100.) Specifically, Defendants omitted a true itemization or description of the fees assessed and concealed the marked-up fees in violation of the disclosures in the mortgage agreements. Defendants were not legally authorized to collect these fees, and Plaintiffs/class members believed they were obligated to pay the amounts assessed when they were not so obligated. Plaintiffs/class members had a reasonable expectation that under the operative agreements and law, the charges were valid and Defendants were not unlawfully marking-up fees. In addition, Defendants lulled borrowers into a sense of trust and dissuaded them from challenging the unlawful fees by telling them the fees were in accordance with the mortgage agreements. Plaintiffs allege they have been injured and suffered loss of money or property, and that they would not have paid the fees (or would have challenged them) if not for Defendants' concealment of material facts.

Plaintiffs' second claim alleges a violation of the Racketeer Influenced and Corrupt Organizations Act ("RICO"), 18 U.S.C. section 1962(c). (SAC ¶¶ 101–123.) The alleged "enterprise" consisted of: (i) Wells Fargo & Company, Wells Fargo Bank, N.A., including their directors, employees, and agents; (ii) their subsidiaries and affiliated companies; and (iii) their third-party vendors, including "property preservation" vendors[2] and the real estate brokers who provide BPOs. (SAC ¶ 104.) This "association-in-fact" enterprise is an "ongoing, continuing

---

[2] The property preservation vendors include First American Financial Corporation, d/b/a First American Field Services, and Fidelity National Financial, Inc. d/b/a Fidelity National Field Services. (SAC ¶ 104.)

group . . . of persons and entities associated together for the common purpose of limiting costs and maximizing profits by fraudulently concealing assessments for unlawfully marked-up fees for default-related services on borrowers' accounts." (*Id.* ¶105; *see id.* ¶¶ 3, 8, 46, 49, 104–108.) The members—while "systematic[ally] link[ed]" through contractual and financial ties—act according to policies established by Wells Fargo executives but also "have an existence separate and distinct from the enterprise." (*Id.* ¶¶ 106–107.) Plaintiffs allege that Defendants' scheme constituted "racketeering activity" based on acts of mail and wire fraud (18 U.S.C. sections 1341 and 1343), by which Defendants communicated false information regarding the alleged fees due and omitted the true amounts at issue through use of the mail and wires. Plaintiffs seek treble damages under RICO.

Plaintiffs' third claim alleges a conspiracy to violate RICO. (SAC ¶¶ 124–128.) Defendants allegedly conspired to violate RICO as summarized above, were aware of the nature and scope of the enterprise's unlawful scheme, and agreed to participate in said scheme. Plaintiffs' fourth claim alleges unjust enrichment as a result of the wrongful acts and omissions of material fact. (*Id.* ¶¶ 129–138.) Plaintiffs seek restitution and an order disgorging all profits obtained by Defendants. Plaintiffs' fifth claim alleges common law fraud as summarized above. (*Id.* ¶¶ 139–151.)

In the pending Motion, Wells Fargo argues that the first claim for violation of the UCL should be dismissed either because a choice of law provision requires the application of Louisiana (not California) law, or alternatively, Plaintiffs lack standing and otherwise fail to state a claim. As to the second, third, and fifth claims for violation of RICO, conspiracy to violate RICO, and fraud, Wells Fargo contends those claims are not pled with particularity and, as to RICO, Plaintiffs lack standing. Finally, Wells Fargo argues that Plaintiffs allege a valid and enforceable contract in the SAC and thus the fourth claim for unjust enrichment is unavailable.

Plaintiffs oppose all of these arguments and request leave to amend if the Court dismisses any claim. The Court addresses each claim in turn.

## II.     DISCUSSION

Pursuant to Fed. R. Civ. P. 12(b)(6), a complaint may be dismissed against a defendant for failure to state a claim upon which relief may be granted against that defendant. Dismissal may be based on either the lack of a cognizable legal theory or the absence of sufficient facts alleged under a cognizable legal theory. *Balistreri v. Pacifica Police Dep't,* 901 F.2d 696, 699 (9th Cir. 1990); *Robertson v. Dean Witter Reynolds, Inc.,* 749 F.2d 530, 533–34 (9th Cir. 1984). For purposes of evaluating a motion to dismiss, the court "must presume all factual allegations of the complaint to be true and draw all reasonable inferences in favor of the nonmoving party." *Usher v. City of Los Angeles,* 828 F.2d 556, 561 (9th Cir. 1987). Any existing ambiguities must be resolved in favor of the pleading. *Walling v. Beverly Enters.,* 476 F.2d 393, 396 (9th Cir. 1973).

However, mere conclusions couched in factual allegations are not sufficient to state a cause of action. *Papasan v. Allain,* 478 U.S. 265, 286 (1986); *see also McGlinchy v. Shell Chem. Co.,* 845 F.2d 802, 810 (9th Cir. 1988). The complaint must plead "enough facts to state a claim [for] relief that is plausible on its face." *Bell Atlantic. Corp. v. Twombly,* 550 U.S. 544, 570 (2007). A claim is plausible on its face "when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal,* 556 U.S. 662, 678 (2009). Thus, "for a complaint to survive a motion to dismiss, the non-conclusory 'factual content,' and reasonable inferences from that content, must be plausibly suggestive of a claim entitling the plaintiff to relief." *Moss v. U.S. Secret Serv.,* 572 F.3d 962, 969 (9th Cir. 2009). Courts may dismiss a case without leave to amend if the plaintiff is unable to cure the defect by amendment. *Lopez v. Smith,* 203 F.3d 1122, 1129 (9th Cir. 2000).

### A.     First Claim: UCL Claim

#### 1.     Choice of Law: California versus Louisiana Law

California choice of law rules apply albeit the parties focus on different tests under California law. (Mot. at 5; Opp. at 6.)

Wells Fargo's analysis is contractual and focuses on the choice of law provision in the mortgage documents. In that situation, *Nedlloyd Lines B.V. v. Superior Court,* 3 Cal. 4th 459, 465–66 (1992) sets forth the test for determining the enforceability of arm's length contractual choice of

law provisions. The court must first examine whether the party advocating the provision has met its burden of establishing the claims fall within its scope. *Washington Mutual Bank, FA v. Superior Court*, 24 Cal. 4th 906, 915–16 (2001) (confirming that *Nedlloyd* should be applied to class claims subject to enforceable choice of law agreements). If the claims fall within the scope of the choice of law provision, then the court must "determine either: (1) whether the chosen state has a substantial relationship to the parties or their transaction, or (2) whether there is any other reasonable basis for the parties' choice of law." *Nedlloyd*, 3 Cal. 4th at 466; *Washington Mutual*, 24 Cal. 4th 916. If neither (1) or (2), *supra*, is met, then the court need not enforce the parties' choice of law. On the other hand, if either (1) or (2) is met, the court "must next determine whether the chosen state's law is contrary to a *fundamental* policy of California." *Nedlloyd*, 3 Cal. 4th at 466 (emphasis in original); *Washington Mutual*, 24 Cal. 4th at 916. If there is no conflict, the parties' choice of law shall be applied; but, if there is a fundamental conflict with California law, then the court must determine whether California has a *materially greater interest* than the chosen state on the particular issue. A choice of law provision shall not be enforced where California has a materially greater interest than the chosen state. *Nedlloyd*, 3 Cal. 4th at 466; *Washington Mutual*, 24 Cal. 4th at 916–17.

Wells Fargo offers three arguments. First, under the *Nedlloyd* test, it has met its burden of establishing a substantial relationship to the chosen state because Plaintiffs are residents of Louisiana, they own property there, and executed the contracts there. Wells Fargo contends Plaintiffs have not met their burden to show that the application of Louisiana law would violate a fundamental policy of California. (Mot. at 6–7.)

Second, Wells Fargo argues that even if the Court declines to enforce the choice of law provision, courts routinely decline to apply a state's laws to out-of-state transactions that do not involve a resident of the state. (*Id.* at 7.) It asserts that merely having headquarters or principal place of business in San Francisco is an insufficient aggregation of contacts (which must exist to apply the UCL), particularly because the properties are located in Louisiana and the relevant conduct, including BPOs and inspections, otherwise occurred there. (*Id.* at 8.)

Finally, even if the Court finds sufficient contacts to California have been alleged, Wells

Fargo argues it prevails under a traditional choice of law "governmental interest" analysis. Wells Fargo identifies "crucial differences" between California's UCL and the Louisiana Unfair Trade Practices and Consumer Protection Law, LSA R.S. 51:401, *et seq.* ("Louisiana CPL"), namely that: (i) the Louisiana CPL prohibits class actions; and (ii) California's UCL has a four-year statute of limitations while the Louisiana CPL has a one-year statute. (Mot. at 9.)

Plaintiffs counter that choice of law is usually addressed at the class certification stage and urges the Court to defer this issue until then. (Opp. at 5.) Plaintiffs further dispute that *Nedlloyd* is the appropriate test, arguing that this is not a breach of contract case, but rather a fraud case. Plaintiffs argue the appropriate test is "governmental interest" test set forth in *McCann v. Foster Wheeler LLC*, 48 Cal. 4th 68, 81–82 & 87–88 (2010) and endorsed in *Mazza v. American Honda Motor Co.*, 666 F.3d 581, 590 (9th Cir. 2012).[3] Plaintiffs identify California's governmental interest as regulating fraudulent practices and the conduct of businesses within California, which have an effect both in California and throughout the country. (Opp. at 5 & 7.) Moreover, Plaintiffs argue the fraudulent conduct, concealment, and decisions by Wells Fargo executives are alleged to have occurred in California.

The Court finds that *Nedlloyd* applies here. The governmental interest test, although overlapping with *Nedlloyd* to the extent that state interests or policies must be examined, applies where "there is no advance agreement on applicable law." *Washington Mutual Bank*, 24 Cal. 4th at 915 (noting, however, that "a trial court considering a nationwide class certification might be required to utilize both analyses").

The conduct at issue here arises from fees purportedly due under agreements containing a

---

[3] Under this test: (1) the court determines whether the relevant law of each potentially affected jurisdiction with regard to the particular issue in question is the same or different; (2) if different, the court examines each jurisdiction's interest in the application of its own law under the circumstances to determine whether a true conflict exists; and (3) if there is a true conflict, the court carefully evaluates and compares the nature and strength of each jurisdiction's interest in the application of its own law to determine which state's interest would be more impaired if its policy were subordinated to the policy of the other state. *McCann*, 48 Cal. 4th at 87–88; *Kearney v. Salomon Smith Barney, Inc.*, 39 Cal. 4th 95, 107–08 (2006). Ultimately, the Court applies the law of the state whose interest would be more impaired if its law was not applied. *McCann*, 48 Cal. 4th at 88.

section entitled: "Governing Law; Severability; Rules of Construction." This section provides, in relevant part:

> This Security Instrument shall be governed by federal law and the law of the jurisdiction in which the Property is located. All rights and obligations contained in this Security Instrument are subject to any requirements and limitations of Applicable Law.

(Request for Judicial Notice in Support of Motion to Dismiss Second Amended Complaint ("RJN" [Dkt. No. 65]), Ex. 1 at ECF p. 12 and Ex. 2 at ECF p. 12.)[4] The agreements further provide that:

> "Applicable Law" means all controlling applicable federal, state and local statutes, regulations, ordinances and administrative rules and orders (that have the effect of law) as well as all applicable final, non-appealable judicial opinions.

(RJN, Ex. 1 at ECF p. 3 and Ex. 2 at ECF p. 4.)

Applying the three-part *Nedlloyd* test, the Court finds that the choice of law determination in this case is better suited for the class certification stage because the record with respect to balancing the competing states' interests is not sufficiently developed. First, the Court finds that Wells Fargo, as advocate of the choice of law provision, has met its burden of establishing that class claims fall within its scope. *Washington Mutual*, 24 Cal. 4th at 916.[5] Proceeding to the next step of *Nedlloyd*, the Court must next determine whether the chosen state has (1) a "substantial relationship to the parties or their transaction" *or* (2) whether there is "any other reasonable basis for the parties' choice of law." *Washington Mutual*, 24 Cal. 4th at 916. Louisiana does have a substantial relationship to the claims because, at a minimum, the properties are located there and the default-related services occurred there. The final step of *Nedlloyd* requires the Court to

---

[4] Wells Fargo seeks judicial notice of three documents under Federal Rule of Evidence 201 and the doctrine of incorporation by reference. Plaintiffs have not objected to the RJN. Exhibits 1 and 2 consist of the mortgages executed by Plaintiffs Bias and Breaux, and White-Price, respectively, which were recorded in public records. The Court hereby **GRANTS** judicial notice of Exhibits 1 and 2.

[5] In *Washington Mutual*, the California Supreme Court examined a similar choice of law provision which stated: "This Security Instrument shall be governed by federal law and the law of the jurisdiction in which the [secured property] is located." 24 Cal. 4th at 912 (alteration in original). Citing to *Nedlloyd*, 3 Cal. 4th at 468–70, the *Washington Mutual* court noted that a broadly-phrased choice of law provision should be construed as intending that the chosen law apply to all disputes arising out of the transaction or relationship. 24 Cal. 4th at 916.

determine "whether the chosen state's law is contrary to a *fundamental* policy of California" and, if contrary, which state has a "materially greater interest" in determining the particular issue. *Id.* at 916–17 (emphasis in original). That analysis is more difficult, and premature, when dealing with a potential nationwide class action. *See id.* at 918–19. Ultimately, Plaintiffs will bear the burden of establishing whether issues relating to choice of law can survive the test for class certification. *Id.* at 922, 926 & 928.

Here, the full scope on where Defendants' conduct occurred (and the actual extent of their conduct) has yet to be fully determined. Such determination should be made based on a more complete record than currently exists. *See Norwest Mortgage, Inc. v. Superior Court*, 72 Cal. App. 4th 214, 222 & 224–25 (Cal. Ct. App. 1999) (holding trial court erred in certifying nationwide UCL class action for non-California residents where "the *facts developed below* show the claims . . . are for injuries suffered by non-California residents, caused by conduct occurring outside of California's borders") (emphasis supplied). The Court must now take as true the allegation that the scheme was designed by executives at Wells Fargo. (SAC ¶¶ 20–26, 35 & 107.) Defendants take issue with the fact that the SAC does not explicitly state that the decisions or conduct occurred within California; however, drawing all reasonable inferences in favor of Plaintiffs, the totality of Plaintiffs' allegations sufficiently state that the scheme was initiated and perpetrated by executives in California. *Usher,* 828 F.2d at 561.[6] The allegations made by Plaintiffs here are plausible, and whether Plaintiffs' UCL claim is ultimately tied to California solely by a California headquarters cannot be discerned without the benefit of discovery. For that reason, a determination is better suited for the class certification stage.[7]

---

[6] Plaintiffs also allege that Defendants established an inter-company division or d/b/a called Premiere Asset Services (located in San Bernardino, California) which exists "to generate revenues" for Wells Fargo and "does not operate at arms-length" with Wells Fargo. (SAC ¶¶ 49–50.) This business is a "vehicle" that provides Wells Fargo with false pretenses to obtain undisclosed profits. (*Id.* ¶¶ 51 & 56 ("phony third party vendor").) While Wells Fargo argued at oral argument that other allegations "negate" Premiere's connection to California, any existing ambiguities must be resolved in favor of the pleading. *Walling,* 476 F.2d at 396.

[7] Defendants also cite to federal cases *Mazza v. American Honda Motor Co.* and *Ralston v. Mortgage Investors Group, Inc.*, in which the respective courts vacated an order of *class certification* and limited *class certification* to exclude non-California residents alleging UCL

For the foregoing reasons, the Court **Declines** to hold, at this juncture, that Plaintiffs are unable to allege a violation of the UCL based on the choice of law provision in the mortgage agreements or based on due process considerations. These issues are better suited for determination at the class certification stage, and Wells Fargo's Motion based on these grounds is hereby **Denied**.

### 2. UCL Standing

#### a. Summary of Law

The issues of concern under UCL standing are injury and reliance. A UCL claim may be brought "by a person who has suffered injury in fact and has lost money or property as a result of the unfair competition." Cal. Bus. & Prof. Code § 17204. In a class action, UCL standing must be established as to the class representatives themselves. *In re Tobacco II Cases*, 46 Cal. 4th 298, 306 (2009) ("*Tobacco II*"); *Plascencia v. Lending 1st Mortg.*, 259 F.R.D. 437, 448 (N.D. Cal. 2009) ("only the named plaintiff in a UCL class action need demonstrate injury and causation"), *order clarified on other grounds*, No. C 07-4485 CW, 2011 WL 5914278 (N.D. Cal. Nov. 28, 2011). "[A] party must . . . (1) establish a loss or deprivation of money or property sufficient to qualify as injury in fact, i.e., *economic injury,* and (2) show that that economic injury was the result of, i.e., *caused by,* the unfair business practice or false advertising that is the gravamen of the claim." *Kwikset Corp. v. Superior Court*, 51 Cal. 4th 310, 322 (2011) (emphasis in original). "[A] party who has lost money or property generally *has* suffered injury in fact." *Id.* (emphasis in original).

In *Tobacco II*, the California Supreme Court held losing that money or property "as a result of" unfair competition imposed an actual reliance requirement on plaintiffs prosecuting a UCL

claims. *Mazza*, 666 F.3d at 594 (holding that "[u]nder the facts and circumstances of this case, . . . each member's consumer protection claim should be governed by the consumer protection laws of the jurisdiction in which the transaction took place"); *Ralston*, No. 08-CV-00536-JF PSG, 2012 WL 1094633, at *4 (N.D. Cal. Mar. 30, 2012) ("conclud[ing] that [a nationwide] class is precluded in *this* case, in which the loans at issue were consummated locally and nearly half of the borrowers reside in other states") (emphasis in original). Importantly, in *Mazza*, the court vacated the district court's class certification order, remanded for proceedings consistent with that order, and expressed no view on whether it would be correct to certify a smaller class of California purchasers or subclasses for members in different states. 666 F.3d at 594. In neither case did the court find on a motion to dismiss that a claim had not been sufficiently pled based on alleged conduct within California.

claim based on fraud. *Tobacco II*, 46 Cal. 4th at 326; *McNeary-Calloway v. JP Morgan Chase Bank, N.A.*, 863 F. Supp. 2d 928, 959 (N.D. Cal. 2012) (allegations of reliance required under unlawful, unfair, or fraudulent prongs of UCL). "[R]eliance is proved by showing that the defendant's misrepresentation or nondisclosure was 'an immediate cause' of the plaintiff's injury-producing conduct. A plaintiff may establish that the defendant's misrepresentation is an 'immediate cause' of the plaintiff's conduct by showing that in its absence the plaintiff 'in all reasonable probability' would not have engaged in the injury-producing conduct." *Tobacco II*, 46 Cal. 4th at 326 (internal citations omitted; alteration in original). "While a plaintiff must show that the misrepresentation was an immediate cause of the injury-producing conduct, the plaintiff need not demonstrate it was the only cause. . . . It is enough that the representation has played a substantial part, and so had been a substantial factor, in influencing his decision." *Id.* (internal citations and quotations omitted).

### b.    Summary of Arguments

Wells Fargo argues that Plaintiffs lack standing to bring a claim under the UCL because they have not alleged they suffered injury in fact nor that they lost money or property as the result of unfair competition. (Mot. at 10–11.) Wells Fargo asserts that because the rates charged for BPOs were within the market rate of $30–$100, economic injury cannot exist. *See Gomez v. Wells Fargo Bank, N.A.*, 676 F.3d 655, 658–59 & 661–62 (8th Cir. 2012) (dismissing UCL claim for lack of standing where plaintiffs admitted they were charged market rates for appraisals, which were alleged to be inflated).[8] Second, Wells Fargo contends that Plaintiffs have not pled actual reliance on the alleged misrepresentations, *i.e.*, "they do not specifically allege [they] ever read [documents containing misrepresentations] or how [they] each specifically acted in reliance on them." (Mot. at 11–12.)

Plaintiffs disagree. They dispute that the market rate of BPOs is determinative because here

---

[8] On this issue, Wells Fargo seeks judicial notice of the "BPO Brief" (attached to RJN, Ex. 3), which is publicly available and which was referenced in the SAC at paragraph 45. It appears the BPO Brief is either used and/or was prepared by the "National Association of BPO Professionals." Based on the fact that Plaintiffs have not objected, the Court **GRANTS** judicial notice of the BPO Brief for determining this Motion.

the issue is that Defendants sought far more than actual fees and concealed the fact that borrowers were *not* required to repay Wells Fargo for these fees under their mortgage agreements. (Opp. at 9–10.) Moreover, Plaintiffs assert that injury has been alleged because they would not have paid the fees but for Wells Fargo's deception. They also allege that Defendants alone maintain a complete accounting of the fees assessed and paid, thus Plaintiffs cannot allege every precise detail at this time. (Opp. at 9; SAC ¶¶ 65 & 67.) As to reliance, Plaintiffs argue that to prove reliance on an omission, they need only prove that had the information been disclosed, they would have been aware and behaved differently—which they have alleged. (*See* SAC ¶¶ 97–98.)

### c. Analysis

The Court is satisfied with the allegations as pled. First, with respect to injury, Plaintiffs allege on information and belief that they have paid some or all of the unlawful fees assessed on their accounts. (SAC ¶¶ 65 & 67.) Taking these allegations as true, Plaintiffs have alleged an economic injury that qualifies as injury-in-fact. *See Kwikset*, 51 Cal. 4th at 885 (economic injury may be shown where plaintiff "surrender[s] in a transaction more, or acquire[s] in a transaction less, than he or she otherwise would have").

As to the market rate of BPOs, regardless of whether the total amount falls within market rate, the fact remains that Plaintiffs have alleged that they paid more to Wells Fargo than they should have if Wells Fargo had simply passed on actual costs. The Court declines to hold as a matter of law that a consumer lacks UCL standing as long as he or she is only being overcharged within the market range. Further, the precedential value of *Gomez v. Wells Fargo* is limited as plaintiffs there conceded they had suffered no concrete financial loss.

Second, the Court finds that Plaintiffs have sufficiently alleged actual reliance. Plaintiffs allege not only that (i) the mortgage agreements that gave Wells Fargo "the right to be paid back" for costs and expenses associated with "protecting and/or assessing the value of the property" are silent on the issue of mark-ups for profit; but they also allege that (ii) they received mortgage statements that omitted a "true itemization" of the nature of the fees—identifying them as "Other Charges" or "Other Fees"—which Plaintiffs believed they were obligated to pay. (SAC ¶¶ 9, 57, 91–92, 97–98.) Put simply, Plaintiffs allege that they received their mortgage statements, believed

based on the statements that they were obligated to pay these amounts to Wells Fargo, and paid them. This sufficiently states that Wells Fargo's "misrepresentation or nondisclosure was 'an immediate cause' of the plaintiff's injury-producing conduct" in that in its absence, plaintiff "in all reasonably probability" would not have paid the fees. *Tobacco II*, 46 Cal. 4th at 326; *see Kwikset*, 51 Cal. 4th at 330 (consumer relying on product label and challenging a misrepresentation can satisfy UCL standing by alleging "that he or she would not have bought the product but for the misrepresentation").[9]

For these reasons, the Court **DENIES** Wells Fargo's Motion on the ground that Plaintiffs lack UCL standing.

### 3. Failure to State a UCL Claim With Particularity

Where a plaintiff chooses to allege fraudulent conduct and relies on such conduct as the basis for its UCL claim, the claim is "grounded" in or "sound[s] in fraud" such that its pleading "as a whole must satisfy the particularity requirement of [Federal Rule of Civil Procedure] 9(b)." *Vess v. Ciba-Geigy Corp. USA*, 317 F.3d 1097, 1103–04 (9th Cir. 2003); *Kearns v. Ford Motor Co.*, 567 F.3d 1120, 1125 (9th Cir. 2009). To be alleged with particularity under Rule 9(b), a plaintiff must allege "the who, what, when, where, and how" of the alleged fraudulent conduct (*Cooper v. Pickett,* 137 F.3d 616, 627 (9th Cir. 1997)) and "set forth an explanation as to why [a] statement or omission complained of was false and misleading" (*In re GlenFed, Inc. Sec. Litig.,* 42 F.3d 1541, 1548 (9th Cir. 1994) (*en banc*)). In other words, "the circumstances constituting the alleged fraud [must] be specific enough to give defendants notice of the particular misconduct . . . so that they can defend against the charge and not just deny that they have done anything wrong." *Vess,* 317 F.3d at 1106 (first alteration supplied; internal quotations and citations omitted). Plaintiffs concede that this is a fraud case and argue that the SAC contains the requisite

---

[9] In addition, "a presumption, or at least an inference, of reliance arises wherever there is a showing that a misrepresentation was material." *Tobacco II*, 46 Cal. 4th at 327 (internal citations omitted). It is plausible that a reasonable person would have considered this information material. (*See* SAC ¶ 98.) Further, the question of whether a misrepresentation is material is generally one of fact unless no reasonable jury could find that a person would be influenced by the representation or nondisclosure. *Engalla v. Permanente Medical Group, Inc.*, 15 Cal. 4th 951, 976–77 (1997). Such is not the case here.

particularity under Rule 9(b). (Opp. at 11–12.) Because Plaintiffs' allegations sound in fraud, the Court finds that Rule 9(b) applies.

Under Section 17200, unfair competition includes "any unlawful, unfair or fraudulent business act or practice." A plaintiff may establish a violation based under any one of these prongs. The Court will address the unfair and fraudulent prongs in detail below.[10]

### a. Unfair Prong of UCL

The California Supreme Court has not established a definitive test to determine whether a business practice is "unfair" in consumer cases. *Davis v. Ford Motor Credit Co.*, 179 Cal. App. 4th 581, 594–98 (Cal. Ct. App. 2009); *Harmon v. Hilton Group*, No. C-11-03677 JCS, 2011 WL 5914004, at *8 (N.D. Cal. Nov. 28, 2011). Three tests for unfairness exist in the consumer context. Under the first test, a business practice is unfair where the practice implicates a public policy that is "tethered to specific constitutional, statutory, or regulatory provisions." *Harmon*, 2011 WL 5914004, at *8 (internal citations omitted). The second test "determine[s] whether the alleged business practice is immoral, unethical, oppressive, unscrupulous, or substantially injurious to consumers and requires the court to weigh the utility of the defendant's conduct against the gravity of the harm to the alleged victim." *Id.* (internal citations and quotations omitted). Under the third test, "unfair" conduct requires that: "(1) the consumer injury must be substantial; (2) the injury must not be outweighed by any countervailing benefits to consumers or competition; and (3) it must be an injury that consumers themselves could not reasonably have avoided." *Id.* (internal citations omitted); *Davis*, 179 Cal. App. 4th at 597–98.

Wells Fargo argues that Plaintiffs cannot satisfy the third test. (Mot. at 15.) As to their

---

[10] For the "unlawful" prong of a Section 17200 claim, "the UCL 'borrows violations of other laws and treats them as unlawful practices that the unfair competition law makes independently actionable.'" *Stearns v. Select Comfort Retail Corp.*, 763 F. Supp. 2d 1128, 1150 (N.D. Cal. 2010) (quoting *Cel–Tech Commc'ns, Inc. v. Los Angeles Cellular Tel. Co.,* 20 Cal. 4th 163, 180 (1999)). Allegations in support of such a claim must state with reasonable particularity the facts supporting the statutory elements of the alleged violation. *Stearns*, 763 F. Supp. 2d at 1150. Wells Fargo argues its actions were lawful and that the "unlawful" prong fails because the RICO and fraud claims fail. (Mot. at 12–14.) Plaintiffs do not specifically dispute that the "unlawful" claim fails if their RICO and fraud claims fail. (Opp. at 13.) As discussed *infra*, the Court finds that Plaintiffs have sufficiently stated their RICO and fraud claims. As such, Wells Fargo's Motion to Dismiss the UCL claim based on the "unlawful" prong is **DENIED**.

injury, Wells Fargo argues that Plaintiffs could have avoided any of the charges at issue simply by staying current on their payments. Further, it argues that there are countervailing benefits to conducting the property inspections and that the third-party real estate brokers and Premiere Asset Services "perform[] a service." (*Id.* at 17 (citing SAC ¶¶ 51–52).)

Plaintiffs identify both the second and third tests to measure whether the alleged conduct is unfair. (Opp. at 15–17.)[11] Plaintiffs argue they have satisfied these tests with their allegations that: (i) the BPOs and property inspection fees contained undisclosed mark-ups; (ii) that the assessment of these illegitimate fees made it impossible for borrowers to become current on their loan, throwing them further into default; and (iii) the undisclosed nature of the fees makes it impossible have avoided them. (*See* SAC ¶¶ 40–42 & 97.) As such, the injury is substantial, not outweighed by any countervailing benefits, and practically could not have been avoided. (*Id.* at 17.)

At this juncture, the Court need only determine whether the allegations, taken as true, state a plausible claim. *Twombly*, 550 U.S. at 570; *Iqbal*, 556 U.S. at 678. Given the nature of the alleged scheme, the Court finds that Plaintiffs' allegations of Wells Fargo's conduct, as pled, satisfy the second test, namely the conduct is plausibly immoral, unethical, oppressive, unscrupulous, or substantially injurious to consumers. As to the third test, the Court cannot find as a matter of law that the supposed benefits outweigh Plaintiffs' injuries. (*See* SAC ¶ 51 ("[Premiere] is really just a vehicle that provides Wells Fargo & Company with a false pretense for obtaining money from borrowers so that it can earn undisclosed profits."); *see also id.* ¶ 56 (alleging Premiere is "a phony third party vendor").)[12]

---

[11] Neither party argues that the first test—where an unfair practice implicates a public policy that is "tethered to specific constitutional, statutory, or regulatory provisions"—applies here. *See Harmon*, 2011 WL 5914004, at *8. Because the parties do not apply this test, the Court will not address it further.

[12] Defendants' cited authorities are inapposite because they either arose at the summary judgment stage, in the context of another statute, and/or did not involve the level of fraud and concealment alleged here. *See Walker v. Countrywide Home Loans, Inc.*, 98 Cal. App. 4th 1158, 1175 (Cal. Ct. App. 2002) (holding on summary judgment motion that inspection fees in that case did not violate UCL, based in part on evidence submitted by defendant regarding legitimacy of the conduct and showing that conduct was not unfair or unethical); *Sosa v. Chase Manhattan Mortg. Corp.*, 348 F.3d 979, 983–84 (11th Cir. 2003) (affirming dismissal of Real Estate Settlement Procedures Act ["RESPA"] claim because, at a minimum, "Chase benefitted the borrowers by arranging for third

Whether this claim ultimately prevails in Wells Fargo's favor is not currently at issue. Taking the allegations as a whole and in the light most favorable to Plaintiffs, they have alleged sufficient facts to state a claim under the second and third tests. Wells Fargo's Motion to Dismiss the UCL claim based on the "unfair" prong is **DENIED**.

### b. Fraudulent Prong of UCL

A business practice is "fraudulent" within the meaning of Section 17200 if "members of the public are likely to be deceived." *Comm. on Children's Television v. General Foods Corp.*, 35 Cal. 3d 197, 211 (1983) (internal citations omitted). A UCL claim based on a fraudulent business practice is distinguishable from a claim for common law fraud. *Morgan v. AT&T Wireless Servs., Inc.*, 177 Cal. App. 4th 1235, 1255 (Cal. Ct. App. 2009). "Allegations of actual deception, reasonable reliance, and damage are unnecessary." *Comm. on Children's Television*, 35 Cal. 3d at 211. The fraudulent practice "may be based on representations to the public which are untrue, and also those which may be accurate on some level, but will nonetheless tend to mislead or deceive. . . . A perfectly true statement couched in such a manner that it is likely to mislead or deceive the consumer, such as by failure to disclose other relevant information, is actionable under the UCL.'" *Klein v. Chevron U.S.A., Inc.*, 202 Cal. App. 4th 1342, 1380 (Cal. Ct. App. 2012) (internal citations and quotations omitted; alteration in original).

Wells Fargo argues Plaintiffs have not pled their "fraudulent" UCL claim with particularity. (Mot. at 17.) It focuses specifically on the SAC at paragraphs 113 and 114, which respectively state that "mortgage invoices, loan statements, or proofs of claims provided to borrowers fraudulently concealed the true nature of assessments made on borrowers' accounts" and that Wells Fargo tells borrowers "in statements and other documents[] that such fees are '[i]n accordance with the terms of [their] mortgage.'" (First and third alteration supplied; *see* Mot. at 17.) Based on these allegations, Wells Fargo first concludes "[i]t is well established . . . that misrepresentations of law

party contractors to perform the deliveries" that were the subject of the charges); *Morales v. Countrywide Home Loans, Inc.*, 531 F. Supp. 2d 1225, 1228 (C.D. Cal. 2008) ("While such repricing or mark-ups could be actionable for *other reasons* (e.g. fraud), it is not a violation of RESPA.") (emphasis supplied); *Davis*, 179 Cal. App. 4th at 584 (no unfair business practice based on "conduct . . . in charging successive late fees for successive late payments").

are not actionable as fraud, because statements of law are considered merely opinions and may not be relied upon absent special circumstances not present here." (Mot. at 17.) Second, it concludes that the SAC alleges no facts supporting that Wells Fargo knew its BPOs or inspections were legally improper nor that it had *no* reasonable basis for stating the fees were consistent with the mortgage agreements and the law. (*Id.* at 17–18.)

In response, Plaintiffs argue that lesser specificity is required for a fraud by omission claim than a normal misrepresentation claim. (Opp. at 17.) In addition, Defendants have exclusive control over the particularized details of their conduct, including internal communications and the design of the scheme itself.

Although Plaintiffs' allegations do allege a fraud based in part on omissions, a plaintiff must still plead such claim with particularity. *Kearns*, 567 F.3d at 1126 ("Because the Supreme Court of California has held that nondisclosure is a claim for misrepresentation in a cause of action for fraud, it (as any other fraud claim) must be pleaded with particularity under Rule 9(b)."); *Marolda v. Symantec Corp.*, 672 F. Supp. 2d 992, 1002 (N.D. Cal. 2009) ("The Ninth Circuit has recently clarified that claims of nondisclosure and omission, as varieties of misrepresentations, are subject to the pleading standards of Rule 9(b)."). "When alleging fraud, a party must plead with particularity the circumstances constituting fraud, while conditions of the mind, such as knowledge and intent, *may be alleged generally*." *Marolda*, 672 F. Supp. 2d at 997 (emphasis supplied).

The Court believes that even under a particularity standard, Plaintiffs have alleged sufficient circumstances underlying the fraudulent practice such that Defendants have "notice of the particular misconduct . . . so that they can defend against the charge[s]." *Vess,* 317 F.3d at 1106 (internal citations omitted). In *Marolda*, a case involving false advertising, the district court held that "to plead the circumstances of omission with specificity, plaintiff must describe the content of the omission and where the omitted information should or could have been revealed, as well as provide representative samples of advertisements, offers, or other representations that plaintiff relied on to make her purchase and that failed to include the allegedly omitted information." 672 F. Supp. 2d at 1002. Here, Plaintiffs have alleged numerous instances where the omitted information could have been revealed—namely, in the mortgage agreements themselves, in the mortgage

statements reflecting the marked-up fees, or during communications with Wells Fargo where it told Plaintiffs that the fees were in accordance with their mortgage agreements. Plaintiffs provide specific dates on which they believe they were charged the marked-up fees, and allege they paid the fees without knowing their true nature. Plaintiffs describe the content of the omission as the failure to inform them that the fees were marked-up and that the majority of the fees ultimately went to Wells Fargo, and not third-party vendors performing the services. As to Defendants' knowledge and intent, which may be alleged generally, Plaintiffs allege that Wells Fargo executives designed the scheme, agreed to participate in the scheme, and concealed the scheme.

Taken together, the Court finds Plaintiffs adequately allege a fraudulent business practice that is likely to deceive the public. *Comm. on Children's Television*, 35 Cal. 3d at 211. True statements couched in a manner "likely to mislead or deceive the consumer, such as by failure to disclose other relevant information, [are] actionable under the UCL." *Klein*, 202 Cal. App. 4th at 1380 (internal quotations omitted).[13]

For these reasons, Wells Fargo's Motion to Dismiss the UCL claim based on the "fraudulent" prong is **DENIED**. The Motion to Dismiss the first claim for violation of the UCL is **DENIED** in its entirety.

### B. RICO Claims

#### 1. RICO Standing: 18 U.S.C. Section 1964(c) ("Section 1964")

The "[c]ivil remedies" provision of RICO permits "[a]ny person injured in his business or property by reason of a violation of [18 U.S.C.] section 1962 . . . [to] sue" and recover treble damages and the cost of the suit, including a reasonable attorney's fee. 18 U.S.C. § 1964(c). "To have standing under [Section] 1964(c), a civil RICO plaintiff must show: (1) that his alleged harm qualifies as injury to his business or property; and (2) that his harm was 'by reason of' the RICO violation, which requires the plaintiff to establish proximate causation." *Canyon County v.*

---

[13] The Court disagrees with Defendants' conclusion that no fraud occurred because the statements were, if anything, "misrepresentations of the law" (Mot. at 17 ("[S]tatements of the law are considered merely opinions and may not be relied upon absent special circumstances not present here.").) Wells Fargo ignores that under the fraudulent prong, statements that are true may still be deceptive or misleading. Moreover, it is premature for the Court to characterize the misrepresentations at issue here as ones relating to "law" only.

*Syngenta Seeds, Inc.*, 519 F.3d 969, 972 (9th Cir. 2008) (internal citations omitted).[14]

With regard to the requirement of injury to business or property, "[i]n the ordinary context of a commercial transaction, a consumer who has been overcharged can claim an injury to her property, based on a wrongful deprivation of her money. . . . Money, of course, is a form of property." *Id.* at 976 (internal citations omitted).[15]

For the same reasons that Wells Fargo's UCL standing argument fails, so does the RICO standing argument. Plaintiffs allege they paid the marked-up fees. Wells Fargo's argument that no "injury in fact" exists where the charges assessed were within the market rate is not persuasive. A consumer who has been overcharged can claim injury to property under RICO based on a wrongful deprivation of money, which is a form of property. *Canyon County*, 519 F.3d at 976; *see Dufour v. BE LLC*, No. C 09-03770 CRB, 2010 WL 2560409, at *11 (N.D. Cal. June 22, 2010) ("Plaintiffs here allege that they were deprived of their money based upon Defendants' conduct, which is sufficient.").

For these reasons, the Court **DENIES** Wells Fargo's Motion to the extent it seeks dismissal of the RICO claims based on lack of standing.

## 2. Second Claim: RICO Violation Under 18 U.S.C. Section 1962(c) ("Section 1962(c)")

Under Section 1962(c), "[i]t shall be unlawful for any person employed by or associated with any enterprise engaged in, or the activities of which affect, interstate or foreign commerce, to conduct or participate, directly or indirectly, in the conduct of such enterprise's affairs through a pattern of racketeering activity or collection of unlawful debt." To state a claim, a plaintiff must allege: "(1) conduct (2) of an enterprise (3) through a pattern (4) of

---

[14] Wells Fargo does not seek dismissal based on the "proximate cause" requirement of RICO standing, and thus the Court does not address that issue.

[15] However, where a plaintiff is a governmental entity not acting as a "consumer" but "to enforce the laws or promote the general welfare" the analysis is slightly different. *Canyon County*, 519 F.3d at 976–80. Canyon County sought to recover damages under RICO for monies it spent on public health care and law enforcement services for undocumented immigrants. *Id.* at 971. Financial loss in *that* specific context was insufficient to allege injury to one's "business or property." *Id.* at 975–76. Accordingly, the Ninth Circuit held that the county lacked RICO standing. *Id.* at 976–80.

racketeering activity." *Odom v. Microsoft Corp.*, 486 F.3d 541, 547 (9th Cir. 2007) (*en banc*). Racketeering activity is also referred to as the "predicate acts." *Living Designs, Inc. v. E. I. Dupont de Numours and Co.*, 431 F.3d 353, 361 (9th Cir. 2005). "Rule 9(b)'s requirement that '[i]n all averments of fraud or mistake, the circumstances constituting fraud or mistake shall be stated with particularity' applies to civil RICO fraud claims." *Edwards v. Marin Park, Inc.*, 356 F.3d 1058, 1065–66 (9th Cir. 2004) (internal citation omitted); *Moore v. Kayport Package Exp., Inc.*, 885 F.2d 531, 541 (9th Cir. 1989).

Wells Fargo challenges Plaintiffs' RICO claim for failure to allege sufficiently: (i) predicate acts of racketeering based on mail and wire fraud; and (ii) the existence of an enterprise. The Court will address each of the disputed elements in turn.

### a.      Predicate Acts of Racketeering Based on Mail and Wire Fraud

"Racketeering activity" has been explicitly defined to include "any act which is indictable" under 18 U.S.C. sections 1341 and 1343 ("Section 1341" and "Section 1343"), which prohibit mail and wire fraud, respectively. 18 U.S.C. § 1961(1).

Mail fraud occurs whenever a person, "'having devised or intending to devise any scheme or artifice to defraud,' uses the mail 'for the purpose of executing such scheme or artifice or attempting so to do.'" *See Bridge v. Phoenix Bond & Indem. Co.*, 553 U.S. 639, 647 (2008) (quoting Section 1341). To allege a claim for mail fraud under Section 1341, "it is necessary to show that (1) the defendants formed a scheme or artifice to defraud; (2) the defendants used the United States mails or caused a use of the United States mails in furtherance of the scheme; and (3) the defendants did so with the specific intent to deceive or defraud." *Schreiber Distrib. Co. v. Serv-Well Furniture Co., Inc.*, 806 F.2d 1393, 1399–1400 (9th Cir. 1986); *Miller v. Yokohama Tire Corp.*, 358 F.3d 616, 620 (9th Cir. 2004) (quoting *Schreiber*).[16] The elements for wire fraud under Section 1343 are substantively the same as mail fraud. *See Schreiber*, 806 F.2d at 1400. The gravamen of both offenses is the scheme to defraud. *Bridge*, 553 U.S. at 647; *Schreiber*, 806 F.2d

---

[16] The Supreme Court has held that "[a] plaintiff asserting a RICO claim predicated on mail fraud *need not show*, either as an element of its claim or as a prerequisite to establishing proximate causation, that it relied on the defendant's alleged misrepresentations." *Bridge*, 553 U.S. at 661 (emphasis supplied).

at 1400 (purpose of the mail and wire fraud statutes "is to proscribe the use of the mails or wires in any situation where it is closely entwined with fraudulent activity").

As for the mailing requirement, use of the mails need not be an essential element of the scheme. *Schmuck v. United States,* 489 U.S. 705, 710 (1989). Rather, any "mailing that is incident to an essential part of the scheme" (*id.* at 712 [internal citations and quotations omitted]) or "a step in [the] plot" (*id.* at 710 [alteration in original; internal citation omitted]) satisfies the mailing element. In fact, "[i]nnocent" mailings—those that "contain no false information"—or routine mailings may satisfy this element. *Id.* at 715. Specific intent is satisfied by "the existence of a scheme which was reasonably calculated to deceive persons of ordinary prudence and comprehension, and this intention is shown by examining the scheme itself." *Schreiber*, 806 F.2d at 1400 (internal citations and quotations omitted).

Wells Fargo argues that the predicate acts of racketeering—*i.e.*, mail and wire fraud—are insufficiently pled.[17] While the SAC alleges that Wells Fargo sent Plaintiffs monthly statements showing charges that do not reflect the actual costs of services, Defendants argue that "other courts have upheld property inspection practices and fees similar to Wells Fargo's." (Mot. at 19.) As with the UCL claim, Wells Fargo contends that these inspections are "reasonable" and that, at most, the alleged practices amount to a breach of contract, *not a fraudulent scheme* prohibited by the mail or wire fraud statutes.[18] (Mot. at 19–20.) In addition, Wells Fargo asserts it was under "no duty to specifically identify each charge on its monthly statements beyond 'other fees'" and that, although required, Plaintiffs fail to allege a duty to itemize to charges or disclose marked-up fees. (*Id.* at 20;

---

[17] The Court notes that Wells Fargo does not seek dismissal based on a failure to allege a *pattern* of racketeering activity. As such, the Court will not address the requirements of a pattern under Section 1962(c).

[18] The Court is, again, not persuaded by Wells Fargo's arguments that the fees were overall "reasonable" and that the alleged conduct simply amounts to breach of contract. *See United States v. Ali*, 620 F.3d 1062, 1071 (9th Cir. 2010) ("Defendants counter that, at most, they are only in breach of contract with Microsoft and that a contract dispute is not itself grounds for mail or wire fraud. . . . We do not read [Defendants' cited authority] to preclude Defendants' criminal prosecution in this case. The simple fact that Microsoft *may* have brought a civil contract claim against Defendants does not immunize Defendants' conduct from criminal prosecution if that conduct meets the elements of the criminal statutes as well.") (emphasis in original).

Reply at 10–11.)  Without a legal obligation to disclose, Wells Fargo argues that Plaintiffs fail to state a fraudulent scheme under *California Architectural Bldg. Products, Inc. v. Franciscan Ceramics, Inc.*, 818 F.2d 1466, 1471–72 (9th Cir. 1987) ("*California Architectural*").  (Mot. at 20 n.73; Reply at 10–11.)

Plaintiffs disagree.  They identify that the scheme is meant to conceal the unlawful assessment of improperly marked up fees for default-related services, and that Wells Fargo has used the mail and wires to engage in said scheme.  (Opp. at 20.)  In the SAC at paragraph 111, Plaintiffs allege: "[t]hrough the mail and wire, the Wells Fargo Enterprise provided mortgage invoices, loan statements, payoff demands, or proofs of claims to borrowers, demanding that borrowers pay fraudulently concealed marked-up fees for default-related services, such as BPOs or property inspections.  Defendants also accepted payments and engaged in other correspondence in furtherance of their scheme through the mail and wire."  In addition, they allege that by "[u]sing false pretenses, identifying the fees on mortgage invoices, loan statements, or proofs of claims only as 'Other Charges' or 'Other Fees' to obtain full payments from borrowers, Defendants disguised the true nature of these fees and omitted the fact that the fees include undisclosed mark-ups.  By omitting and fraudulently concealing the true nature of amounts purportedly owed in communications to borrowers, Defendants made false statements using the Internet, telephone, facsimile, United States mail, and other interstate commercial carriers."  (SAC ¶ 113.)

Defendants' reliance on *California Architectural* regarding a duty to disclose is distinguishable.  There, on a motion for summary judgment, the Ninth Circuit held that a tile manufacturer did not have an independent duty to disclose to customers its contingency plan to close its business.  Significant evidence justified summary judgment for the manufacturer because the evidence showed it was making significant, honest efforts to remain open.  The court found no direct evidence (*i.e.*, no "smoking gun") of a "preconceived plan to close."  818 F.2d at 1470–72 (finding that business correspondence and officers' assurances likewise did not permit a reasonable trier of fact to infer fraud).  The Ninth Circuit affirmed that no factual basis existed to support that the manufacturer had any intent to defraud as required for mail and wire fraud.  *Id.*

Here, the circumstances are markedly different.  Defendants' alleged omissions are

interwoven with misrepresentations. Wells Fargo's failure to advise Plaintiffs of the actual cost of the BPOs is linked to the inflated cost that Wells Fargo expressly demanded as "reimbursement" in monthly mortgage statements and other documents. When asked by borrowers to substantiate the amounts demanded for reimbursement, Defendants responded that the fees were charged pursuant to agreements that borrowers had previously signed. As alleged, the fraud is equally about the failure to disclose material information as it is that the amounts demanded on mortgage statements were false because they did not correspond to the actual amounts owed pursuant to the mortgage agreements relied upon by Defendants.

The dual nature of the fraud must also be considered in light of the allegations that when asked to substantiate the charges, Defendants directed Premiere to create fictitious invoices. (SAC ¶¶ 52–56, 111 & 113.) Plaintiffs allege that Premiere did so such that it appeared Wells Fargo was merely seeking reimbursement for payments made to independent entities. Although creating the impression that Wells Fargo paid third parties pursuant to the invoices, Wells Fargo never paid those invoices and instead paid an agreed-upon lesser amount (which had been coordinated by Premiere). Wells Fargo ultimately collected the higher, invoiced amount from borrowers based, at least in part, on Premiere's conduct.

Plaintiffs have sufficiently alleged a fraudulent scheme as is required for mail and wire fraud.[19] Accordingly, the Court **DENIES** Wells Fargo's Motion to Dismiss the RICO claim based on failure to allege predicate acts of racketeering activity.

### b.  Existence of an Enterprise

Section 1962(c) targets conduct by "any person employed by or associated with any enterprise . . . ." The Supreme Court has recognized the basic principle that Section 1962(c) imposes a distinctiveness requirement—that is, one must allege two distinct entities: a "person" and an "enterprise"[20] that is not simply the same "person" referred to by a different name.

---

[19] Based on the allegations in the SAC, Plaintiffs have sufficiently alleged *use* of the mail and wires as incident to an essential part of the scheme. *Schmuck,* 489 U.S. at 711 & 712.

[20] A "'person' includes any individual or entity capable of holding a legal or beneficial interest in property." 18 U.S.C. § 1961(3). An "'enterprise' includes any individual, partnership, corporation,

*Cedric Kushner Promotions, Ltd. v. King*, 533 U.S. 158, 161 & 166 (2001) (holding that under Section 1962(c), distinctiveness is satisfied and RICO applies "when a corporate employee unlawfully conducts the affairs of the corporation of which he is the sole owner—whether he conducts those affairs within the scope, or beyond the scope, of corporate authority"). The Supreme Court noted that the distinctiveness requirement was consistent with a prior holding that liability "depends on showing that the defendants conducted or participated in the conduct of the '*enterprise's* affairs,' not just their *own* affairs." *Id.* at 163 (quoting *Reves v. Ernst & Young,* 507 U.S. 170, 185 (1993)).

An enterprise that is not a legal entity is commonly known as an "association-in-fact" enterprise. *Mitsui O.S.K. Lines, Ltd. v. Seamaster Logistics, Inc.*, 871 F. Supp. 2d 933, 939 n.6 (N.D. Cal. 2012). In *Odom v. Microsoft Corp.*, the Ninth Circuit held that "an associated-in-fact enterprise under RICO does not require any particular organizational structure, separate or otherwise." 486 F.3d 541, 551 (9th Cir. 2007) (no requirement of an "ascertainable structure"). "[A]n associated-in-fact enterprise is 'a group of persons associated together for a common purpose of engaging in a course of conduct.'" *Id.* at 552 (quoting *United States v. Turkette*, 452 U.S. 576, 583 (1981)); *Boyle v. United States*, 556 U.S. 938, 944 (2009). Ninth Circuit precedent requires proof of three elements: (i) a common purpose of engaging in a course of conduct; (ii) evidence of an "ongoing organization, formal or informal"; and (iii) evidence that the various associates function as a continuing unit. *Odom*, 486 U.S. at 552 (citing *Turkette*).[21]

The parties' arguments are summarized as follows: Wells Fargo principally argues that the distinctiveness requirement is not met and, at best, Plaintiffs have only alleged that Wells Fargo

association, or other legal entity, and any union or group of individuals associated in fact although not a legal entity." 18 U.S.C. § 1961(4).

---

[21] The Ninth Circuit in *Odom* noted that the definition of an enterprise is, based on its text, "not very demanding." 486 F.3d at 548; *Boyle*, 556 U.S. at 944 ("the very concept of an association in fact is expansive"). In fact, the Supreme Court has recognized that "RICO is to be read broadly" and is to "be liberally construed to effectuate its remedial purposes." *Sedima, S.P.R.I v. Imrex Co., Inc.*, 473 U.S. 479, 497–98 (1985) (quoting Pub. L. 91–452 § 904(a), 84 Stat. 947 (1970)); *see Boyle*, 556 U.S. at 946 (association-in-fact enterprise must have three structural features: a purpose; relationships among those associated with the enterprise; and longevity sufficient to permit these associations to pursue the enterprise's purpose).

participated in their own affairs, not that of the enterprise.  (Mot. at 20–21.)  Plaintiffs "treat[]

Wells Fargo Bank, N.A. and Wells Fargo & Co. as the "person[,]" but also "try to create a separate

'association-in-fact' enterprise comprised of the Wells entities and vendors and brokers they utilize

to perform inspections and BPOs."  (*Id.* at 21.)  Relying primarily on Seventh Circuit authority,

Wells Fargo argues that distinctiveness fails because the vendors and brokers "operated only as

Wells Fargo's agents" by providing requested services "in the course of [Wells Fargo's] normal

business dealings."  (*Id.*)  Further, the alleged misrepresentations, omissions, and use of the mail or

wires—including the issuance of mortgage statements and other loan documents—were performed

by Wells Fargo alone as part of its normal lending activities.  (*Id.* at 21–22; Reply at 12.)  Wells

Fargo also argues that Plaintiffs fail to allege that the vendors and brokers acted with a "common

purpose" to engage in fraudulent conduct.  (Reply at 13.)  The Court notes that Wells Fargo only

briefly addresses common purpose, and does not address the remaining elements under *Odom* of an

ongoing organization or continuing unit.  As these elements are not at issue, the Court will not

address them.

Plaintiffs respond that they are not required to allege any more about the enterprise than that

they have.  Specifically, Wells Fargo participated by establishing the policies directing the non-

Wells Fargo property preservation vendors and real estate brokers, who performed the BPOs, to

carry out the scheme.  (Opp. at 21.)  Citing *Odom*, Plaintiffs emphasize that an association-in-fact

enterprise does not require any particular organizational structure.  (*Id.*)

Here, Plaintiffs have met the distinctiveness and common purpose requirements.  They have

explicitly alleged an association-in-fact enterprise (referred to in the SAC as the "Wells Fargo

Enterprise") comprised of "Wells Fargo & Company, Wells Fargo Bank, N.A., including their

directors, employees, and agents, along with their 'property preservation' vendors – including First

American Financial Corporation d/b/a First American Field Services, and Fidelity National

Financial, Inc. d/b/a Fidelity National Field Services – and the real estate brokers who provide

BPOs for Wells Fargo."  (SAC ¶ 104.)  Plaintiffs also allege in paragraph 49 that Premiere Asset

Services "participates as a member of the enterprise."  The Wells Fargo Enterprise "is an ongoing,

continuing group or unit of persons and entities associated together for the *common purpose* of

limiting costs and maximizing profits by fraudulently concealing assessments for unlawfully marked-up fees for default-related services on borrowers' accounts." (*Id.* ¶ 105 (emphasis supplied).) Plaintiffs have also explicitly alleged that the enterprise members, including the vendors and brokers, "devised a scheme to defraud borrowers and obtain money from them by means of false pretenses." (*Id.* ¶ 46.)

Plaintiffs allege conduct specifically between and among Wells Fargo Defendants *and* at least one other entity, namely Premiere, which supports the requirement that the enterprise members have "associated together for a common purpose." As stated above, the alleged common purpose here was to limit costs and maximize profits through concealment of marked-up fees. As alleged, this scheme to profit is a sufficient common purpose. Moreover, Wells Fargo and Premiere each played different roles from each other (and from the third-party vendors and brokers) to accomplish their purpose.

Premiere sub-contracted the BPOs requested by Wells Fargo to different local real estate brokers and vendors. (SAC ¶ 52.) Premiere served a critical role connecting Defendants, who designed the scheme to defraud, with third-party vendors and brokers, who provided the default-related services at the core of the scheme. Without the third-party vendors' and brokers' involvement, Wells Fargo would have been unable to seek reimbursement of fees in the first place. Thus, the existence of Premiere itself, its creation of fictitious invoices to substantiate fees, Wells Fargo's reliance on those invoices to justify the marked-up fees, and Wells Fargo's payment of lesser amounts—independent of the invoices—directly to third-party vendors and brokers satisfy the distinctiveness requirement. Plaintiffs have sufficiently alleged that Defendants have engaged in enterprise conduct, not simply their own affairs.

This case is akin to *Young v. Wells Fargo & Co.*, 671 F. Supp. 2d 1006 (S.D. Iowa 2009), where the court examined an alleged scheme "center[ing] around Wells Fargo's use of a computer system that . . . [wa]s programmed to automatically assess excessive mortgage servicing fees following late payments." *Id.* at 1012. In that case, the court held:

> Congress clearly intended RICO liability to extend to situations where one entity directs the formation of a RICO enterprise and then makes use of the association to further a pattern of unlawful activity, even where portions of the unlawful activity

do not issue directly from the RICO enterprise. Here, Plaintiffs allege that Wells Fargo conducted the affairs of the enterprise by ordering the property inspections, used its association-in-fact business arrangement with the property inspection vendors to conduct its unlawful practice of imposing excessive fees on the mortgagors, and engaged in mail and wire fraud to collect payments for the enterprise's benefit. Accordingly, the Court concludes that the RICO enterprise as pleaded by Plaintiffs satisfies the requirements set forth under 18 U.S.C. § 1962(c).

*Id.* at 1028 (internal citations to complaint omitted). Wells Fargo's challenge that its actions were simply "normal business dealings" without the existence of an enterprise or any "common purpose" is fact-determinative and cannot be resolved at this juncture.

For the foregoing reasons, the Court **DENIES** Wells Fargo's Motion to Dismiss Plaintiffs' second claim for violation of RICO under Section 1962(c).

### 3. Third Claim: Conspiracy to Violate RICO Under 18 U.S.C. Section 1962(d) ("Section 1962(d)")

Under Section 1962(d), "[i]t shall be unlawful for any person to conspire to violate any of the provisions of subsection (a), (b), or (c) of this section." "To establish a violation of section 1962(d), Plaintiffs must allege either an agreement that is a substantive violation of RICO or that the defendants agreed to commit, or participated in, a violation of two predicate offenses." *Howard v. America Online Inc.*, 208 F.3d 741, 751 (9th Cir. 2000) (affirming district court's holding that failure to adequately plead substantive RICO violation precluded claim for conspiracy). The conspiracy defendant "must intend to further an endeavor which, if completed, would satisfy all of the elements of a substantive criminal offense, but it suffices that he adopt the goal of furthering or facilitating the criminal endeavor." *Id.* (quoting *Salinas v. United States,* 522 U.S. 52, 65 (1997)). Moreover, the defendant must also have been "aware of the essential nature and scope of the enterprise and intended to participate in it." *Id.* (quoting *Baumer v. Pachl,* 8 F.3d 1341, 1346 (9th Cir. 1993).

As discussed *supra*, the Court finds that Plaintiffs have sufficiently alleged a substantive RICO violation under Section 1962(c) and that Defendants agreed to participate in that RICO violation. Having developed and designed the scheme, Plaintiffs meet the pleading standard of intent to further the RICO violation and awareness of the scope of the enterprise. (*See* SAC ¶ 127 (Plaintiffs allege that Defendants "directed and controlled the affairs of the Wells Fargo Enterprise,

were aware of the nature and scope of the enterprise's unlawful scheme, and they agreed to participate in it.").)

For these reasons, Wells Fargo's Motion to Dismiss the third claim for conspiracy under Section 1962(d) is **DENIED**.

### C. Fourth Claim: Unjust Enrichment

Defendants argue that there is no viable unjust enrichment claim under either California or Louisiana law because Plaintiffs explicitly allege Wells Fargo violated the disclosures in the mortgage agreements. (Mot. at 23.) Specifically, the "quasi-contract theory of recovery [for unjust enrichment] cannot lie where a valid express contract covering the same subject matter exists between the parties." (*Id.*; *see* Reply at 13–14.) Even if the claim does exist, Wells Fargo contends it fails because the alleged practices cannot be deemed unjust as pled. (Mot. at 24.)

Wells Fargo never specifically argues whether California or Louisiana law applies—only that either way, a viable claim has not been stated. (*Id.* at 23.) *Paracor Fin., Inc. v. Gen. Elec. Capital Corp.*, 96 F.3d 1151, 1167 (9th Cir. 1996) (in California, "unjust enrichment is an action in quasi-contract, which does not lie when an enforceable, binding agreement exists defining the rights of the parties"); *Drs. Bethea, Moustoukas & Weaver LLC v. St. Paul Guardian Ins. Co.*, 376 F.3d 399, 408 (5th Cir. 2004) ("Louisiana law provides that no unjust enrichment claim shall lie when the claim is based on a relationship that is controlled by an enforceable contract.").

Referring only to California law, Plaintiffs argue they have pled the required elements of a claim for unjust enrichment and the viability of the claim is unaffected by the existence of the agreements. (Opp. at 24 (citing *In re Countrywide Fin. Corp. Mortg. Mktg. & Sales Practices Litig.*, 601 F. Supp. 2d 1201, 1220–21 (S.D. Cal. 2009)).) In *In re Countrywide*, the district court rejected both of defendants' arguments for dismissal of an unjust enrichment claim, holding that "[a]lthough there are contracts at issue in this case, none appears to provide for the specific recovery sought by Plaintiffs' unjust enrichment claim." *Id.* at 1220–21 (noting conflicting case law regarding whether California recognizes unjust enrichment as a claim and declining to conclude the claim was not legally cognizable).

It is premature for the Court to take a position on whether this action derives from the "same

subject matter" as the agreements such that a claim for unjust enrichment is unavailable. Moreover, the Court declines to engage in a choice of law analysis at this juncture. Plaintiffs will ultimately bear the burden of establishing whether this claim can be certified as a nationwide class. Even so, under either California or Louisiana law, Plaintiffs have pled sufficient facts to support a claim for unjust enrichment.[22] Whether there was legal justification for Wells Fargo's conduct such that it was "unjust" is another factual issue that should proceed beyond the pleadings.

For these reasons, the Court **DENIES** Wells Fargo's Motion to Dismiss the fourth claim for unjust enrichment.

### D.    Fifth Claim: Fraud

Defendants argue that Louisiana law applies to the fraud claim and reiterate various arguments already made with respect to RICO. Specifically, Plaintiffs have failed to allege a duty to disclose or a special relationship that would give rise to a duty to disclose. (Mot. at 24; *Becnel v. Grodner*, 2007-1041 (La. App. 4 Cir. 4/2/08), 982 So. 2d 891, 894 (where a fraud claim is based on an omission, "there must be a duty to speak or disclose information").) In addition, Wells Fargo argues that Plaintiffs fail to specify the material fact that was misrepresented, have only identified statements of legal opinion, and fail to allege when and how each Plaintiff relied upon the purported misrepresentation or omission.

Plaintiffs do not specifically address which state's law applies, but argue generally that they have alleged injury and reliance. Plaintiffs identify the mortgage contracts as containing "disclosures" regarding what occurs if borrowers default, and argue it is not disclosed that Wells Fargo will mark-up costs. (Opp. at 25.)

---

[22] A claim for unjust enrichment requires a plaintiff to plead two elements: "receipt of a benefit and unjust retention of the benefit at the expense of another." *Lectrodryer v. SeoulBank*, 77 Cal. App. 4th 723, 726 (Cal. Ct. App. 2000); *see also Hirsch v. Bank of America, N.A.*, 107 Cal. App. 4th 708, 721–22 (Cal. Ct. App. 2003) (valid claim for unjust enrichment stated where banks collected and retained excessive fees passed through to them by title companies at the expense of plaintiffs); *Transp. Ins. Co. v. Leavines*, 94-651 (La. App. 5 Cir. 5/10/95), 656 So. 2d 720, 721 (unjust enrichment claim under Louisiana law requires proving that: "(1) defendant was enriched, (2) plaintiff was impoverished, (3) there is a connection between the defendant's enrichment and the plaintiff's impoverishment, (4) there was no legal cause or justification for the enrichment and (5) there is no other remedy available for the plaintiff").

For the reasons set forth above, the Court finds that regardless of whether Plaintiffs identify a specific "duty to disclose," the omissions and misrepresentations are inextricably tied together such that the demands for reimbursement of fees in Wells Fargo's monthly mortgage statements are akin to misrepresentations. Wells Fargo sought reimbursement from Plaintiffs based on fictitious invoices prepared by Premiere at Wells Fargo's direction. However, Wells Fargo did not actually pay those invoices, and instead directly paid third parties for a lesser amount—all of which occurred by a plan of Defendants' design. (SAC ¶¶ 52–56, 111 & 113.) Plaintiffs have pled sufficient detail in the SAC under Rule 9(b) to explain why the mortgage statements and explanation of fees were false and misleading (*In re GlenFed*, 42 F.3d at 1548), and Defendants have sufficient notice of the alleged misconduct such that they can defend themselves in this action (*Vess*, 317 F.3d at 1106).

The Court need not engage in a choice of law analysis at this time because under either state's law, a claim for fraud is sufficiently pled.[23] Moreover, as noted above, it will be Plaintiffs' ultimate burden to establish whether this fraud claim can be certified as a nationwide class.

For the foregoing reasons, the Court **DENIES** Wells Fargo's Motion to Dismiss the fifth claim for fraud.

## III. CONCLUSION

For the foregoing reasons, the Court **DENIES** Wells Fargo's Motion to Dismiss. Wells Fargo shall file an answer to the SAC within fourteen (14) days. This Order terminates Dkt. No. 66.

**IT IS SO ORDERED**.

Dated: April 25, 2013

**YVONNE GONZALEZ ROGERS**
**UNITED STATES DISTRICT COURT JUDGE**

---

[23] "The elements of a cause of action for fraud in California are: "(a) misrepresentation (false representation, concealment, or *nondisclosure* ); (b) knowledge of falsity (or 'scienter'); (c) intent to defraud, i.e., to induce reliance; (d) justifiable reliance; and (e) resulting damage." *Kearns*, 567 F.3d at 1126 (quoting *Engalla*, 15 Cal. 4th at 974) (emphasis supplied by *Kearns*). Under Louisiana law, a claim for fraud requires: (1) a misrepresentation of material fact; (2) made with the intent to deceive; (3) causing justifiable reliance with resultant injury. *Becnel*, 982 So. 2d at 894.